# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

GILES ALBERT NADEY, JR.,
Defendant and Appellant.

S087560

Alameda County Superior Court
129807

June 17, 2024
(rehearing denied September 13, 2024;
reposted with Supreme Court order and statement)

Justice Corrigan authored the opinion of the Court, in which Chief Justice Guerrero and Justices Kruger, Groban, and Jenkins concurred.

Justice Liu filed a dissenting opinion, in which Justice Evans concurred.

PEOPLE v. NADEY

S087560


Opinion of the Court by Corrigan, J.


Defendant Giles Albert Nadey was convicted of one count of unlawful sodomy and one count of first degree murder for the killing of Terena Fermenick. (Pen. Code, §§ 187, 286, former subd. (c).)[1] The jury found that both offenses were committed with the use of a knife (§ 12022, subd. (b)) and the murder occurred during the commission of unlawful sodomy (§ 190.2, subd. (a)(17)(D)). After the first jury deadlocked on penalty, a second jury returned a verdict of death. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. BACKGROUND

### A. *Guilt Phase*

1. *Prosecution Evidence*

Terena Fermenick was sexually assaulted and killed on January 18, 1996. Her husband, Donald, had just been named a minister for the Church of Christ in Alameda.[2] The couple were planning to move from Donald's parents' home into the minister's residence. On the day of the murder, Terena had arranged for Skyline Chem-Dry to clean the carpets before the move. The job was assigned to defendant.

---

[1] All undesignated statutory references are to the Penal Code.

[2] Because they share a surname, we refer to the Fermenicks by their given names.

1

The cleaning was scheduled to begin between 2:00 and 4:00 p.m. Terena left the parents' home in Pleasanton around noon and brought the couple's five-month-old daughter, Regan, with her. Terena called Donald's mother around 1:30 p.m. to say she had arrived safely but the carpet cleaner was not there. When she expressed concern about being alone in the house with a stranger, Donald's mother suggested she leave while the cleaner worked and come back later to pay him. Terena went to browse at a nearby antiques store but left around 2:05 p.m., saying she was late to meet with a carpet cleaner. A Skyline Chem-Dry work order states that the job began at 2:16 p.m. A check indicated Terena purchased diapers at a nearby grocery store at 3:32 p.m. The carpet cleaning work order, completed by defendant and signed by Terena, indicates that the cleaning concluded at 3:54 p.m.

Donald had worked a night shift at his second job and did not wake that day until 4:00 p.m. He called the minister's residence around 4:30 p.m. but received no response. He called unsuccessfully several more times that evening. When Terena had not arrived by 8:45 p.m., Donald borrowed his father's car and drove to Alameda, arriving around 9:15 p.m. He saw Terena's car parked nearby and found Regan asleep in her car seat. Regan's diaper was very soiled, suggesting it had not been changed for some time. Donald grabbed the baby and walked around the outside of the house, looking for Terena. He peered through a window and saw Terena lying on the floor. Having no key, he kicked in a window to gain entry. He screamed upon finding Terena's "cold, lifeless" body and called 911. Police arrived around 9:30 p.m. They removed the baby, handcuffed Donald, and secured the scene. Donald was taken to the

hospital for a sexual assault examination and then questioned at the police station.

Terena's body lay face down on the family room floor. She was nude except for blue jeans and a pair of underpants positioned around her ankles. In the primary bedroom, the bed was stained with human feces and a large amount of blood. The mattress foam displayed bloody swipe marks, suggesting an implement had been wiped on it. Terena's wallet, a credit card, and a pen lay on top of the bedding. Her nursing bra, undershirt, and sweatshirt had been removed and left in a heap on the bed. Her purse, a tennis shoe, and the Skyline Chem-Dry work order lay on the floor next to the bed. A blood trail led from the bed, through a hallway, to her body in the family room. A sheathed hunting knife was found behind a set of blinds in the primary bedroom. No fingerprints were found on the knife, which bore no visible bloodstains. Donald testified he had previously found the knife when he and Terena were cleaning out the house, and he had placed it on the windowsill. A serrated paring knife was recovered from a different bedroom, but it was not tested for fingerprints.

The autopsy revealed one deep incised wound to the left side of Terena's neck, as well as seven superficial neck lacerations, defensive wounds on her fingers and hands, and two incised wounds to her torso. Her jugular vein had been completely severed, causing her death. A person generally dies within three to five minutes after infliction of such an injury. There were also five lacerations around Terena's anus consistent with the insertion of a penis. These injuries were inflicted before death. There was fecal matter present around the anus. Its presence could have been caused by sodomy.

The prosecution theorized Terena was killed shortly after 3:54 p.m., when she signed the work order. A McDonald's bag had been found in Terena's car, and her stomach contents were consistent with having eaten a hamburger. The food did not appear digested and could have been eaten less than half an hour before her death.

Defendant's supervisor testified that defendant left for the Fermenick cleaning job around 1:45 p.m. He was wearing white canvas shoes, blue pants, a white Skyline Chem-Dry work shirt, and an old yellow raincoat. A small job of this nature would typically take an hour to an hour and a half. Skyline employees were supposed to call the office when a job was finished. Defendant called around 4:15 or 4:30 p.m. with that report. He said he had stopped by a Jack-in-the-Box in Oakland and was calling from the area. The secretary asked him to pick up cigarettes for her on his way back. Defendant returned with the cigarettes between 4:30 and 4:50 p.m. and behaved normally. He turned in the completed work order for the Fermenick job and a $184 check signed by Terena. Defendant had noted on the work order that he started the cleaning job at 2:16 p.m. and completed it at 3:54 p.m. The supervisor noticed that defendant was missing his raincoat and asked about it. Defendant said he had left it in the Jack-in-the-Box restroom. Police went there the next day but found no raincoat.

The day after the murder, the police contacted Skyline Chem-Dry and asked that the person who had cleaned the Fermenick house come in for questioning. Defendant went to the station and gave a tape-recorded statement. The next day, police obtained a search warrant for defendant's home and person.

4

A Plier's Plus multifunctional tool was found in defendant's bedroom. The testifying pathologist opined that Terena's wounds could have been produced by the blade on this tool, though no bloodstains were detected on it. A writing tablet in defendant's nightstand contained drawings of male and female genitalia and a letter describing defendant's experience with anal sex. Pornographic magazines, handwritten material, and videocassettes were also found in defendant's bedroom, along with a book of pornographic stories, including one related to sodomy. Telephone records from the Fermenick residence in Alameda revealed that calls had been placed from their phone to two 1-900 numbers at 3:07 and 3:08 p.m., while defendant was cleaning the carpets. The phone numbers corresponded to the Real Swingers Hot Line and the Info Service Entertainment Line. Each call lasted under a minute.

While his house was searched, defendant was taken to the hospital for a sexual assault examination. His genital area appeared dirty and encrusted with flaky material. There was a reddened abrasion on the head of his penis. A DNA expert later determined from two types of testing that semen present in swabs taken from Terena's rectal area and stains on her jeans matched defendant's DNA. From restriction fragment length polymorphism (RFLP) testing, the probability of this match occurring at random was one in 32 billion Caucasians.[3] Based on polymerase chain reaction (PCR) testing, the probability of the match identified was one in 150,000 Caucasians. Sperm was also recovered from Terena's vulvar area. Defendant was identified as the major donor of DNA in this sample, with a

_____

[3] It is evident from cross-examination of the DNA expert that defendant's ethnic heritage is predominantly Caucasian.

match probability of one in 1.6 million Caucasians. DNA recovered from one vulvar swab indicated an additional minor donor, who was neither defendant nor Terena's husband Donald. Based on the unclean condition of defendant's genital region, the prosecution theorized that defendant may have transferred the foreign DNA onto Terena's body when he assaulted her.

After defendant's sexual assault examination, he was placed under 24-hour police surveillance. At one point, defendant initiated a conversation with the officers stationed outside the home he shared with his mother. Saying he wanted to cooperate, he remarked, "I must be the lead suspect in the case because I was the last one at the house." He asked if police could arrest him at his workplace, rather than at home, to avoid embarrassing his mother. He also requested that they handcuff him in a way that would not strain his shoulders. Later, defendant told the officers he had spoken to an attorney and been advised not to talk to them. He went inside the house, then came back to the police car and said, "I'm starting to feel the weight of this, all this on my shoulders."

The prosecutor argued defendant forcibly sodomized and stabbed Terena in the bedroom shortly after she paid for the carpet cleaning and signed the work order. After the assault, she staggered to the family room in an attempt to use the phone and died there.

2. *Defense Evidence*

Terena's father-in-law testified that she was apprehensive about moving to the house in Alameda because she was worried about safety. There was a good deal of foot traffic on the

sidewalk in front of the house, and people occasionally walked through the passageway between the house and the church.

A police officer who responded to the scene reported that Donald appeared "extremely calm considering the circumstances." The officer testified that he meant Donald seemed to be in shock following the traumatic discovery and subsequent events. Another officer who was present during Donald's sexual assault examination described him as "void of emotion" and "flat lined." He made an odd joke to the nurse who took a pubic hair sample about his hair thinning "on top" but not "down there."

Finally, an FBI agent testified that an examination of defendant's Chem-Dry van found no evidence of blood or semen. Nor did the van smell like it had recently been cleaned.

In closing, the defense challenged the DNA match evidence, claiming the expert was biased and the samples had been mishandled. Counsel argued that an intruder could have come into the house after defendant left and assaulted Terena, accounting for the foreign DNA detected. The defense stressed that defendant was acting normally when he returned to work, his clothes were not bloody, and no blood traces were found in his vehicle.

## B. *Penalty Phase*

### 1. *Aggravating Evidence*

After the guilt phase jurors were unable to reach a penalty verdict, a second jury was empaneled to retry the penalty phase. Because the new jury had not heard testimony from the guilt phase, several witnesses testified again to establish facts and circumstances surrounding the crimes. (See § 190.3, subd. (a).) The evidence was more condensed than that presented in the

guilt trial and did not include, for example, evidence of the DNA matches and defendant's statements to the officers monitoring him. We do not repeat this evidence here but discuss any variations from the guilt phase evidence when they bear on defendant's claims of error.

### a. Prior Misconduct

The prosecution introduced certified copies of two prior felony convictions. (See § 190.3, subd. (c).) In 1985, defendant was convicted of two counts of first degree burglary and served two years in prison. In 1993, he was convicted of second degree burglary and petty theft with a prior felony conviction. The parties stipulated that these felonies were part of a single incident.

During a January 1990 traffic stop, a three-foot-long club was found lodged between defendant's driver's seat and car door. He was arrested for possessing a deadly weapon and on suspicion of receiving stolen property. Defendant was pat-searched during another traffic stop later that year, and a concealed dagger was recovered. The knife was in a leather sheath tucked partly into defendant's shoe and covered by a sock. Defendant was again arrested for possessing a deadly weapon. He was convicted of misdemeanor charges for both weapons incidents, serving 30 days in county jail for the first and 19 days for the second.

In 1994, defendant invited 13-year-old Sarah S. to come to his motel room "to have fun, play cards." When Sarah arrived with her younger sister and an 11-year-old friend, they joined defendant and two of his adult friends in the room. Defendant took Sarah into the bathroom and offered her methamphetamine. After they both took the drug, defendant

hugged her. Sarah used the drug several more times that night and drank "[m]ore than five beers." Eventually, she lay on the bed and passed out. Defendant lay down next to her. Defendant's friend Ricky testified that defendant fondled Sarah's breasts and pelvic region while she was unconscious. Defendant admitted he had unsuccessfully tried to have intercourse with Sarah then put his fingers into her vagina. A police report was filed about the incident, but defendant was not charged.

The next year, defendant was living with his father in Virginia. On the night of April 17, 1995, while driving his father's station wagon, defendant followed closely behind the car of college student Virginia H. As he passed her on a winding, two-lane country road, a gunshot was fired from the passenger window of his vehicle. Ms. H. reported the incident to police, and the next day defendant's parole officer was contacted. Defendant told the parole officer he had fired a gun but was aiming at a bird sitting on a fence and not Ms. H.'s car. Later that year, the other occupant of the station wagon pled guilty to shooting a gun from a moving vehicle. He told his wife that defendant was the actual gunman but "he was taking the rap basically to keep Al from getting in trouble[,] or more trouble." Probation revocation proceedings were initiated, but defendant was not charged separately for the shooting.

While defendant was awaiting trial on the present charges, a plastic razor was found in his jail cell. Possessing the razor violated jail rules because the blade can be used as a weapon.

### b. Victim Impact

Donald could not function or care for his daughter after Terena's murder. He left the ministry and quit a series of jobs. He described the pain of losing his wife and having to watch Regan grow up without her. Terena's mother and older sister testified about their horror at the manner of her death and how much they missed her, particularly when the family gathered at Christmas. Terena's father was angry and unable to sleep even with prescribed medication. He missed their hunting and fishing trips and the walks they had enjoyed together.

### 2. Mitigating Evidence

Several family members testified about defendant's life and his continued positive influence on them. His parents divorced when he was around four years old. He and his younger brother initially lived in the Bay Area with their mother but went to live with their father in Sacramento when defendant was eight. Defendant was sent back to live with his mother at age 14 because he had been sneaking out at night, disobeying curfew, and possibly using drugs and alcohol. He played sports in high school and enjoyed cake decorating but also seemed depressed and began skipping school.

After obtaining a high school equivalency degree, defendant left home and began a relationship with a woman, with whom he had three daughters. Defendant's parents testified that he was a caring father and remained in close contact with his children, aged 14, 11, and nine at the time of trial. The girls were being raised by defendant's father in Virginia. Each testified that they loved their father and stayed in regular contact with him by letters and phone. They wanted to continue that contact. Defendant had become a Christian in

prison and advised his daughters to go to church. Two of defendant's cousins and a childhood friend testified about their appreciation for defendant's positive influence in their lives. A friend described her long correspondence with defendant, which increased in frequency and intensity after his incarceration.

The defense also called two experts. A psychiatrist testified that methamphetamine use can cause paranoia and inappropriate sexual behavior. An expert on prison adjustment who had interviewed defendant and reviewed his jail and prison records testified that defendant had a positive attitude and would likely adjust well to life in prison. There was no evidence he had ever been assaultive toward staff or involved with a gang.

### 3. Rebuttal Evidence

A sheriff's deputy testified about a fight among inmates involving a razor blade to illustrate the severity of defendant's possession of such a blade. The jury also heard evidence that, in addition to calls made on the day of the murder, defendant made several calls to phone sex hotlines in November and December 1995. Finally, witnesses testified about a 1992 incident in which defendant responded to a prank by an 11-year-old and 12-year-old by exposing his penis and placing it against their car window.

## II. DISCUSSION

### A. *Pretrial* Batson/Wheeler *Motions*

Defendant contends he was denied his constitutional rights to equal protection and a representative jury because the prosecutor exercised peremptory challenges to exclude Black

women from the jury.[4]  In general, parties may exercise a peremptory challenge " 'for any permissible reason or no reason at all' " (*People v. Smith* (2018) 4 Cal.5th 1134, 1146 (*Smith*); see *People v. Armstrong* (2019) 6 Cal.5th 735, 765 (*Armstrong*)), but the federal and state constitutions prohibit their use to exclude prospective jurors based on race or gender.  (*Wheeler*, *supra*, 22 Cal.3d at pp. 276–277; *Batson v. Kentucky* (1986) 476 U.S. 79, 89.)

*Batson*/*Wheeler* claims have been evaluated in the trial court under a three-step framework.  "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'  [Citation.]  Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' "  (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.)  "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."  (*Purkett v. Elem* (1995) 514 U.S. 765, 768.)  To support a *Batson*/*Wheeler* motion, a

_____

[4]  Both defendant and the victim were White.  A defendant need not be a member of the excluded group in order to raise a *Batson*/*Wheeler* claim, but "if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may" be relevant to the court's analysis.  (*People v. Wheeler* (1978) 22 Cal.3d 258, 281 (*Wheeler*); see *People v. Clark* (2011) 52 Cal.4th 856, 906 (*Clark*); *People v. Farnam* (2002) 28 Cal.4th 107, 135–136 (*Farnam*).)

party must prove "it was more likely than not" that a challenge was motivated by discrimination. (*Johnson*, at p. 170; see *Armstrong, supra*, 6 Cal.5th at p. 766.)[5]

Defendant first raised a *Batson/Wheeler* motion after the prosecutor had excused two Black panelists. When the court later paused proceedings to hear the motion, it found a prima facie case of discrimination because, although one Black female remained on the panel, the prosecutor had used four out of eight peremptory challenges to strike Black women. At the court's request, the prosecutor provided his reasons for excusing each panelist in question: Alice S., Victoria E., Harriett D., and Lorraine D. Defendant's attorney declined the court's invitation to respond and submitted the matter. The court denied the motion, concluding the reasons given were "facially and racially neutral." The court observed, "I don't believe that any of these

---

[5] A recent enactment provides for a new statutory claim with a distinct procedure. (Code Civ. Proc., § 231.7, added by Stats. 2020, ch. 318, § 2.) Effective January 1, 2021, and scheduled to sunset on January 1, 2026, the new statute does not require a prima facie showing of discrimination before reasons for a challenge must be given, and certain reasons are considered presumptively invalid. (Code Civ. Proc., § 231.7, subds. (c), (e).) The court must consider only the reasons given, need not find purposeful discrimination, and must sustain the objection if it "determines there is a substantial likelihood that an objectively reasonable person would view race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, as a factor in the use of the peremptory challenge." (*Id.*, subd. (d)(1).) The statute applies only to "jury trials in which jury selection begins on or after January 1, 2022" (*id.*, subd. (i)), and no party here contends it could be applied retroactively to defendant's trial.

jurors are excused because of their race, and there is justification and cause for the excus[al] of each juror."

When the prosecutor later struck a fifth Black woman, Doris C., defendant made a second *Batson/Wheeler* motion. Defense counsel argued there had been a systematic exclusion of Black prospective jurors because none of the seated jurors appeared to be Black, but the court observed that the defense had also excused a Black woman from the jury. Noting it had already found a prima facie case of discrimination, the court asked the prosecutor to explain his reasons for striking Doris C. Before he did so, the prosecutor observed that he had retained another Black female panelist, who was later excused by the defense, and rated her "very highly" because she worked as a police dispatcher "and as such had some leanings toward law enforcement." He explained that his sole concern in exercising peremptory challenges was panelists' "relative strengths or weaknesses regarding the penalty of death," and he excused them "based upon what they would do in the penalty phase." He then gave specific reasons for striking Doris C. The court found these reasons "genuine and facially neutral" and denied the motion. From the record, it appears no Black juror served on the guilt phase jury.[6]

---

[6] After hardship excusals and cause challenges, 78 qualified jurors remained in the venire. Only eight of these were identified in the record as Black or African American. As to those identified, the prosecutor used his peremptory challenges to excuse five, the defense excused one, and two were never called to the jury box.

1. *Legal Principles*

Because the trial court found a prima facie case of racial discrimination and the prosecutor stated reasons for the strikes at issue, our analysis focuses on the third *Batson/Wheeler* prong. (See *People v. Lomax* (2010) 49 Cal.4th 530, 570 (*Lomax*).) At the third stage, the question is whether the defendant has shown it was more likely than not that at least one of the prosecutor's strikes was motivated by intentional discrimination. (*People v. Baker* (2021) 10 Cal.5th 1044, 1076 (*Baker*).) "The answer to this factual question will ordinarily depend 'on the subjective genuineness of the race-neutral reasons given for the peremptory challenge.' [Citation.] A justification based on a mischaracterization of the record could reveal a discriminatory motive [citation], but might reflect a mere error of recollection [citations]. Likewise, a justification that is 'implausible or fantastic . . . may (and probably will) be found to be pretext[ual],' yet even a 'silly or superstitious' reason may be sincerely held." (*Ibid.*) The question for the trial court is " ' "the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* . . . the objective reasonableness of those reasons." ' " (*People v. Miles* (2020) 9 Cal.5th 513, 539 (*Miles*); see *Armstrong, supra*, 6 Cal.5th at p. 767.)

Comparative juror analysis, comparing questionnaire and voir dire responses of challenged jurors with those of similar jurors from a different racial group, must also be considered upon review of these claims. (*People v. Lenix* (2008) 44 Cal.4th 602, 607 (*Lenix*).) While not necessarily dispositive, this analysis may offer relevant circumstantial evidence bearing on the genuineness of the prosecutor's race-neutral justifications. (*Id.* at p. 622.) Compared jurors need not be identical to

challenged jurors in all respects. (*Flowers v. Mississippi* (2019) 588 U.S. 284, 311–312; *Miller-El v. Dretke* (2005) 545 U.S. 231, 247, fn. 6.) But "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." (*Miller-El*, at p. 241.)

Because this case was tried before *Miller-El* and *Lenix* established the relevance of comparative juror analysis, the parties did not explore these issues in the trial court. Defense counsel did not raise comparisons to jurors the prosecutor retained, the prosecutor did not explain why he had retained jurors with characteristics assertedly similar to those stricken, and the trial court did not press for any such explanation in evaluating reasons given for the strikes. Accordingly, in reviewing defendant's arguments here, we must be "mindful that comparative juror analysis on a cold appellate record has inherent limitations." (*Lenix*, *supra*, 44 Cal.4th at p. 622.) " 'When comparative juror arguments are made for the first time on appeal, . . . the prosecutor was not asked to explain, and therefore generally did not explain, the reasons for not challenging other jurors. In that situation, the reviewing court must keep in mind that exploring the question at trial might have shown that the jurors were not really comparable.' " (*People v. Hardy* (2018) 5 Cal.5th 56, 77 (*Hardy*).) A comparative juror analysis conducted on appeal is thus appropriately limited to the stricken panelists and seated jurors discussed in defendant's briefing. (*Miles*, *supra*, 9 Cal.5th at p. 541; *Lomax*, *supra*, 49 Cal.4th at p. 572; *Lenix*, at p. 624.)

A trial court's ruling on the ultimate question of discriminatory intent is ordinarily reviewed with restraint, because that court "is best situated to evaluate both the words

and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes." (*Davis v. Ayala* (2015) 576 U.S. 257, 273–274.) " 'We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.' " (*Lenix, supra,* 44 Cal.4th at pp. 613–614.) A third-stage ruling is thus entitled to " 'great deference,' " and is reviewed for substantial evidence, so long as "the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror." (*People v. Silva* (2001) 25 Cal.4th 345, 385−386 (*Silva*); see *Baker, supra,* 10 Cal.5th at p. 1078; *Lenix,* at p. 613.)

Defendant contends appellate deference is permissible only if the trial court has performed "an appropriate on-the-record analysis of the prosecutor's stated reasons for the strike or strikes." This position is contrary to California precedent. Although a clear record is always helpful, "[t]he law . . . does not require a court in all circumstances to articulate and dissect at length the proffered nondiscriminatory reasons for a strike." (*Baker, supra,* 10 Cal.5th at p. 1080.)[7] On the contrary, we have recognized that the "court may make a sincere and reasoned effort to evaluate a peremptory challenge even if it does not provide a lengthy and detailed explanation for its ruling." (*Baker,* at p. 1077.) "When the prosecutor's stated reasons are

---

[7]     Recently enacted Code of Civil Procedure section 231.7, subdivision (d)(1) now requires the court to "explain the reasons for its ruling on the record" when addressing an objection to the improper use of a peremptory challenge. As noted, however, there is no claim that this new requirement applied to defendant's trial. (See *ante,* at p. 12, fn. 6.)

both inherently plausible and supported by the record," the trial court's ruling is accorded deference even if the court did not question the prosecutor or make detailed findings. (*Silva, supra,* 25 Cal.4th at p. 386.) In deciding whether deference is warranted, our opinions have thus consistently examined whether the reasons given for a strike are both plausible and supported by the record. (See, e.g., *Miles, supra,* 9 Cal.5th at pp. 539–541; *Hardy, supra,* 5 Cal.5th at pp. 78–79.)

Here, the trial court did not elaborate on its rulings and "could have done more to make a fuller record." (*Miles, supra,* 9 Cal.5th at p. 540.) Defendant asserts deference is unwarranted because the court simply ruled that the prosecutor's reasons were "facially and racially neutral" and "genuine" and did not specifically find that these reasons actually motivated the strikes in question. The dissent similarly argues the court should have "resolved th[e] inconsistency" when some voir dire responses were contrary to the reasons given for a panelist's excusal. (Dis. opn. of Liu, J., *post,* at p. 10.) Yet, we have repeatedly explained that trial courts are " ' "not required to make specific or detailed comments for the record to justify every instance" ' " in which they have accepted a prosecutor's race-neutral reasons for a strike as genuine. (*People v. Stanley* (2006) 39 Cal.4th 913, 936; see *People v. DeHoyos* (2013) 57 Cal.4th 79, 102; *People v. Vines* (2011) 51 Cal.4th 830, 848 (*Vines*).) "A court may make a sincere and reasoned effort to evaluate a peremptory challenge even if it does not provide a lengthy and detailed explanation for its ruling. [Citations.] Under our precedent, '[w]hen the trial court has inquired into the basis for an excusal, and a nondiscriminatory explanation has been provided, we . . . assume the court understands, and carries out, its duty to subject the proffered reasons to sincere

and reasoned analysis, taking into account all the factors that bear on their credibility.'" (*Baker*, *supra*, 10 Cal.5th at pp. 1077–1078.) Although that presumption may be overcome when the proffered reasons for a strike are implausible or lack support in the record (see *Silva*, *supra*, 25 Cal.4th at pp. 385−386), or when the rationale behind a prosecutor's strike is not self-evident (see *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1171–1172), the starting point is one of deference. (*Baker*, at p. 1078; *Armstrong*, *supra*, 6 Cal.5th at p. 777.)[8]

### 2. *Challenged Jurors*

During voir dire, the prosecutor asked all prospective jurors to gauge their philosophical support for the death penalty on a ten-point scale. As he explained the scale, a "one" is "somebody who is never going to give the death penalty to anyone," even for the worst crimes. A "ten," on the other hand, describes someone who believes death is the appropriate punishment for any murder. Before addressing individual challenges, defendant broadly asserts that the prosecutor's stated reasons for these strikes must have been pretextual because the stricken panelists frequently rated themselves at the same number or higher on this scale than panelists who ultimately served on the jury. If the prosecutor accepted jurors

---

[8] The dissent urges a different result based on broad characterizations of the entire Alameda County District Attorney's Office filed in a different case and in a different court. (See dis. opn. of Liu, J., *post*, at pp. 18–19.) Neither party has discussed these extra-record materials or sought judicial notice of them. The materials are not before us in this appeal and thus cannot properly inform our decision. (See *People v. Wilson* (2005) 36 Cal.4th 309, 344 fn. 8; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1249.)

who rated themselves a five or a six on his scale, the argument goes, what reason could he have had other than discrimination for striking jurors who rated themselves an eight or a ten? The answer is that, as the record makes clear, the prosecutor did not exercise challenges based on the numerical scale alone. He supplemented the court's voir dire with his own questions designed to probe each prospective juror's willingness to impose the death penalty. While the scale might have offered some insight, as a starting point, on that issue, additional voir dire enabled a more nuanced evaluation and a consideration of whether the panelists' self-assigned numbers accurately reflected their views. It is also true that, in selecting individual panel members, factors other than the initial rating may reasonably make a given panelist more or less acceptable to one side or the other.

Because defendant claims all of the five challenges were improper, we examine the record surrounding each. " 'Excluding even a single prospective juror for reasons impermissible under *Batson* and *Wheeler* requires reversal.' " (*Baker*, *supra*, 10 Cal.5th at p. 1071.) We conclude in each instance the prosecutor's reasons were inherently plausible and supported by the juror's questionnaire responses and voir dire. Accordingly, our review is deferential, evaluating whether substantial evidence supports the trial court's factual findings. (See *Armstrong*, *supra*, 6 Cal.5th at pp. 767–768; *Lenix*, *supra*, 44 Cal.4th at p. 613.)

### a. *Prospective Juror Harriett D.*

The prosecutor gave only one reason for striking Harriett D.: "[G]ranted she said she was a ten philosophically, but on her questionnaire what she told us was the death penalty

was a last resort. When somebody tells me that, that tells me I'm going to have to sit there and, you know, prove something beyond any possible shadow of a doubt. When they say its's a last resort, that means that they will do anything or think anything of getting away from it." Reluctance to impose the death penalty has long been recognized as a legitimate, nondiscriminatory basis for a peremptory strike. (See, e.g., *Armstrong, supra*, 6 Cal.5th at p. 770; *People v. Winbush* (2017) 2 Cal.5th 402, 436 (*Winbush*); *Lomax, supra*, 49 Cal.4th at p. 572.) The prosecutor's reason was plausible (see *People v. Williams* (2013) 56 Cal.4th 630, 653 (*Williams*)), and the record bears out his characterization of Harriett D.'s questionnaire response. Asked for her general feelings on the death penalty, Harriett D. simply wrote, "As the last resort."

Defendant argues the prosecutor's reason was pretextual because Ms. D, described herself as a "10" on the prosecutor's scale. It appears from the context of voir dire, however, that she misunderstood the prosecutor's question about the scale. He asked her to rate "how you feel about the death penalty as a philosophy, as a punishment," and Harriett D. answered, "It would have to be at the ten because I mean if you're going to pick a death penalty, *there is nothing beyond that*." (Italics added.) This response suggests that Harriett D. was rating how severe a punishment she believed the death penalty to be, not how strongly she would be inclined to impose it. Indeed, when the court interrupted to probe Ms. D.'s response further, she ultimately placed herself in the middle of the hypothetical scale:

> THE COURT: Are you telling us that in every murder case you feel that the death penalty is the only appropriate penalty?

PROSPECTIVE JUROR:     No, not in every case.

THE COURT:     You want to find out the details first?

PROSPECTIVE JUROR:     Right.

THE COURT:     I just wanted to make sure.

PROSPECTIVE JUROR:     Yes.

THE COURT:     Because when you tell the defense lawyers you're a ten, boy, that red flag goes up.

PROSPECTIVE JUROR:     Yes.

THE COURT:     And they think this lady is going to pick death every time.

PROSPECTIVE JUROR:     No, no, no.

She also told defense counsel her views on the death penalty were middle-of-the-road, favoring neither punishment:

[DEFENSE COUNSEL]:     As I understand what you're saying, . . . [¶] [y]ou wouldn't do that automatically in every case?

A.     No.

Q.     Nor would you . . . give life without parole in every case.

A.     Definitely not.

Q.     Correct?

A.     No.  I would — I want to be sure I know what is going on, what the circumstances are, how they occurred, and what motivated the person.

Q.     Would it be fair to say that — that your position really is you're in the middle; it really could be

death or life? . . . [¶] If you get to a penalty phase, you are not starting out favoring death —

A.    No.

Q.    — any more than you're favoring life? You're really more in the middle waiting to see what it's all about?

A.    Exactly.

When the prosecutor inquired about her "as a last resort" questionnaire response, Harriett D. stressed the importance of being absolutely convinced that the person deserves to die before the death penalty can be imposed. "Because we're speaking of life," she explained, "to be in the position to have to make a judgment as to whether a person will live or die, you want to try to be absolute as far as your decision without any remorse or any — you can't have second thoughts, because once a person — if they've been sentenced to death, once they die, you cannot bring them back." Concerned about the word "absolute," the prosecutor asked, "Is it that kind of absolute whether he did it or not and maybe you're executing the wrong guy?" Harriett D. responded, "No. Does this particular sentence deserve this person to actually go to the death chamber, [or] whatever."

In summary, Harriett D. ultimately placed herself in the *middle* of the prosecutor's hypothetical scale measuring attitudes toward the death penalty. She accepted it in theory and thought she could impose it, but she also thought deciding to take a life was very serious and she would want to be "absolutely" certain defendant deserved death. The dissent points to several of Harriett D.'s voir dire responses expressing an ability or willingness to impose the death penalty. Certainly, such responses demonstrated her qualification to serve as a

capital juror and would likely have been sufficient to defeat a challenge for cause. But we are addressing a peremptory challenge. "A prosecutor's reasons for exercising a peremptory challenge 'need not rise to the level justifying exercise of a challenge for cause.' (*Batson*[ *v. Kentucky*], *supra*, 476 U.S. at p. 97.)" (*People v. Hamilton* (2009) 45 Cal.4th 863, 901.) Considering her questionnaire and voir dire as a whole, Harriett D.'s responses could have raised a legitimate concern that the prosecutor would have to present a more compelling case to her than would be required to persuade other jurors. Sufficient evidence supports the court's finding that Harriett D.'s excusal was legitimate and not racially motivated.

Comparative juror analysis does not undermine this conclusion. Defendant compares Harriett D. to two seated jurors, Juror No. 2 and Juror No. 12, but both were notably stronger for the prosecution, particularly with regard to penalty phase concerns.[9] Like Harriett D., Juror No. 2 wanted certainty

---

[9] Although we have at times focused our comparative juror analysis on differences among jurors that relate to the prosecutor's reasons for excusal (see *Miles*, *supra*, 9 Cal.5th at p. 544), we need not ignore obvious reasons why a prosecutor would want to retain some jurors and not others. "When asked to engage in comparative juror analysis for the first time on appeal, a reviewing court need not, indeed, must not turn a blind eye to reasons the record discloses for not challenging other jurors even if those other jurors are similar in some respects to excused jurors." (*People v. Jones* (2011) 51 Cal.4th 346, 365–366 (*Jones*).) Citing federal circuit court decisions, defendant urges us to depart from this precedent. We decline to do so. Nevertheless, because the prosecutor here stressed that his challenges were exercised based solely on jurors' apparent willingness to impose the death penalty, our analysis focuses primarily on traits and opinions the prosecutor might reasonably have viewed as bearing upon this question.

before she could impose the death penalty, but her concern was for certainty as to the defendant's guilt, not over whether death was warranted. Once the prosecutor and court explained the difference between guilt and penalty determinations, however, she affirmed that she would not hold the prosecution to a higher standard for showing guilt and reiterated her ability to impose the death penalty. Indeed, her voir dire revealed that she tended to favor the death penalty for a first degree murder involving sodomy. While conceding that she "would have to still be open" to returning a life sentence, she stated that "the death penalty would still be an overriding factor for me." And Juror No. 2 had strong ties to law enforcement, something the prosecutor rated "very highly." She had worked for the Internal Revenue Service's criminal division, and her significant other was an Alameda County Deputy Sheriff. These responses suggested she would look favorably on many of the prosecution's witnesses and would be receptive to victim impact evidence in the penalty phase.

Juror No. 12 was a considerably stronger supporter of the death penalty than Harriett D. He said on his questionnaire that it is "warranted" and explained in voir dire his belief that the death penalty is a deterrent and serves a societal purpose. When asked during voir dire whether "the death penalty should be used every time somebody is convicted of murder," he responded that "if it's a first-degree murder where you have planned and carried out a heinous act and there is some special circumstance, then — then the death penalty is — I think it should be done." He also wrote on the questionnaire that we cannot "blame all of our 'wrong doings' on our past," which suggests he would not be overly swayed by mitigation evidence in the penalty phase. Finally, Juror No. 12 would have been

attractive to the prosecutor for reasons not directly related to the death penalty. As an engineer married to a microbiologist, the juror was familiar with DNA analysis and would have been receptive to this evidence of guilt. He was also a gun owner, which could be viewed as consistent with conservative political views. Because the prosecutor mentioned "liberal" tendencies as a reason for excusing Alice S. and Lorraine D., he evidently preferred to seat jurors with conservative leanings.

### b. *Prospective Juror Lorraine D.*

The prosecutor gave several reasons for excusing Lorraine D. She seemed "very weak on the death penalty," and the prosecutor worried she might have a "liberal bent" because her husband ran a homeless shelter. He explained that her views could cause Lorraine D. to be overly sympathetic when considering mitigation evidence. As noted, reluctance to impose the death penalty is a valid, race-neutral reason supporting a challenge. (*Armstrong, supra,* 6 Cal.5th at p. 770; *Vines, supra,* 51 Cal.4th at p. 850.) Anticipating the defense would present evidence of drug abuse as mitigation, the prosecutor also expressed concern that even though Lorraine D.'s sister had "died of AIDS and crack and things like that, that didn't seem to make a big impact on her." The prosecutor's explanation for this reason is somewhat garbled: "And there is a possibility of drug use in this particular case which would make her familiar with some sort of drug abuse and I didn't want to take a chance when I have a ton of better jurors qualified coming up in the later rounds."[10] Taken as a whole, it appears that the prosecutor was

---

[10]     Here, all potential jurors were questioned before the court moved to the exercise of peremptory challenges. Thus, the

concerned Lorraine D. would sympathize with defendant as someone who, like her sister, had abused drugs.[11]

These reasons were plausible and are supported by the record. Lorraine D. stated on the questionnaire that her husband ran a homeless shelter and she sometimes helped cook there. She also disclosed her sister's heroin and crack use and recent death from AIDS. With regard to general feelings on the death penalty, she said, "*I do not believe taking one's life is the answer*, but each situation is different[,] depends on the circumstances." (Italics added.) Asked in voir dire to elaborate on the response, Lorraine D. explained that whether "taking a person's life" was warranted depended on the nature of the crime and the defendant's "upbringing, what caused them to come to this point in their life." The prosecutor followed up on Lorraine's mention of "the nature of the crime" to ask whether "the death penalty would be a possibility for you" if defendant was found guilty of first degree murder during the commission of criminal sodomy. She responded, "I can't really answer to that like to say that the death penalty would do just for that type of crime. A lot more would have to be established." To this, the court interjected to explain, "[W]e all have a sort of a threshold

---

advocates knew the views of all those panelists who were available to be called should a challenge be exercised.

[11] It is unclear what the prosecutor meant in saying the sister's death from AIDS did not seem to "have a big impact" on Lorraine D. It appears he was referring to the relative absence of emotion in her responses to the many questions posed in the questionnaire probing jurors' attitudes about drugs. Several jurors expressed strong anti-drug sentiments in response to these questions, yet Lorraine D., who had lost her sister to a drug-related illness two years earlier, said simply that drug use was "stupid."

where we feel that somebody's conduct would, in your mind, if he did that, make him eligible for the death penalty. That's what he is asking you. [¶] So, if you find the defendant in this case guilty of assaulting Ms. Fermenick, sodomizing her, and cutting her throat, without telling us how you would vote, is that case serious enough in your own mind where the death penalty could be an option?" Lorraine D. simply responded, "It's serious" and did not indicate whether the death penalty was an option in her mind. Despite these responses, she rated herself an eight on the prosecutor's numerical scale, but she refused to agree that she leaned toward death. Instead, she repeated that any decision on life versus death would "depend[] on the circumstances." She explained that she would need to know how the crime came about and the circumstances that led the defendant to murder someone.

Overall, Lorraine D.'s voir dire responses reasonably support the prosecutor's view that her support for the death penalty was not strong and that she would potentially have sympathy for a mitigation defense. Although she said she was open to imposing the death penalty in theory, she would not answer directly when asked twice whether the death penalty was even an option for her in a case similar to this one. Substantial evidence supports the court's ruling that she was excused for permissible reasons.

Defendant compares Lorraine D. to three seated jurors, but once again all were objectively stronger for the prosecution. Although Juror No. 3 also qualified his support for the death penalty by stating that it is not "a blanket cure for crime," he explained in voir dire that he simply meant the penalty should not be automatic. Whereas Lorraine D. was "not sure" she would vote to retain the death penalty, Juror No. 3 thought the

death penalty should be retained because "[t]here needs to be some 'ultimate penalty.'" The prosecutor could reasonably conclude Juror No. 3 would be more inclined to vote for death than Lorraine D. Juror No. 3 was skeptical of psychiatric testimony, noting that such experts "merely form opinions. No better than you or I." Thus, he might be more resistant to that evidence if offered in mitigation. Finally, Juror No. 3's assault weapon ownership and family support for the "right to keep and bear arms" reflect a conservative viewpoint that this prosecutor appeared to favor.

Defendant compares Lorraine D. to Juror No. 4 because the seated juror was a teacher, had personal experience with drugs, and had qualified her support for the death penalty by saying it should be used "in certain circumstances . . . depends on the case." The seated juror had previously worked in restaurant management, however, giving her experience in supervisory positions that involve evaluating circumstances and making decisions that affect others. Juror No. 4's use of marijuana in high school hardly compares to the years of addiction and ultimate loss of life suffered by Lorraine D.'s sister. And although Juror No. 4 wanted to consider individual circumstances, she "believe[d] in" the death penalty in certain circumstances and did not express the same degree of reluctance as Lorraine D. about imposing it. She was also a strong prosecution juror for other reasons. Equipped with a biology degree, Juror No. 4 had a solid understanding of DNA and viewed it as "pretty accurate" evidence, unlike Lorraine D., whose knowledge came only from the "OJ Simpson case." And, like Juror No. 2, Juror No. 4 had strong law enforcement ties. Her father was a Mountain View Police Department captain,

and her discussions with him had led her to view the criminal justice system as "fair and very effective."

Finally, though she shared some surface similarities with Lorraine D., Juror No. 7 was also objectively more favorable for the prosecution. She was a retired education administrator who now ran her own consulting business. She had no connection with social work. She expressed stronger support for the death penalty than Lorraine D., noting she "would probably vote in favor" of it. And, of all the jurors, she had perhaps the strongest association with law enforcement and the court system. She had participated in a citizen's police academy and previously served on the Alameda County Grand Jury, including two years as its foreperson. She was acquainted with an Alameda County superior court judge and deputy district attorney and had worked with many police officers on student discipline issues. Given this background, the prosecutor could reasonably expect Juror No. 7 to look favorably on the state's witnesses and to take a more emotionally detached approach to sentencing than Lorraine D.

### c. Prospective Juror Alice S.

Like Lorraine D., the prosecutor gave several reasons for excusing Alice S., all of which he believed tended to show her reluctance to vote for death. He observed that, when the court asked whether Alice S. could personally impose the death penalty, "there was a 15-second pause before she gave her answer." He noted that Alice S. was "a social worker for special education children" and seemed to be "liberal." He was concerned she lacked "family values that would help me out in the penalty phase" because she was unmarried and seemed unfazed by her brother's murder. Finally, he noted that when

he asked if the murder of a minister's wife was significant to her, she said it was not. There were two errors in this recitation: Alice S. was a special education teacher, not a social worker, and it was defense counsel who asked about the significance of a minister's wife being murdered. In themselves, these discrepancies were minor. If misstatements by a prosecutor in responding to a *Batson* motion are not consequential, they may be regarded as simple misrecollection. (See *People v. Huggins* (2006) 38 Cal.4th 175, 231.)

Some of the prosecutor's reasons do not find support in the record, however. The full question about the murder of a minister's wife was: "Since you are active in your church, does the fact that it is a minister's wife affect you differently than if she was the wife of somebody with a different occupation?" Given the preface to this question and that it was defense counsel who posed it, Alice S. could simply have intended her "No" response as a denial that her religious feelings would make her overly sympathetic to the prosecution. The answer does not necessarily convey that the murder of a minister's wife "meant nothing to her," as the prosecutor believed. Similarly, the record of Alice S.'s responses about her family does not clearly indicate that she lacked "family values" or was unfazed by her brother's murder. It is true that Alice S. had never married, and some of her voir dire responses suggested she was not close to the brother who had been killed. She knew nothing about the murder investigation and had only heard about the case secondhand from a brother who lived in North Carolina, where the murder occurred. Nevertheless, other answers suggested she was affected by the murder. Although she and her brother had "been separated as grown people a long time," she noted

that they had been "a pretty close family" and agreed that she still felt a loss from the murder.

Other reasons offered by the prosecutor find stronger support in the record. Although Alice S. was not a social worker per se, she had spent her career working with developmentally disabled and mentally ill people. We have held that work in social services is a race-neutral basis for excusal. (See, e.g., *People v. Streeter* (2012) 54 Cal.4th 205, 225 (*Streeter*).) Perhaps the strongest support for this panelist's excusal, however, lies in her voir dire responses to questions about the death penalty. When the court asked if she "could ever vote to execute another human being," Alice S. said, after a 15-second pause,[12] "I'm not certain." She then added, "I'm not absolutely, positively sure" and explained that "the circumstances would . . . influence me greatly." She acknowledged that she did not lean toward the death penalty even for her brother's murderer:

> [DEFENSE COUNSEL]: Did you have in your mind if they catch the guy that killed my brother I want him dead?
>
> [Alice S.] No.
>
> Q. So even then that — you still wanted to know more about it before you had a feeling?
>
> A. Yes.

---

[12] Defense counsel did not dispute the prosecutor's characterization of this pause. When given an opportunity to respond after the prosecutor stated his reasons for excusing the panelists, defense counsel simply replied, "Submitted." (See *Jones*, *supra*, 51 Cal.4th at p. 361.)

As noted, reluctance to impose the death penalty is a valid non-discriminatory basis for excusal. (*Williams, supra,* 56 Cal.4th at p. 653.) Alice S.'s responses support a finding of genuine and race-neutral doubts about her ability to impose the death penalty.

"A prosecutor's positing of multiple reasons, some of which, upon examination, prove implausible or unsupported by the facts, can in some circumstances fatally impair the prosecutor's credibility." (*Smith, supra,* 4 Cal.5th at pp. 1157–1158.) In such circumstances, "trial courts should attempt to evaluate the attorney's statement of reasons as a whole rather than focus exclusively on one or two of the reasons offered." (*Id.* at p. 1158.) Here, the court listened to the prosecutor's reasons, allowed the defense an opportunity to respond, and denied the motion after the defense submitted with no comment. Consistent with the prosecutor's representation that he was solely concerned with "what [panelists] would do in the penalty phase," he gave reasons for each of the challenged excusals that were based on the prospective jurors' reluctance to impose the death penalty and their work in social services or similar professions he viewed as indicating "liberal" tendencies. He cited these race-neutral factors for nearly all of the challenged panelists, including Alice S., and on these issues his reasons find clear support in the record. Because the court appeared to judge the prosecutor's credibility in light of "the reasons as a whole," and did not "focus[] on a single stated reason to the exclusion of others" (*ibid.*), and because the court was uniquely positioned to evaluate the prosecutor's demeanor in determining his credibility (*id.* at p. 1147), its ruling is entitled to deference. (*Id.* at p. 1158; see *Miles, supra,* 9 Cal.5th at pp. 540–541.)

Comparative juror analysis is in accord. Defendant compares Alice S. to several other jurors who were educators (Jurors No. 4 and No. 7), unmarried (Juror No. 9 and Alternate Juror No. 1), or victimized by crime (Juror No. 1). But, again, all of these jurors were objectively more favorable for the prosecution than Alice S. As discussed, Jurors No. 4 and No. 7 believed they could impose the death penalty and had strong law enforcement ties. Juror No. 9, an insurance network administrator, also had a connection to law enforcement because her uncle was a retired policeman, and she had stronger views than Alice S. in favor of the death penalty. Asked her general feelings, she stated, "If a person takes another life intentionally, they don't deserve to live." Alternate Juror No. 1, a bank vice president, similarly described herself as "generally pro death penalty." In voir dire she explained, "[S]ometimes I think that if people kill other people they should be killed, too." Given their professions and death penalty views, the prosecutor could reasonably consider Juror No. 9 and Alternate Juror No. 1 more inclined than Alice S. to dispassionately weigh the evidence and vote for death.

Defendant's comparison to Juror No. 1 falters on similar grounds. Juror No. 1 was a rape victim who chose not to press charges. But that did not mean she was untroubled by the crime. On the contrary, she thought her experience might disqualify her from serving as a juror because she thought it was a particularly "bad crime" "[w]hen somebody forces themselves on somebody." Although she did not expect rape to carry a death sentence, she said, "it's a big violation," so much so that sometimes she thought being murdered would be better because then the victim would not have to live with memories of the assault. Although Juror No. 1 thought she could decide this case

fairly even though it involved a forcible sodomy, the prosecutor could reasonably expect her to empathize with the victim and give substantial weight to the circumstances of the offense. Indeed, Juror No. 1 supported the death penalty and wrote in her questionnaire that it "should be used more often."

### d. Prospective Juror Victoria E.

The prosecutor's reasons for excusing Victoria E. were similar. He stated that Ms. E. "vacillated between death and LWOP" (life imprisonment without parole) and had said that the death penalty does not bring back the murder victim. In his view, Victoria E. was "a wild card," and what she might do in the penalty phase was "anybody's guess." He explained he did not want to "take a chance" on her when there were "tons of better qualified jurors as far as imposing the death penalty coming up." As with Alice S., the prosecutor expressed concern that Victoria E. was "a welfare worker," which he equated with "being very liberal." Finally, he said, "I suspect there's a language barrier," noting that he and Victoria E. had a difficult time understanding each other during voir dire.

Once again, the record bears out the stated reasons, which were plausible and connected to the prosecutor's overarching goal of picking a jury inclined to impose the death penalty. Victoria E. seemed to be of two minds about capital punishment. In her questionnaire, she wrote that a person who kills someone intentionally should be killed too, but she also indicated that her views about the death penalty had changed recently because she had learned innocent people were in prison, and she believed it would be unfair for someone to die for a crime he did not commit. She expressed similarly unsettled views during oral questioning. The court began voir dire by asking if Ms. E. could

35

ever vote to execute someone. She responded that she had "mixed feelings about it" and said, "I don't have answer right now." She explained that "in one sense, I think if they kill[ed] somebody, they should be killed but, . . . when I think about it again, if you kill that person, will it bring the other person back?" Although the death penalty might help victims' families feel closure, she thought death would not "solve the problem" of murder, and she would be "happier" with a penalty of life without possibility of parole. After the court described specific facts about this case, Victoria E. repeated that she "would prefer life without possibility of parole." Nevertheless, she also said she could keep an open mind and could choose either penalty. At this point, the court observed that both sides might have cause for concern about Ms. E.'s death penalty views, and it asked if the attorneys might stipulate to excuse her. No stipulation was forthcoming, and voir dire continued. In response to the prosecutor's questions, Victoria E. repeated the dual views she had expressed in the questionnaire about death being the proper punishment for someone who commits murder but also being futile because it cannot bring back the murder victim. She reiterated her fear that an innocent person might be put to death.

This record supports the prosecutor's stated concern that Victoria E. would be an unpredictable juror in the penalty phase. She seemed to alternatively favor and oppose the death penalty. Defendant protests that Ms. E. repeatedly said she was open to choosing either penalty, but this argument misconstrues the nature of our inquiry. "Unlike a for-cause challenge under *Witherspoon*[ *v. Illinois* (1968) 391 U.S. 510] and [*Wainwright v.* ]*Witt* [(1985) 469 U.S. 412], the issue here is not whether a juror held views that would impair his or her ability to follow the law.

Unimpaired jurors may still be the subject of valid peremptory strikes. The issue instead is whether the prosecutor held a genuine race-neutral reason for exercising a strike." (*Armstrong*, *supra*, 6 Cal.5th at p. 773.) Hesitancy about imposing the death penalty is a valid race-neutral reason for striking a prospective juror, and the prosecutor noted it was the rationale behind all of his challenges.

The record also supports the prosecutor's additional reasons for the challenge. For the past 10 years, Victoria E. had worked as an eligibility technician for the Alameda County Welfare Department. She explained in voir dire that it was her job to determine whether applicants were eligible for welfare benefits. It was not unreasonable for the prosecutor to assume that Ms. E.'s work with welfare applicants might make her sympathetic toward defendant or disinclined to impose the death penalty. "A peremptory challenge based on a juror's experience in counseling or social services is a proper race-neutral reason for excusal." (*Clark*, *supra*, 52 Cal.4th at p. 907; see *Streeter*, *supra*, 54 Cal.4th at p. 225.) As for the prosecutor's concern about miscommunication, the record supports the prosecutor's observation that they seemed to have had trouble understanding each other during voir dire. At the close of his questioning, the prosecutor described his 10-point scale at some length and asked Victoria E. where she would place herself on it. She responded, "I don't think I understand it. Maybe you need to — how will I — before I can choose, I have to have the evidence to determine what kind — ." The court interrupted to clarify that the prosecutor was just asking about her philosophical views, not in relation to this particular case. She eventually rated herself a "five" in response to the court's focused questions about the scale.

Defendant claims the prosecutor's reasons for striking Victoria E. were pretextual because six seated jurors and two alternates also rated themselves a "five" on the prosecutor's scale and expressed that voting for death would be "difficult" (Jurors No. 2 and No. 5) or would depend on the specific circumstances (Jurors No. 6, No. 7, No. 9, No. 10, and Alternate Jurors No. 1 and No. 5). Yet none of these jurors expressed such strong or shifting sentiments against the death penalty as Ms. E.

None of the seated jurors in this comparison said they had "mixed feelings" about capital punishment or suggested the death penalty might be futile because it would not "solve the problem" of murder. None said they would be "happier" imposing a penalty of life imprisonment without parole. Perhaps most importantly, none were unable to answer the court when asked if they could vote to execute someone. Juror No. 2 said, "It would be difficult for me, but I believe that I could do it," and then repeated, "I think I could" and "I don't think I'd have a problem with it." Juror No. 5 repeatedly expressed a belief that he could return a death vote, despite focused questioning from the prosecutor about how difficult the decision might be. Asked the question "could [you] ever vote to execute any human being," Juror No. 6 answered: "Given the right circumstances, yes, I can." When the prosecutor outlined the facts of the case, Juror No. 6 affirmed that the death penalty could be an appropriate punishment here. Juror No. 7 similarly responded that she could vote to execute someone given "the proper circumstances," adding, "I feel there are times when it's justified." When the prosecutor stressed the unpleasantness of returning a death verdict in open court, with the defendant and his family present, Juror No. 7 repeatedly affirmed, "I believe I

could do that." Juror No. 9 also affirmed, "I believe I could" vote to execute someone. She had also written in her questionnaire that "[i]f a person takes another life intentionally, they don't deserve to live," a statement defense counsel voiced concern about in voir dire. Juror No. 10 stated unequivocally "I could" vote to execute someone. Alternate Juror No. 1 responded "Probably" when asked this question, explaining her vote would depend on the evidence presented. As noted above, Alternate Juror No. 1 had described herself in the questionnaire as "generally pro death penalty" and said in voir dire that she sometimes thought "if people kill other people they should be killed, too." Finally, like the other seated jurors, Alternate Juror No. 5 expressed a more definitive ability to vote for death than Victoria E. If someone had been found guilty after a trial, voting for death was "not a problem" for him. Asked to explain why he supported the death penalty, he said, "there's laws out there, and the whole reason why we have laws and punishment is to keep the world from anarchy."

As the Attorney General points out, several of these jurors would have appeared more favorable to the prosecution than Victoria E. for additional reasons. Many had stronger connections to law enforcement and the criminal justice system than Victoria E., whose nearest connection was the occupation of her husband and brother-in-law as security guards. As noted above, Juror No. 2's partner was an Alameda County Deputy Sheriff, and she herself had worked in the criminal division of the IRS. Juror No. 6's neighbor was captain of their local police department. Juror No. 7 had served as foreperson of the Alameda County Grand Jury, participated in a citizens police academy, and was acquainted with a judge, a prosecutor, and several police officers. Juror No. 9's uncle was a retired

policeman.  Alternate Juror No. 5 had at least six friends in the San Leandro Police Department, and his roommate worked for the FBI.

Relatedly, the prosecutor could have had cause for concern about Victoria E.'s views of law enforcement because she reported in the questionnaire that her husband had been stopped for driving while intoxicated but "he was not drunk."  A close relative's negative contact with the criminal justice system is a race-neutral basis for excusal.  (See *Farnam*, *supra*, 28 Cal.4th at p. 138.)  The seated jurors in defendant's comparative juror analysis reported no such negative experiences, and some affirmatively expressed favorable views.  For example, Juror No. 7 expressed "respect [for] the professional work done," and Alternate Juror No. 1 thought the criminal justice system "is fairly effective."  The prosecution might reasonably have favored such jurors over Victoria E., who lacked contacts with police officers or criminal justice employees and whose loved one had a negative experience with law enforcement.  These characteristics and experiences of jurors who served are consistent with the prosecutor's representation that he exercised some challenges because he believed panelists who had not yet been considered would be stronger candidates from his perspective.

Defendant also contends a comparison with Juror No. 7 reveals that the prosecutor's expressed concern that Victoria E. was "very liberal" was pretextual.  He asserts:  "Ms. [E.]'s employment status as a welfare worker . . . would make her no more liberal than Juror No. 7, who had a doctorate in education and worked twenty-five years as an administrator in education."  The comparison does not withstand scrutiny.  As discussed in regard to Lorraine D., Juror No. 7 would have been an attractive

prosecution juror for a number of reasons. She ran her own consulting business and, unlike Victoria E., had no connections with social work mentioned in her questionnaire or voir dire. In contrast to Victoria E.'s "mixed feeling[s]," Juror No. 7 expressed support for the death penalty and reaffirmed that she could impose it. And, as noted above, Juror No. 7 had notably strong law enforcement ties. Given their very different backgrounds, the prosecutor's acceptance of Juror No. 7 does not suggest that his excusal of Victoria E. was motivated by discriminatory animus.

### e. *Prospective Juror Doris C.*

Finally, defendant argues the court erred in denying his second *Batson/Wheeler* motion after the excusal of Doris C. The prosecutor said he excused this prospective juror for several reasons: (1) she worked for the county welfare department, which he thought reflected a sympathetic worldview; (2) she thought childhood trauma can cause future problems, which he feared would sway her toward the defense in the penalty phase; (3) her questionnaire showed animosity toward the police; (4) she had "a rich-versus-poor attitude," which he thought would make her more resistant to some prosecution witnesses; (5) "she misled us on the questionnaire, as far as I'm concerned"; and (6) he believed "there were tons of better-qualified jurors more willing to impose the death penalty that were coming up."[13] The record is silent about what the prosecutor meant by the

---

[13] When the prosecutor excused Doris C., there remained 48 panelists who had not been called into the jury box. The prosecutor would have been aware of their death penalty views from their questionnaires and voir dire.

"misleading questionnaire" reason, and he was not asked to clarify.

Doris C. had worked for the Alameda County Welfare to Work Department for almost 28 years. In her questionnaire, she agreed that how a child is raised can have a future impact, explaining "it can determine their outlook on themselves and how they relate to others." Without prompting, she also brought up the mitigating effects of childhood experience when responding to voir dire questions about the death penalty. She volunteered that she "would be open to listening" to such evidence "because I know that things in your childhood or life can . . . cause you to do certain things. I understand that." With respect to the death penalty, she did say on the questionnaire that "[i]f you do the crime you should pay the price." However, during voir dire she stressed mitigation. She explained she meant that, while "death is a possibility" for murder, "the things in someone's life" could make that penalty inappropriate. "[M]aybe[] they were on drugs or something like that. Then that would have an effect on their thinking. So at that point, they weren't doing it just for themselves." Asked by defense counsel whether she'd be willing to consider mitigating evidence about the defendant's childhood and drug abuse, Doris C. answered, "Yes, I would, because I believe that almost everything that's happened in your childhood can affect you," though she also felt it was possible to "overcome a lot of it." These responses are consistent with the prosecutor's conclusion that Doris C. would have been focused on mitigation evidence in the penalty phase.

In addition, as the prosecutor noted, the juror's questionnaire responses reflected both animosity toward the police and strong feelings about the criminal justice system. When asked about her views, Doris C. wrote, "[U]nfair system

at times — the rich go free and the poor are punished." Asked about her experiences with the police, Doris C. replied: "My grandson's father . . . was killed in his home by an Oakland policeman and no one has served time or been charged for this murder."[14] Such a traumatic personal experience could lead this juror to view police officers with distrust or hostility.[15] (See *Winbush, supra,* 2 Cal.5th at pp. 436–437; *Lomax, supra,* 49 Cal.4th at p. 574.)

Defendant's comparative juror analysis for Doris C. is fairly cursory. He notes that nearly every juror agreed that childhood experiences can have some impact on people's adult lives. However, in none of the responses he identifies did the juror relate childhood experiences directly to penalty mitigation, as Doris C. did. As with Victoria E., defendant asserts that employment with the welfare department is no more "liberal" than the substitute teaching of Juror No. 4 or the educational administration of Juror No. 7. Even accepting this premise, as discussed, the prosecution could reasonably have viewed these retained jurors as more favorable. (See *ante,* at pp. 25–26, 33–34.) As for views on economic status, defendant compares Doris C. to three jurors (Jurors No. 5 and No. 12, and Alternate Juror No. 5) who expressed the view that poverty often leads to criminal behavior. These general assertions differ from a belief that the criminal justice system is inherently biased in favor of

---

[14] Doris C.'s daughter and five-year-old grandson were living in her household at the time of jury selection.

[15] Although defendant complains the prosecutor asked nothing about this event in voir dire, questioning on every issue of concern is not required. (*Jones, supra,* 51 Cal.4th at p. 363.) Given the sensitivity of the topic, the parties' failure to ask more probing questions about it is understandable.

the rich. Defendant identifies no seated juror who expressed such a view. Nor does defendant attempt to compare Ms. C.'s hostility toward police to attitudes expressed by any seated juror. Comparative juror analysis does not support a conclusion that the prosecutor's stated reasons were disingenuous.

Accordingly, we conclude substantial evidence supports the trial court's rejection of the two *Batson/Wheeler* motions. It is also notable that, when the court heard defendant's first motion, the prosecutor had passed on a panel that included Cheryl W, a Black woman. The prosecutor accepted the panel a total of four times before the defense ultimately excused Ms. W. "While acceptance of one or more black jurors by the prosecution does not necessarily settle all questions about how the prosecution used its peremptory challenges, these facts nonetheless help lessen the strength of any inference of discrimination that the pattern of the prosecutor's strikes might otherwise imply." (*People v. Reed* (2018) 4 Cal.5th 989, 1000 (*Reed*); see *Clark, supra,* 52 Cal.4th at p. 906; *Jones, supra,* 51 Cal.4th at pp. 362–363.)

## B. *Trial Issues*

### 1. *Defense DNA Expert*

Defendant raises claims of error and prosecutorial misconduct regarding testimony and argument about a defense-retained DNA expert who was not called as a witness. He also contends the court erred in its handling of a juror note related to this issue. We conclude: (1) the court properly admitted evidence that DNA testing materials and notes were shared with the defense expert; (2) the prosecutor committed no prejudicial misconduct in eliciting this evidence or commenting on it in closing argument; and (3) any error in the court's

response to the juror's note was harmless. We also reject defendant's claim that the asserted errors had the cumulative effect of denying him due process and a fair trial.

### a. Background

Early in the proceedings, defendant filed a *Kelly/Frye* motion[16] challenging the results of the DNA testing performed by Department of Justice criminalist Steven Myers. The prosecutor explained at a pretrial hearing that he had worked with one of defendant's attorneys to send all of Myers's lab results and documentation to Dr. Edward Blake, an expert the defense had retained. The court asked, "[I]s Ed Blake going to be your expert?" and defense counsel replied, "He will be one of our experts, yes." With a view to determining whether an Evidence Code section 402 hearing on the motion would be necessary, the court asked if Blake would be preparing a report with his findings. Defense counsel said they had not asked for a report and did not "think" they would in the future. Nor would they definitively commit to whether retained-expert Blake would be called as a witness. The court eventually held a *Kelly/Frye* hearing. After extensive testimony from Myers, the defense obtained a continuance in order to review the hearing's transcript in consultation with Blake. When court resumed, defendant submitted on the basis of Myers's testimony and the motion was denied.

---

[16] A motion pursuant to *People v. Kelly* (1976) 17 Cal.3d 24 and *Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013 seeks to exclude novel scientific evidence that is not generally accepted as reliable within the relevant scientific community. (See *People v. Turner* (2020) 10 Cal.5th 786, 801.) It should be recalled that defendant's trial was conducted in 1999, when DNA evidence was relatively new.

At trial, near the close of Myers's direct examination, the prosecutor asked if his lab's testing had consumed all the available forensic evidence. Myers responded that he had preserved at least half of every swab "for potential defense retesting, because really the best way to take care of any risk of sample mixup is to retest the evidence." When the prosecutor asked, "So, if the defense for Mr. Nadey wished to hire another lab to do their own independent testing, there is enough evidence remaining so that they can do that," Myers agreed. The prosecutor then asked about Dr. Blake in particular:

Q. "Did you as a matter of fact provide your entire work notes —

[DEFENSE COUNSEL]: Objection. Irrelevant.

THE COURT: Overruled.

[PROSECUTOR]: — entire work notes and copies of everything you did in this case to a man described as Dr. Edward Blake, who was hired by the defense in this case?

[DEFENSE COUNSEL]: Your Honor, that is an improper question. I'd ask that it be stricken.

THE COURT: Overruled. [¶] Go ahead. You can answer that.

THE WITNESS: Yes. Copies of all of my notes were provided to Dr. Blake of Forensic Science Associates. It's a private forensic firm in Richmond, California. He also came over to our lab and took his own photographs of photos in my notes.

[PROSECUTOR]: In fact, was there correspondence both via the telephone and via the mail with respect to Dr. Blake to you regarding defense testing in this case?

A. There was correspondence regarding what notes he wanted to see. So, for instance, he called to ask to come over and photograph the photographs in my file because he felt the photocopies —

At this point, the court sustained a defense objection to further inquiry into Myers's thoughts about why Blake wanted to take the photographs. The prosecutor then presented Myers with a one-page letter from Blake concerning the Fermenick case. Defense counsel objected, "Your Honor, isn't this hearsay and the subject of the last objection and irrelevant?" The prosecutor responded that the letter was not offered for its truth, but "to show the availability of this evidence was there and this was documentary proof that these two experts conversed with each other, and the rest, inferences can be drawn therefrom." The objection was overruled, and the letter was admitted into evidence. Myers confirmed that he had received the letter from Blake "requesting additional pieces of discovery," and he had provided Blake with all the items sought.

Defense counsel cross-examined Myers at length regarding the possibility of contamination and asserted errors in his testing. He also impugned Myers's qualifications, noting that whereas Blake had a doctorate in criminalistics, Myers had not yet finished a master's degree.

Although the prosecutor did not refer to Blake by name in his closing argument, he stressed that the defense had presented no witness to contradict Myers: "Now, did you hear anyone for the defense testify to disprove Mr. Myers' findings or results? [¶] Not one. Not one. [¶] Here we have the uncontroverted testimony and unquestioned expert in the field of DNA . . . ." He then observed: "I rested with Steve Myers'

47

testimony. [¶] What was the defense to all this? [¶] None." Defense counsel's closing argument was focused almost entirely on challenging the state's DNA evidence. He attacked Myers's competence and credibility and explained in laborious detail the many errors he saw in Myers's analysis. He also questioned why none of the "Ph.D.s" in Myers's laboratory had supervised his work or reviewed his notes. He observed, "So at best you have some review by Gary Sims," another analyst at the state's laboratory, "and you know that Gary Sims made big adjustments when he looked at the work." Defense counsel did not mention Blake at any point in his argument, nor did he explain why the defense was not obliged to present evidence of its own testing.

When defense counsel concluded his argument, the court took the luncheon recess. Noting that a juror had handed in a question, the court remarked, "I do believe that that question will be answered for you this afternoon." After the jury left, the court read the note: "Does the defense have access to a DNA expert which it could have had as a defense witness, or is there a limitation of funds to prevent this?" The court observed that the issue would almost certainly be addressed in the prosecutor's rebuttal argument. Defense counsel objected to any argument about whether the defense had funding for an expert. The court replied that the issue did not concern funding, but whether the defense had an expert, and evidence had been admitted on that subject. He observed that the prosecutor had "a right to comment on the fact that the defense didn't call a particular witness." Defense counsel again objected and asked that the prosecutor "be limited to saying that defense hired Ed Blake to review some records and that's it, because that's all

that's in evidence." The court overruled the objection, remarking "[t]he DA can argue the way he wants."

Noting that the timing of the juror's note meant that the prosecutor alone would have an opportunity to respond, defense counsel then asked permission "to reopen for just the limited purpose of explaining to the juror my point of view about hiring the expert because otherwise it's an unfair advantage." The court refused: "Mr. Horowitz, you argued for five hours and 15 minutes. If you didn't see fit to cover that issue in your argument, you're not going to deal with it now. Denied." After the recess but before the jury had returned, defendant's attorneys renewed their objections, arguing the court should have interrupted closing argument to give them an opportunity to respond to the note. They complained it was fundamentally unfair that only one side would have the ability to speak to the issue raised in the note. The court responded: "[I]t's in the record that there was a defense expert in this case. It was addressed by Mr. Myers. [¶] . . . [¶] I can't believe that the defense in this case would not anticipate the fact that the district attorney would address that issue in his argument. I'm not here to orchestrate the defense argument in this case. You're free to argue whatever the record shows. If you left something out, I don't think it's my responsibility to let you reopen because you left something out of your argument." The court later observed that the defense's failure to call Blake, after there was evidence of his involvement in the case, was "so elementary that I felt that you deliberately left that out because you didn't want to touch that issue." The prosecutor said he had planned to address Blake's absence all along, beginning when he learned the defense would not be calling Blake as a witness. The court denied the defense's request to reopen.

As a "compromise" following this ruling, defense counsel proposed that the court read "one of the appropriate jury instructions" responsive to the juror's question. He suggested CALJIC No. 2.11, which explains that parties need not call every witness who may have knowledge relevant to the case. The court responded that this instruction would be given in the final charge to the jury. It then rejected counsel's suggestion that the instruction be read specifically in response to the juror's question "so that she doesn't feel that a question to a Judge is delegated to the prosecutor." The court disagreed that would be the impression given.

The prosecutor discussed Blake in his rebuttal argument. In response to defense counsel's attacks on Myers's credibility and competence, he reminded the jury of testimony that the defense's own expert, "[o]ne Dr. Edward Blake, . . . ha[d] access to all of Steve Myers' work, including his notes and the evidence. If Myers is wrong in anything he has done, then they certainly would have picked up on it and retested the evidence to exclude Mr. Nadey. [¶] Wouldn't they?" He then asked, "Why then didn't we see any defense expert here to say that Steve Myers was wrong or to show by their own expert, the famous Dr. Blake — not master [*sic*], as Mr. Myers was, but a doctor — why didn't they call him to say that Myers is wrong and that we've got the wrong guy; Nadey is excluded?" He remarked, "You all know the answer. They can't." The prosecutor then directed the jury's attention to the relevant testimony about Blake's credentials and the materials shared with him. He noted that Blake's letter requesting materials bore Blake's own file number and concluded there was "no question" the defense had retained Blake as an expert. He then observed that "for five and a half hours [defense counsel] is railing on the People's contaminated

evidence, on the faulty databases, calling my case garbage in and garbage out, when they've got a D. Crim. sitting there who has examined this and we don't see him."

After reminding the jury that counsel's arguments attacking Myers were not evidence, the prosecutor answered his own question about why the defense had not called Blake as a witness: "I'm telling you why they refused to hire Ed Blake to come to court to testify. [¶] One, he found no errors in Steve Myers' work, his methods, his samples, his statistical data or his results; and, [¶] Two, they did not retest because then there would have been a second finger of DNA evidence of guilt pointing at Mr. Nadey." He later summarized his conclusion on this subject: "The DNA is one in 32 billion. Rectal swabs and jeans. [¶] If you don't like it, call your own defense expert to do it. But, whoops, they don't want to do that, and they don't want to retest it because they know Myers is correct, and they don't want another DNA finger of guilt pointing their way. [¶] We have the now uncontroverted testimony of Steven Myers when they have hired an expert and refused to call him. That makes his testimony uncontroverted." The defense raised no objection during or after this argument.

In its final charge to the jury, following the prosecutor's rebuttal, the court instructed that "[s]tatements made by the attorneys during the trial are not evidence" (CALJIC No. 1.02) and that jurors "must decide all questions of fact in this case from the evidence received in this trial and not from any other source" (CALJIC No. 1.03). The jury was also given CALJIC No. 2.11: "Neither side is required to call as witnesses all persons who may have been present at any of the events disclosed by the evidence or who may appear to have some knowledge of these events. [¶] Neither side is required to

produce all objects or documents mentioned or suggested by the evidence." Finally, as relevant here, the jury was instructed that defendant had a right not to testify (CALJIC No. 2.60) and that, in making this decision, "the defendant may choose to rely on the state of the evidence and . . . upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him" (CALJIC No. 2.61).

### b. *Evidence of Defense Expert Involvement*

Defendant first asserts the court erred in allowing the jury to hear evidence that he had retained a DNA expert. He argues admission of this evidence was so prejudicial that it unfairly shifted the burden of proof onto him and deprived him of his rights to due process and the effective assistance of counsel. (U.S. Const., 5th, 6th, 8th, & 14th Amends.; see Cal. Const., art. I, §§ 7, 15, 16 & 17.) He further contends the prosecutor committed misconduct in eliciting the evidence, and in so doing violated the attorney work-product privilege (Code Civ. Proc., § 2018.010 et seq.) and Penal Code provisions concerning the disclosure of expert witnesses (§ 1054 et seq.). On the contrary, the evidence was properly admitted, and the prosecutor did not commit misconduct in eliciting it.

A criminal defendant's Sixth Amendment right to counsel includes the right to have assistance from experts in preparing his defense. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1046; see *Ake v. Oklahoma* (1985) 470 U.S. 68, 83–84.) To effectuate this right, the defense is also entitled to maintain confidentiality in communications with its experts. (*Alford*, at p. 1046.) But confidentiality can be waived, and a defense expert's identity is not necessarily confidential in itself. Here, defense counsel enlisted the prosecutor's help in releasing

Myers's DNA testing materials to defense expert Blake, and counsel confirmed in open court that the defense had retained Blake as an expert. Although Blake did not testify at the pretrial *Kelly/Frye* hearing, defense counsel obtained a continuance of the hearing in order to review Myers's testimony with Blake. As a result, the defense's own disclosures showed it had retained Blake to review the state's DNA testing and results.

Nevertheless, defendant contends it was misconduct for the prosecutor to call the jury's attention to Blake's involvement by questioning Myers about it at trial, and error for the court to permit such questioning. His primary theory appears to be that admission of this evidence violated the work product privilege. Defense counsel did not object on this ground, however, but merely objected that questions about Myers's correspondence with Blake were irrelevant and "improper." Failure to object on the specific ground later asserted, including the work product privilege, forfeits that ground on appeal. (*People v. Zamudio* (2008) 43 Cal.4th 327, 354 (*Zamudio*); see Evid. Code, § 353.) But even assuming counsel's objection to the questions as "improper" was sufficient to preserve the claim, it fails on the merits.

Defendant's argument relies heavily on *People v. Coddington* (2000) 23 Cal.4th 529 (*Coddington*). There, only some of the psychiatrists who had examined the defendant testified, and the prosecution learned about examinations performed by other experts. (*Id*. at p. 603.) The trial court ruled that the nontestifying experts' reports were protected by the work product privilege, but it allowed the prosecutor to elicit evidence about their examinations and to comment on that evidence in closing argument. (*Id*. at p. 604.) We concluded the

prosecutor's questions and commentary violated the work product privilege, reasoning that the privilege encompassed counsel's decisions about whether an expert who has been consulted is likely to give favorable testimony. (*Id.* at pp. 605–606.)

*Coddington* is distinguishable. There, the prosecutor discussed experts and reports that had never been disclosed by the defense; he learned about them "through jail sign-in sheets and social contacts." (*Coddington, supra*, 23 Cal.4th at p. 603.) Here, defense counsel voluntarily disclosed to the prosecution that Dr. Blake was their expert. By making this disclosure, and encouraging their expert to communicate directly with the prosecution expert about the case, the defense effectively waived any work product protections applicable to Blake's identity and role. (See *Wells Fargo Bank v. Superior Court* (2000) 22 Cal.4th 201, 214.)

Further, *Coddington*'s holding has been superseded by statute. (See *Zamudio, supra*, 43 Cal.4th at p. 356.)[17] In 1990, after Coddington's trial, the electorate enacted Penal Code section 1054.6, which states in relevant part: "Neither the defendant nor the prosecuting attorney is required to disclose any materials or information which are work product as defined in subdivision (a) of Section 2018.030 of the Code of Civil Procedure." The referenced statute establishes two levels of privilege for different types of attorney work product. Subdivision (a), relates to written work product, which is absolutely privileged: "A writing that reflects an attorney's

---

[17] As in other cases, we express no opinion on *Coddington*'s "continuing efficacy." (*Zamudio, supra*, 43 Cal.4th at p. 356, fn. 16.)

impressions, conclusions, opinions, or legal research or theories is not discoverable under any circumstances." (Code Civ. Proc., § 2018.030, subd. (a).) Under subdivision (b), all other attorney work product that is not contained in such a writing is protected by a qualified privilege, which may be overcome if the court concludes denial of discovery would result in unfair prejudice or injustice. (Code Civ. Proc., § 2018.030, subd. (b).) By specifically referencing only subdivision (a) of this statute, Penal Code section 1054.6 " ' "expressly limits the definition of 'work product' *in criminal cases* to 'core' work product, that is, any *writing* reflecting 'an attorney's impressions, conclusions, opinions, or legal research or theories.' " ' " (*Zamudio*, *supra*, 43 Cal.4th at p. 355; see *People v. Bennett* (2009) 45 Cal.4th 577, 595 (*Bennett*).)

Even assuming the defense did not waive work product protections applicable to Dr. Blake's involvement, no writing constituting core work product was disclosed in Myers's testimony, which described the sharing of his notes with Blake, allowing Blake to visit his laboratory and examine photographs, and corresponding with Blake about the testing notes. Blake's letter was admitted into evidence over a hearsay objection, but it was not received for the truth of any contents, only as evidence of the cooperation between the two experts.[18] It did not discuss, reveal, or in any way reflect defense counsel's "impressions, conclusions, opinions, or legal research or theories." (Code Civ. Proc., § 2018.030, subd. (a).) The fact that the evidence concerned the potential retesting of samples by a defense expert is not sufficient to establish a violation of the work product privilege or Penal Code section 1054.6. (See, e.g., *People v. Scott*

---

[18] Defendant does not renew the hearsay argument here.

(2011) 52 Cal.4th 452, 489; *Bennett, supra,* 45 Cal.4th at p. 595; *Zamudio, supra,* 43 Cal.4th at p. 352, 355.)[19] "The mere fact that a piece of evidence was given to the defense says nothing about what the defense team did or did not do with the evidence." (*Scott,* at p. 489.) Moreover, testimony establishing "that forensic evidence was made available to the defense does not constitute comment on the 'exercise of' the work product privilege." (*People v. Gray* (2005) 37 Cal.4th 168, 208.) Because defendant has failed to establish a statutory violation, his related constitutional claims fail as well. (*Scott,* at p. 489; *Zamudio,* at p. 355, fn. 15.)

Defendant also contends the evidence was unduly prejudicial and irrelevant, though only the latter objection was raised at trial. Again, assuming the claims were sufficiently preserved, they are unavailing. The DNA match identifying defendant as the source of semen found on the victim's body was critical in establishing his guilt. It was apparent from defendant's opening statement, if not before, that a fundamental part of the defense strategy would be to attack the validity of the state's DNA testing, and in particular the credibility of its expert, Myers. Evidence that a defense expert had reviewed all notes from Myers's testing, and that samples had been preserved to allow retesting, was relevant to show that Myers

---

[19] Nor did admission of the evidence violate the discovery statute. In *People v. Combs* (2004) 34 Cal.4th 821, 862, no error occurred when the prosecutor obtained a nontestifying expert's report through the defendant's own disclosure, rather than the court's discovery order. Here, defense counsel themselves alerted the prosecutor to Blake's involvement and worked with the prosecutor to facilitate Blake's review. Blake's identification did not result from any court order. There was no discovery violation. (See *id.* at pp. 861–863.)

had professionally performed the testing and to support his credibility by showing that the evidence was made available for defense scrutiny. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1357 (*Foster*); *People v. Bolden* (2002) 29 Cal.4th 515, 552–553.) Although the defense did not attack Myers specifically until cross-examination, the court had discretion to permit evidence related to his credibility during his initial examination. (See Evid. Code, § 765, subd. (a); *People v. Alvarez* (1996) 14 Cal.4th 155, 207.) If the jury had been left with the false impression that the DNA evidence had been kept from the defense, they may have ignored it, believing the defense had been put at an unfair disadvantage.

Defendant's related claims of prosecutorial misconduct, even assuming they were preserved, fare no better. The prosecutor's questions merely sought to elicit relevant evidence that Myers's work had been reviewed by an outside expert. " ' "Although it is misconduct for a prosecutor *intentionally* to elicit inadmissible testimony [citation], merely eliciting evidence is not misconduct." ' " (*People v. Mills* (2010) 48 Cal.4th 158, 199.) The fact that evidence, or an inference drawn therefrom, is harmful to the defendant's case does not mean the evidence is unfairly prejudicial. "As we have repeatedly explained: ' "In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " ' [Citation.] ' " '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.' " ' [Citation.] The 'prejudice' which section 352 seeks to avoid is that which ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues.*' " ' " (*People v. Cage* (2015) 62 Cal.4th 256, 275.) Nor are we persuaded that testimony about a defense expert's involvement in the case

improperly shifted the burden of proof onto defendant. (See *Foster*, *supra*, 50 Cal.4th at p. 1357.) The jury was instructed that the prosecution bore the burden of proving defendant's guilt beyond a reasonable doubt (CALJIC Nos. 2.61, 2.90) and that neither side was required to call all witnesses who might have relevant knowledge (CALJIC No. 2.11). We presume it followed those instructions. (*Bennett*, *supra*, 45 Cal.4th at p. 596.)

### c. *Response to Juror Note*

Defendant next raises several arguments regarding the court's handling of the juror note asking if the defense had access to a DNA expert. The court indicated that a juror handed the note to the clerk when returning from a recess. It appears the court read the note while counsel was arguing. Because the note was submitted during defense counsel's summation, defendant asserts the court should have either interrupted counsel's argument and alerted him to the note, allowed counsel to reopen and present argument addressing the note, or instructed the jury in response to the note. Defendant contends that, by denying the defense request to reopen but allowing the prosecutor to address the issue in rebuttal, the court deprived him of the opportunity to present a defense and made Blake a "de facto" witness for the prosecution. He argues these errors deprived him of due process and a fair trial. Defendant also takes issue with the court's statement in response to the note, "I do believe that that question will be answered for you this afternoon," apparently referring to the prosecutor's rebuttal argument. Defendant argues this statement evinced judicial bias and implicitly endorsed the prosecution's position.

A trial court has not only the power but "the duty . . . to control all proceedings during the trial," including the

arguments of counsel. (§ 1044; see *People v. Gonzalez* (2006) 38 Cal.4th 932, 951.) It is accordingly given broad inherent and statutory discretion to limit both the length of argument and the matters addressed. (*People v. Edwards* (2013) 57 Cal.4th 658, 743 (*Edwards*); *Gonzalez*, at p. 251; see *Herring v. New York* (1975) 422 U.S. 853, 862.) We conclude the court's response was generally within its discretion, and any error in its statement to the juror was harmless.

The court indicated that the juror handed the clerk a note near the end of defense counsel's argument, when the jurors returned from a recess. The court did not abuse its discretion in allowing counsel to finish his argument without interruption. Interrupting an advocate's properly conducted closing argument to raise an unrelated issue would have been irregular and potentially disruptive to counsel's effective advocacy. (See § 1044.) Nor was the court *obligated* to allow the defense to reopen and address the note's question. Defense counsel implicitly acknowledged as much when he conceded reopening would not be required if the juror asked another question. "The decision to grant or deny a motion to reopen . . . remains in the discretion of the trial court." (*People v. Monterroso* (2004) 34 Cal.4th 743, 779 (*Monterroso*).) Because the prosecutor had already commented on the absence of defense testimony controverting Myers's results, it was reasonable for the court to assume defense counsel would be addressing the topic in his final remarks, or that any failure to do so was a strategic decision to avoid emphasizing unfavorable evidence. As the court repeatedly admonished the defense team, they knew evidence about Blake's involvement had been admitted, and the prosecutor's initial argument had highlighted defendant's failure to present evidence undermining the DNA match. The

juror's note raised no new issue. It simply reflected the juror's awareness of a contrary argument. If the defense chose not to provide an explanation for Blake's failure to testify, it was not the court's responsibility to interfere with that strategic decision. Moreover, even when defense counsel asked permission to reopen his argument, he never described what he actually intended to say in response to the juror's note. The court did not abuse its discretion in declining the request to reopen so that counsel might express an undisclosed "point of view" as to the decision to hire an expert. It appears any assertions along that line would have been improper to the extent they would not have been based on evidence or reasonable inferences therefrom but instead counsel's own explanation of strategic decisions made by the defense.

For the same reasons, the court acted within its discretion when it refused to limit the prosecutor's argument. Evidence had been properly admitted about Blake's review of the DNA testing, and the prosecutor was entitled to comment on this evidence in final arguments. The defense could have anticipated that the prosecutor would remark on Blake's failure to testify, even without the note. Indeed, the prosecutor observed that he had planned to address Blake's absence all along. Although the court's refusal to limit the prosecutor's argument meant that only one side would be addressing an issue that was of interest to at least one juror, that difficulty would have arisen for the defense even absent the note. The court's rulings were within its discretion.

It is a closer question, however, whether the court erred in responding to the note itself. The court did not read the note aloud in the jury's presence. Instead, it addressed the juror directly: "Juror Number 7 handed me a question, and I can tell

Juror Number 7 that I do believe that that question will be answered for you this afternoon." It is possible to construe this comment as a reference to the final jury instructions, which were also given that afternoon. However, the juror may well have thought the court was referring to the prosecutor's rebuttal argument. Just before addressing the note, the court had mentioned that the prosecutor would be presenting a response to the defense argument in the afternoon.

The court's comment about the note was problematic. After consultation with counsel, the court should have provided a neutral response to the juror's question or advised the juror it was unable to respond. By leaving the impression, even if unintended, that the juror would find her answer in the prosecutor's argument, the court could be viewed as deferring to the prosecution or even aligning itself with that party.[20]

Assuming the court erred in its response to the note, however, defendant suffered no prejudice. In assessing prejudice, a reviewing court's " ' "role . . . is not to determine

---

[20] The comment was not so clearly erroneous as the one we encountered in *People v. Serrato* (1973) 9 Cal.3d 753, however, despite defendant's attempt to equate the two. In *Serrato*, the trial court prefaced its final instructions by telling the jury, " 'what you have to decide is, I suppose, fundamentally, whether there is enough of an explanation given by the defense case with reference to these particular contraband items. Is it enough for you, as citizens, to feel satisfied?' " (*Id.* at p. 766.) We held the "thrust" of that comment "was to reverse the burden of proof on the only contested factual issue in the case." (*Ibid.*) The same is not true here. The court's oblique statement that a juror's question would be addressed in the afternoon could not reasonably have been construed as shifting the burden of proof or in any way lightening the prosecution's obligation to prove guilt beyond a reasonable doubt.

whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial." ' " (*People v. Abel* (2012) 53 Cal.4th 891, 914.) The court's comment here was limited and fleeting, and would have had meaning for only one juror. Only Juror No. 7 knew the question she had asked, and only Juror No. 7 may have interpreted the court's response in one of the problematic ways discussed. But any prejudice that may have resulted from the court's comment would have been dispelled by the final instructions read that same afternoon. In addition to CALJIC No. 2.11's admonition that neither side is required to call all relevant witnesses, jurors were instructed pursuant to CALJIC No. 17.30 that they should form their own conclusions and disregard any statements suggesting the court's assessment of the facts or witness credibility. (See *Abel*, at p. 916.) "That instruction reminded the jury of the trial judge's role as an impartial presiding officer" whose function was not to comment upon evidence or draw conclusions from it. (*People v. Cook* (2006) 39 Cal.4th 566, 598.) "Defendant offers no reason to believe the jury failed to follow this instruction." (*Monterroso*, *supra*, 34 Cal.4th at p. 784.) Finally, even if the juror understood the comment to be an endorsement of the prosecutor's argument, that would simply mean the court agreed that the defense had access to an expert witness. But this fact was clearly established by the evidence in the case. At its worst, the court's comment would have merely confirmed what the evidence showed. Furthermore, because the prosecutor's argument did not respond to the note's question about whether the defense was provided funding for an expert,

the juror may well have been left with a lingering concern for unfairness, a concern that would have benefited the defense.

### d. Prosecutor's Rebuttal Argument

Defendant next asserts the prosecutor committed prejudicial misconduct by commenting in rebuttal argument on Blake's failure to testify. As noted, the prosecutor questioned in rebuttal why the defense had not called Blake to describe the claimed shortcomings in Myers's work or to present his own contrary findings. The prosecutor suggested no such testimony had been offered because Blake had found no errors and any retesting of the evidence would have confirmed the DNA match. Defendant now asserts these arguments improperly shifted the burden of proof by implying he had a duty to produce evidence, deprived him of the presumption of innocence, infringed his Fifth Amendment right to silence and his Sixth Amendment right to effective assistance of counsel, and violated both the attorney work-product privilege and Penal Code provisions governing the disclosure of expert witnesses. (U.S. Const., 5th, 6th, 8th, & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16 & 17; Code Civ. Proc., § 2018.010 et seq.; § 1054 et seq.)

A prosecutor's conduct violates the federal Constitution when it " 'so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 (*Darden*).) "Conduct that does not render a trial fundamentally unfair is error under state law only when it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*Bennett, supra*, 45 Cal.4th at p. 595; see *People v. Friend* (2009) 47 Cal.4th 1, 29 (*Friend*).) When a misconduct claim "focuses on the prosecutor's comments to the jury, we

determine whether there was a reasonable likelihood that the jury construed or applied any of the remarks in an objectionable fashion." (*People v. Booker* (2011) 51 Cal.4th 141, 184–185 (*Booker*).)

Although the prosecutor's arguments were vigorously presented, they were fair comment on the state of the evidence in the case. The primary defense offered at the guilt phase was that the state's DNA collection and testing were flawed and led to a misidentification of defendant as the perpetrator of the sodomy and murder. Defense counsel spent nearly the entirety of his lengthy closing argument discussing these alleged flaws. Yet, although there was evidence that the defense had retained an expert to review the DNA testing, neither this expert, nor any other, was called to testify on the topic. "We have long held that a prosecutor may make ' "comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses." ' " (*People v. Steskal* (2021) 11 Cal.5th 332, 351 (*Steskal*); see *People v. Gonzales* (2012) 54 Cal.4th 1234, 1275 (*Gonzales*); *People v. Stevens* (2007) 41 Cal.4th 182, 210; *People v. Lewis* (2001) 25 Cal.4th 610, 670.) Such comments do not invade the attorney work product privilege. (See *Zamudio, supra,* 43 Cal.4th at pp. 352, 355.) The prosecutor did not argue that defendant had a duty to produce evidence, nor did he attempt to shift or lighten the state's burden of proof. (See *Bennett, supra,* 45 Cal.4th at p. 596.) But he was entitled to point out that the defense had presented arguments only regarding its theory of DNA mishandling, and the logical witness who might have presented evidence to support this contention had not been called. (See *Stevens*, at p. 210.) While it is true that neither side is required to produce certain evidence, it is common for both sides to

comment on the absence of potentially available evidence.  Both parties will often, and legitimately, note that certain testimony is uncorroborated by any other witness, or that no fingerprint, photo, document, or forensic evidence supports the other side's theory.

*People v. Kaurish* (1990) 52 Cal.3d 648 applied these principles to argument about an absent expert witness.  Kaurish initially intended to call a serologist who was a consulting expert.  He changed his mind when the prosecutor sought leave to explore certain topics on cross-examination.  (*Id.* at pp. 679–680.)  At Kaurish's request, the court later barred the prosecutor from commenting in argument about the serologist's failure to testify.  (*Id.* at p. 680.)  "Nevertheless the prosecutor, while not mentioning [the expert] by name, referred to the absence of a defense serologist" using a female pronoun.  (*Ibid.*)  We rejected Kaurish's claim of prejudicial error, explaining that the prosecutor was "entitled to comment on the state of the evidence, including the lack of conflicting serological evidence." (*Ibid.*)  Because the record indicated the jury already knew of the specific person the defense had retained as an expert serologist, we concluded no prejudice could have resulted from the prosecutor's allusion to her by pronoun.  (*Ibid.*)

Case law has also firmly established that prosecutorial argument about absent witnesses does not infringe a defendant's rights under *Griffin v. California* (1965) 380 U.S. 609.  Interpreting the Fifth Amendment privilege against self-incrimination, "*Griffin* held that 'the prosecution may not comment upon a defendant's failure to testify on his or her own behalf.  Its holding does not, however, extend to bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call

anticipated witnesses.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 299; see *People v. Thomas* (2012) 54 Cal.4th 908, 945; *People v. Szeto* (1981) 29 Cal.3d 20, 34 (*Szeto*).) Here, the prosecutor's rebuttal argument "did not refer to the defendant's failure to testify, but to the failure of the defense to call witnesses to contradict the testimony of the prosecution's witnesses or to offer any evidence in opposition to the prosecution's case. *Griffin* . . . does not prohibit the prosecution from emphasizing the defense's failure to call logically anticipated witnesses or the absence of evidence controverting the prosecution's evidence." (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1051.)

A prosecutor's ability to comment on absent witnesses is not unbounded, however. In *People v. Wash* (1993) 6 Cal.4th 215, the defense called Wash's friend and an aunt. The prosecutor cross-examined them about the statements they had made to defense-retained experts. (*Id.* at pp. 250–251.) In closing, the prosecutor criticized the defendant's failure to offer expert psychiatric testimony in support of his mental state defense. Similar to the argument here, the prosecutor in *Wash* observed, " '[W]e've had a couple of guys lurking around in the background on this case, Dr. Rosenthal and Dr. Seligman. They were out talking to people, and then we never heard from them.' " (*Id.* at p. 262.) We observed without further explanation or citation that, because "neither expert testified at trial, their names should not have been invoked by the prosecutor during closing argument." (*Ibid.*)[21] Yet, based on the

---

[21] It is not completely clear from the opinion whether the names of Doctors Rosenthal and Seligman were mentioned in prior testimony. Here, by contrast, Dr. Blake's name was used repeatedly during Dr. Rogers's examination.

authorities permitting prosecutorial comment on the state of the evidence, we concluded in *Wash* that the remarks did not constitute error or misconduct. (*Wash*, at pp. 262–263, citing *Szeto, supra*, 29 Cal.3d at p. 34 & *People v. Ratliff* (1986) 41 Cal.3d 675, 691.) The same is true here. The prosecution was permitted to comment on the state of the evidence as presented to the jury. Unlike *Wash*, the jury here heard evidence, not simply that Blake had been retained by the defense, but also about his credentials, his review of Myers's results, and his opportunity to retest the evidentiary samples. The defense attacked Myers's credibility as an expert by emphasizing his lesser academic credentials as compared to Blake's doctorate. The prosecutor was not required to ignore the evidence about Blake, or tiptoe around it in his argument, simply because the defense chose not to call Blake to testify.

*Steskal, supra*, 11 Cal.5th 332 sounded a related note of caution. Steskal did not call his wife to testify about why he " 'all of a sudden . . . decided to act out' " on the day of the murder. (*Id*. at p. 350.) In closing argument, the prosecutor pointed out the lack of evidence supporting the defense on this issue, noting " 'the person that was perhaps the best witness to talk about the defendant before the murder and after the murder, who I can't call because of the marital privilege, they don't call. They don't call Nannette Steskal.' " (*Ibid*.) We rejected the defendant's prosecutorial misconduct claim based on long-standing case law allowing such commentary on the defense's failure to introduce material evidence or call logical witnesses. (*Id*. at p. 351.) However, we also made clear that argument is improper if it invites speculation, suggests the defense has the burden to prove innocence, lightens the prosecution's burden, or suggests a defendant may not " 'simply

stand[] on his right to have the state prove his guilt.' " (*Id*. at p. 352.)

After asking why the defense would have failed to call Blake, the prosecutor answered his own rhetorical question. He posited that Blake could have offered no helpful testimony for the defense because Blake found no errors in Myers's work and because any retesting of the forensic evidence would have produced a second set of DNA results confirming defendant's guilt. The arguments were forcefully presented and close to the line in specifying particular conclusions to be drawn from Blake's failure to testify. However, defendant failed to object and therefore forfeited his misconduct claim.

"To preserve a misconduct claim for appellate review, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the remark (or conduct) unless such an admonition would not have cured the harm." (*Booker*, *supra*, 51 Cal.4th at p. 184.) At no point, either during the argument itself or during earlier proceedings, did the defense object that the prosecutor's presentation was improper. Defendant asserts his misconduct claim was not forfeited, however, because any objection would have been futile. (See *People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).) He relies on the court's refusal to limit the prosecutor's rebuttal argument and its accompanying comment that "[t]he DA can argue the way he wants." But in this same exchange, the court reminded defense counsel of his right and obligation to object if the argument was improper: "He can say whatever he wants. You can't tell him what he is going to say. *If he says something, you don't like it, object*." Moreover, defense counsel's objections did not touch on whether it would be permissible for the prosecutor to speculate about why the defense had not called Dr. Blake. As a result, the

court had no opportunity to rule on that issue, and the claim is forfeited on appeal. (See *People v. Lucas* (1995) 12 Cal.4th 415, 473 (*Lucas*).)

On the merits, although the question is closer for these remarks than for other aspects of defendant's prosecutorial misconduct claim, we conclude the argument was not misconduct. "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial." (*Lucas, supra,* 12 Cal.4th at p. 473.) Defense counsel had spent considerable effort trying to discredit the DNA evidence, both in Myers's cross-examination and in closing argument. There was evidence that a defense expert with superior credentials had reviewed Myers's work, yet that expert did not testify. The prosecutor was entitled to remark upon this state of evidence. The proposed inferences about Blake's absence were logical given the evidence of this expert's prior involvement. "Whether the inferences drawn by the prosecutor were reasonable was a question for the jury to decide." (*Id.* at p. 474.) We rejected a prosecutorial misconduct claim for similar reasons in *Gonzales, supra,* 54 Cal.4th 1234. There, the prosecutor argued the defense could have presented testimony from a child witness's advocate or psychologist, asserting its failure to do so meant the jury should conclude those experts would have contradicted the defense claim that the child's testimony had been influenced. (*Id.* at p. 1274.) That speculation was even more questionable than what occurred here, particularly given the potential privileges involved. Nevertheless, we concluded the defendant fell "well short of showing the sort of deceptive, reprehensible, and prejudicial argument that would constitute misconduct." (*Id.* at p. 1275.) So too here, the prosecutor's argument was not

deceptive or reprehensible, rendering the trial fundamentally unfair. (See *Bennett, supra,* 45 Cal.4th at p. 595.)

Nor is it reasonably likely the jury construed the prosecutor's remarks in an improper fashion. (See *Booker, supra,* 51 Cal.4th at pp. 184–185.) The jury was instructed both before and after closing argument that attorney statements are not evidence (CALJIC No. 1.02), a point the prosecutor also stressed in his own argument. Jurors were specifically told to disregard an attorney's interpretation of the evidence if it differed from theirs. And, as noted, they were instructed that the prosecution bore the burden of proving defendant's guilt beyond a reasonable doubt (CALJIC No. 2.90), that neither side was obligated to call all witnesses who might have relevant knowledge (CALJIC No. 2.11), and that defendant was entitled to rely on the state of the evidence as well as the People's failure, if any, to prove the charges beyond a reasonable doubt (CALJIC No. 2.61). Thus, even assuming the comments were improper, defendant has not shown they were prejudicial.

### e. *Cumulative Prejudice*

Finally, defendant asserts that, taken together, the admission of evidence about Blake's involvement, the court's response to the juror note, and the prosecutor's rebuttal argument about Blake had such a cumulative effect of unfairness that he was deprived of a fair trial. Defendant did not raise this argument or assert any constitutional objections below, including in his post-verdict motion for new trial. Assuming the claim was not forfeited, it fails on the merits. Having reviewed each of defendant's contentions in detail, and in the context of the trial as a whole, we conclude the admission of evidence and argument about Blake's involvement did not

render defendant's trial so fundamentally unfair that he was denied due process. (See *Bennett*, *supra*, 45 Cal.4th at pp. 594–596.)

### 2. *Confrontation Issues*

Defendant next claims his Sixth Amendment right to confrontation was violated when a pathologist who did not conduct the autopsy related the report's findings to the jury. We conclude that much of the examination was proper, and any error in admitting other testimony was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

Dr. Paul Herrmann, the pathologist who performed Terena's autopsy, was out of the country at the time of trial. The prosecution called Dr. Thomas Rogers to testify in his place. Dr. Rogers had worked with Dr. Herrmann for 20 years at a forensic medical group that performed autopsies for the Alameda County Coroner's Office. Dr. Rogers was present for some of the autopsy and had a "vague recollection" of it when he reviewed the case for trial.

Without objection on hearsay or confrontation grounds, Dr. Rogers testified about the autopsy, as well as the autopsy report and its accompanying photographs. He described all of the significant wounds shown in the pictures, including lacerations around the rectum and the stab wound that completely severed Terena's jugular vein. When shown a multipurpose tool taken from defendant, Dr. Rogers opined that it was consistent with the implement used in the stabbing. Based on photographs that showed hemorrhaging from the rectal lacerations, Dr. Rogers concluded these wounds were inflicted before death. He did not express an opinion as to why

fecal matter was found to be present in that area but agreed that sodomy was a possible explanation. A photograph of stomach contents showing nondigested food indicated Terena could have been killed within half an hour after eating. Dr. Rogers also identified evidence samples taken in the autopsy. He described the process by which swabs would have been collected from different areas of the body and preserved in sealed evidence envelopes. Based on his knowledge of office procedures and his knowledge of Dr. Herrmann's practices, he explained that all tissue samples would have been dried, packaged, and then refrigerated before being transmitted to the coroner's office. At the close of trial, the court admitted the autopsy photos and swabs into evidence. The court refused to admit the autopsy report itself, however, noting it contained a large amount of material not covered in Dr. Rogers's testimony.

The federal confrontation clause guarantees criminal defendants the right to confront adverse witnesses. (U.S. Const., 6th Amend.) In *Crawford v. Washington* (2004) 541 U.S. 36, 53–54, 68 (*Crawford*), the United States Supreme Court departed from its previous precedent (*Ohio v. Roberts* (1980) 448 U.S. 56) to hold that the admission of "testimonial" hearsay against a criminal defendant violates the Sixth Amendment right to confrontation unless the declarant is unavailable *and* the defendant had a prior opportunity for cross-examination.[22] Based on *Crawford* and cases following it, defendant asserts his confrontation rights were violated by portions of Dr. Rogers's

---

[22] Because the prosecution proceeded by way of grand jury indictment rather than a preliminary hearing, defendant would have had no opportunity to cross-examine Dr. Herrmann at a preliminary hearing.

testimony. Although defendant did not raise a hearsay or confrontation objection below, the claim is not forfeited because his trial occurred five years before *Crawford* was decided. (See *People v. Garton* (2018) 4 Cal.5th 485, 505 (*Garton*); *People v. Pearson* (2013) 56 Cal.4th 393, 461–462 (*Pearson*).)

Setting aside testimony about Dr. Rogers's background and expert qualifications, the topics covered in his examination can be grouped into four different categories (see *Garton*, *supra*, 4 Cal.5th at p. 505): (1) statements in Dr. Herrmann's autopsy report relating his observations and opinions; (2) testimony describing or explaining photographs from the autopsy; (3) testimony conveying Dr. Rogers's own opinions based on information conveyed in the autopsy report or his examination of accompanying photographs; and (4) testimony describing the custom and practice Dr. Herrmann would have followed in collecting and preserving evidence samples for forensic analysis. As we explain, only the first category of statements raises a potential confrontation clause issue.

"Whether a challenged statement is hearsay is always the threshold question" in analysis of a *Crawford* claim. (*People v. Turner*, *supra*, 10 Cal.5th at p. 820, fn. 19.) Hearsay is defined as "a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid Code, § 1200, subd. (a).) Documents such as letters or reports are very often hearsay because they are prepared out of court and generally offered to prove the truth of their contents. (See *People v. Sanchez* (2016) 63 Cal.4th 665, 674 (*Sanchez*).) The same is not true of photographs, however. A "statement" for hearsay purposes is defined as the "oral or written verbal expression or . . . nonverbal conduct *of a person*." (Evid. Code, § 225, italics added.) "Only people can make

hearsay statements; machines cannot." (*People v. Leon* (2015) 61 Cal.4th 569, 603 (*Leon*).) Accordingly, "[i]t is clear that the admission of autopsy *photographs*, and competent testimony based on such photographs, does not violate the confrontation clause." (*Ibid.*; see *Garton, supra*, 4 Cal.5th at p. 506.) A significant portion of Dr. Rogers's testimony was explicitly based on autopsy photographs, explaining what they depicted and his opinion as to what those depictions signified. He referred to photographs in evidence, using them to discuss many of Terena's wounds, including lacerations to the rectal opening indicative of penetration, and his own estimate of her time of death in relation to food consumption. The photographs were not hearsay, nor was Dr. Rogers's testimony based on his examination of them.

It was also permissible for Dr. Rogers to testify about his own independently conceived opinions, even if those opinions were based on inadmissible hearsay. (See *Leon, supra*, 61 Cal.4th at p. 603; see also *People v. Perez* (2018) 4 Cal.5th 421, 457 (*Perez*).) "Any expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so. Because the jury must independently evaluate the probative value of an expert's testimony, Evidence Code section 802 properly allows an expert to relate generally the kind and source of the 'matter' upon which his opinion rests." (*Sanchez, supra*, 63 Cal.4th at pp. 685–686; see *Garton, supra*, 4 Cal.5th at p. 506.) Dr. Rogers gave several of his own opinions, including how soon Terena would have died after the severing of her jugular vein, whether defendant's multipurpose tool could have been used to inflict the stab wounds, whether rectal injuries were inflicted before death, and how soon death occurred after she had eaten. These opinions were Dr. Rogers's own; they are

not contained in the autopsy report.  Although they may have been based, to varying extents, on hearsay statements in the report, it was permissible for Dr. Rogers to rely on this material in forming his own opinions.  (See Evid. Code, § 802; *Sanchez*, at pp. 685–686.)

Portions of Dr. Rogers's testimony were potentially problematic, however.  A "hearsay problem arises when an expert simply recites portions of a report prepared by someone else, or when such a report is itself admitted into evidence.  In that case, out-of-court statements in the report are being offered for their truth."  (*Leon*, *supra*, 61 Cal.4th at p. 603.)  Here, Dr. Herrmann's autopsy report was marked for identification but not admitted into evidence.  However, it is evident from Dr. Rogers's testimony that, in response to some questions, he referred to the autopsy report, and he may have relayed some details from the report in giving his answers.[23]  To the extent

-------

[23]    Defendant notes that, when asked about the cause of Terena's death, Dr. Rogers replied:  "Incised wound to the neck."  Defendant then refers to Dr. Herrmann's report, which reads:  "CAUSE OF DEATH:  INCISED WOUND OF THE NECK."  He urges that Dr. Rogers must have simply reported Dr. Herrmann's opinion, rather than giving his own.  This conclusion is not supported by the record.  It is not surprising that two forensic pathologists would conclude an incised wound to the jugular vein caused the decedent's death and would describe the cause using that professional nomenclature.  It is clear from this record, however, that Dr. Rogers examined photos showing the severed vein.  He described one of the autopsy photographs as showing the left side of the body, blood covering the body, and "an incised defect on the left side of the neck."  A fair reading of the record is that, in recounting the cause of death, Dr. Rogers was giving his own opinion, rather than simply repeating Dr. Herrmann's statement.  This reading is consistent with Dr. Roger's later testimony.  Asked "how long

Dr. Rogers was simply relaying the contents of the report to the jury, his testimony constituted hearsay. Under the United States Supreme Court's *Crawford* jurisprudence, admission of this hearsay violated the confrontation clause if it was "testimonial." (*Crawford, supra,* 541 U.S. at p. 53; see *id.* at pp. 53–54; *Bullcoming v. New Mexico* (2011) 564 U.S. 647, 657.) Although the high court has discussed the topic in a number of decisions (see, e.g., *Bullcoming,* at pp. 658–659; *Davis v. Washington* (2006) 547 U.S. 813, 822), it has yet to articulate a comprehensive definition of the term "testimonial." (See *People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 912.)

Primarily because the trial here occurred before *Crawford*'s newly adopted approach to analyzing the admissibility of testimonial hearsay, the parties did not parse precisely when Dr. Rogers was giving his own conclusions or simply relating statements from Dr. Herrmann's report. In an abundance of caution, because the record is sometimes unclear on the distinction, we assume for purposes of this review that Dr. Rogers's testimony conveyed some testimonial hearsay from the report. However, any confrontation error was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24; see *Pearson, supra,* 56 Cal.4th at p. 463.) The jury received ample evidence of Terena's wounds and sexual assault from non-hearsay sources, including the autopsy and crime scene photographs and police testimony. Moreover, the condition of her body and the cause of her death were undisputed. (See

---

would a person survive after having suffered the injury to the neck that you previously described?" Dr. Rogers answered, "I can't say exactly; however, it would be my opinion that most people are going to die within a three- to a five-minute period after sustaining an injury of that nature."

*Garton, supra,* 4 Cal.5th at p. 507; *Perez, supra,* 4 Cal.5th at p. 457.)  The defense did not contest the manner of Terena's death.  Instead, it challenged who had caused it.

In an attempt to establish prejudice, defendant points to Dr. Rogers's testimony about how Dr. Herrmann would have collected evidence swabs from Terena's body.  Defendant stresses that the evidence obtained in these swabs was critical in establishing the DNA match that linked defendant to the present crimes.  The forensic evidence was manifestly important.  However, Dr. Rogers's testimony about the evidence collection was not hearsay.  He did not recite facts from the autopsy report about how tissue samples were obtained and preserved.  In fact, the autopsy report includes no description whatsoever of the swabs in question.  The report only mentions evidence collection in two places, where it notes that fibers adhering to blood on Terena's fingers were "removed and placed into evidence."  Sergeant James Taranto testified that he was present and observed the collection and preservation of evidence swabs from Terena's autopsy, and Dr. Rogers testified about his office's general custom and practice of collecting, marking, and preserving swabs for forensic examination and memorializing the chain of custody.  He then gave opinions about how he believed, based on these standard practices, Dr. Herrmann would likely have obtained the samples here.  This testimony related no out-of-court statements.  Accordingly, it was not hearsay and did not violate the confrontation clause.[24]  The

---

[24]    In *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 308, the high court held that " 'certificates of analysis' " reporting the results of drug testing were testimonial hearsay. The majority took pains, however, to stress that the confrontation clause does not demand live testimony for each

testimony was also admissible under Evidence Code section 1105, which expressly authorizes the admission of habit or custom evidence. To the extent testimony about how Dr. Hermann may have collected the samples lacked foundation, defendant forfeited any such claim by failing to raise this objection. (See *People v. Jackson* (2016) 1 Cal.5th 269, 366–367 (*Jackson*).) Nor would defendant have been prejudiced by any error in the admission of this testimony. The defense never suggested there was any problem with Dr. Herrmann's collection of the swabs. On the contrary, defense counsel argued vigorously that Herrmann's slides were "so good" but criminalist Sharon Smith had hopelessly contaminated them, resulting in inaccurate DNA results. Given this defense theory of the case, any error in admitting testimony about Dr. Herrmann's procedures was harmless under any standard.

### 3. *Juror Misconduct*

Defendant claims the court conducted an "inadequate and improper" investigation of juror misconduct and that this misconduct infringed his constitutional rights to a fair trial by an impartial jury. We conclude the court's inquiry was adequate and there was no prejudicial misconduct.

---

link in the evidentiary chain of custody: "[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. While the dissent is correct that '[i]t is the obligation of the prosecution to establish the chain of custody,' [citation] this does not mean that everyone who laid hands on the evidence must be called. As stated in the dissent's own quotation [citation], 'gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility.' " (*Id.* at p. 311, fn. 1.)

### a. Background

After the jury deliberated and returned guilty verdicts, a bailiff found what appeared to be two typewritten poems in the jury room, both signed by Juror No. 1. The court read them into the record, and we quote them in full. The first reads:

JUROR # 1

What kind of person could do such a crime?
This is the thought that runs through my mind.
The brutality and nature of this attack —
Surely was a vicious act.
The day seems so long, focusing on facts;
I start to get pains in my neck and my back.
The details are very long and graphic,
My mind seems like it's weaving in traffic.
Both sides arguing to prove their points,
Listening so hard you feel it in your joints.

The Jury enters and leaves in a row,
Emotions and feelings unable to show.
You're instructed not to talk about the case;
Your insides churn; the tension in your face.
For someone to hold all of this in
Really should be considered a sin.
A part of you has to stop living
While on the jury you are sitting.
Some of the evidence I have seen
Are in my thoughts and in my dreams.

No one said it was going to be easy,
Talking about blood and samples of feces.
I can't wait 'til the end of this trial
So I can release my soul of this bile.

The second poem reads:

JUROR RESPONSIBILITY

The responsibility of someone's life in your hand —

79

Only a juror would understand.
Is he guilty?  Or is he not?
In your mind this battle's fought.
If there is a reasonable doubt,
"Not guilty," the jury will shout.
If the evidence is so compelling,
"Guilty," is what they'll be yelling.

Justice certainly will prevail
If a guilty man is put in jail.
An innocent man shall be free.

These decisions are up to WE.
WE as a jury need to find
If — or if not — he did the crime.

Clear up any of your confusion
Before you come to your conclusion.
Remember WE all must agree
Whether or not he's guilty!

At defense counsel's request, the court questioned Juror No. 1 about the poems.  She said she had written them at home after hearing all the guilt phase evidence.  Although she initially thought she had given the poems to the other jurors after they returned guilty verdicts, she later corrected herself and said they had been shared during deliberations.  She explained that another juror had typed up the poems, "brought them in," and gave them to the other jurors.  When the court asked if anything about the poems had affected her ability to be a fair juror in the guilt phase, Juror No. 1 replied to the contrary and explained the poems were simply meant to express her feelings about the difficulty of serving as a juror.  She affirmed that she had followed the court's instructions and had not spoken to anyone about the case.

The court announced its intention to ask all jurors three questions: (1) whether they had read the poems; (2) whether the poems had affected their guilt phase verdicts; and (3) whether the poems would compromise their ability to be fair in the penalty phase. Juror No. 1 apologized and offered that she had written one of the poems "because the one lady was struggling. You know, I mean it wasn't — nobody was pressuring her. I felt for her, to tell the truth." After the juror left, defense counsel expressed concern that Juror No. 1 might have collaborated with another juror to type up the poems in order to persuade a holdout juror to return a guilty verdict. The court believed its proposed questioning would reveal if any such misconduct occurred. Defense counsel objected, however, and urged the court to explore all the factual circumstances surrounding how the poems were used. The court refused, noting that jurors would have an opportunity to say whether the poems had any influence on their verdicts.

The court then examined each juror individually, apart from the others, and posed its three questions. Juror No. 2 confirmed that the poems were handed out during deliberations. She said she had read the poems, although she did not say when, and stated they did not in any way affect her decision. Defense counsel protested that the questioning was insufficient and urged the court to explore why the poems were distributed. The court declined to do so.

Juror No. 6 had read the poems before voting but said they did not influence his decision in any way. Juror No. 7 could not remember exactly when she read the poems but was certain they had "[a]bsolutely" no effect on her verdict. She believed the poems were simply an expression of the author's feelings and conveyed the responsibility jurors felt. Likewise, Juror No. 8

and Juror No. 10 were uncertain when they had read the poetry but said it had not affected their verdicts. Juror No. 3, Juror No. 5, and Juror No. 9 each reported that they had not read the poems until after the guilt phase verdicts were returned. Juror No. 3 observed, "I think it was just one person's way of expressing the whole feeling of the whole trial." Juror No. 4 had not read the poems at all and was waiting until trial was over. Juror No. 11 said he had not yet read the poems. As background, he offered that Juror No. 1 had written them in her juror notebook, and it was noted "during the deliberative process, that she likes to write poetry." Another juror, whom he believed was Juror No. 7, took the pages home to be typed, and she did not distribute them until the first day of the penalty phase. Based on this sequence of events, Juror No. 11 opined that "probably not all of the jurors even heard or had access to [the poetry] until [the guilt phase] was over." Juror No. 12, the foreperson, could not recall whether he had read the poems before voting. He thought the poetry was not distributed until "the very end of the deliberations." It did not affect his verdict, and he reported that no one referred to the poetry at any time during deliberations. "As a matter of fact," he said, "I think if you poll most of the people, probably half of them don't even remember what was in there." In his opinion as foreperson, the poems "in no way affected any of the deliberations." [25] All jurors

---

[25] At defense counsel's request, the court also questioned the alternate jurors about their exposure to the poems. Apparently, once the penalty phase began, the alternates joined jurors in the jury room when court was not in session. Because the alternates did not participate in guilt phase deliberations, the questioning focused on whether, even if they had seen the poems, they could remain fair and unbiased should they serve during the penalty phase. Like all of the seated jurors, all averred that they could.

also confirmed their ability to remain fair in the penalty phase. Because this jury was ultimately unable to reach a penalty verdict, those responses are not repeated. The only question here is the impact of the poems, if any, on the guilt verdicts.

After this questioning, defense counsel requested a further inquiry and moved for a mistrial on the ground that two jurors had "conspire[ed]" to use the poems to pressure a holdout juror. He also argued Juror No. 7 had lied in saying she was uncertain when she read the poems, given that Juror No. 11 surmised she was the juror who had typed them. The court denied the request for further inquiry and denied the mistrial motion.

### b. Discussion

Defendant does not directly challenge the court's ruling on his mistrial motion. Rather, he contends the court failed to undertake an adequate or appropriate investigation of the alleged juror misconduct. He also contends the juror misconduct was so prejudicial that he was denied his constitutional rights to a fair trial by an impartial jury. (U.S. Const., 5th, 6th, 8th, & 14th Amends.)

When a court has become aware of potential juror misconduct, it must conduct a sufficient inquiry to determine the facts reasonably necessary to resolve the matter. (*Clark*, *supra*, 52 Cal.4th at p. 971; *People v. Prieto* (2003) 30 Cal.4th 226, 274.) However, the court enjoys broad discretion in determining whether and how to investigate potential misconduct, and we review the adequacy of its inquiry with deference. (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1170; *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 69–70 (*Allen and Johnson*); *Clark*, at p. 971.) Moreover, "failure to conduct a sufficient inquiry is ordinarily viewed as an abuse of discretion,

rather than as constitutional error." (*People v. Pinholster* (1992) 1 Cal.4th 865, 928 (*Pinholster*); see *People v. Burgener* (1986) 41 Cal.3d 505, 519–520.)

The court's inquiry here was sufficient, especially considering the innocuous content of the poems.[26] Immediately upon learning that poems had been found in the jury room, the court notified the attorneys, questioned Juror No. 1 about the circumstances under which she wrote and distributed the poems, then questioned each juror individually to discern any impact the poems may have had on their verdicts. Defendant argues the court should have probed more deeply into the circumstances surrounding how the poems might have been used to coerce a holdout juror into changing her vote, but we have cautioned that a trial court's inquiry into jury misconduct " ' "should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations." ' " (*People v. Maciel* (2013) 57 Cal.4th 482, 547; see *People v. Thompson* (2010) 49 Cal.4th 79, 137; *People v. Wilson* (2008) 44 Cal.4th 758, 829 (*Wilson*).) " 'The hearing should not be used as a "fishing expedition" to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred.' " (*People v. Avila* (2006) 38 Cal.4th 491, 604.) The court questioned each juror separately and determined that only one specifically recalled having read the

---

[26] As the Attorney General points out, it is clear the poems would have been unobjectionable if the juror had read them aloud to fellow jurors during deliberations.

poems before a verdict was decided upon.[27] All others read the poems after the verdicts, did not recall when they read them, or had yet to read them. And all jurors unequivocally affirmed that the poems had no impact on their decisions. No juror said they felt coerced. "We have long recognized that, except when bias is apparent from the record, the trial judge is in the best position to assess the juror's state of mind during questioning." (*Clark, supra*, 52 Cal.4th at p. 971.) Given the jurors' responses, which the court was entitled to credit, and the speculative nature of counsel's assertion that the poems had been used for coercive purposes, the court did not abuse its discretion in denying defendant's request for further inquiry. (See *ibid*.)

Defendant also contends the court's inquiry improperly intruded on the jurors' deliberative process. Evidence Code section 1150, subdivision (a) provides that, while a verdict's validity may be challenged by evidence of "statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly," evidence may *not* be admitted "to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent or dissent from the verdict or concerning the mental processes by which it was determined." "Thus, where a verdict is attacked for juror taint, the focus is on whether there is any *overt* event or circumstance, 'open to [corroboration by] sight, hearing, and the other senses' [citation], which suggests a likelihood that one or more members of the jury were influenced

---

[27] Precisely when Juror No. 2 read the poems is unclear. She affirmed that she had read them but did not mention whether she did so before or after returning a verdict.

by improper bias." (*In re Hamilton* (1999) 20 Cal.4th 273, 294.) Defendant argues the court's second question, asking whether the poems had an impact on jurors' verdicts, violated Evidence Code section 1150 by attempting to probe the effect of the asserted misconduct on jurors' mental processes. (See *In re Carpenter* (1995) 9 Cal.4th 634, 651–652 (*Carpenter*).)

The procedural posture in which the inquiry here was conducted bears upon defendant's argument. Juror No. 1's poems were discovered after the jury had returned guilt phase verdicts but before it was discharged. At that time, the jury was in the process of receiving penalty phase evidence. Thus, the court's inquiry needed to serve a twofold purpose. The court had to investigate whether the poetry influenced any juror's guilt phase verdict, which would render that verdict invalid, but it also had to determine whether the poetry affected any juror's ability to remain fair, which would require the juror's discharge from the penalty phase. Defendant's argument concerns only the first aspect of the court's inquiry. "Evidence Code section 1150 applies only to postverdict challenges." (*Allen and Johnson*, *supra*, 53 Cal.4th at p. 72, fn. 10; see *People v. Cleveland* (2001) 25 Cal.4th 466, 485.) It governs the evidence that may be received from a party seeking to impeach a verdict. Indeed, defendant cites no case holding that a court's inquiry into jury misconduct was improper based on Evidence Code section 1150.

In any event, we need not decide the extent to which Evidence Code section 1150 applies here because defendant forfeited this claim of error. Although defense counsel urged the court to conduct a broader inquiry into circumstances surrounding the poems' creation and distribution, they did not object to the court's proposed questions and, in particular, did

not assert that any question would invade the jury's deliberative processes in violation of Evidence Code section 1150. Defendant has not established that an objection on this ground would have been futile or would have failed to alleviate existing prejudice. (See, e.g., *People v. Woodruff* (2018) 5 Cal.5th 697, 769.) "It is essential that if a party deems prejudicial an act or statement of the presiding judge that he call the matter to the attention of the judge when the matter occurs so that the error may be corrected." (*People v. Archerd* (1970) 3 Cal.3d 615, 636.) Here, a timely objection would have allowed the court to consider whether it was advisable to limit or change its questions to avoid intruding upon the deliberative processes. (See *Monterroso*, *supra*, 34 Cal.4th at p. 761; *People v. Boyette* (2002) 29 Cal.4th 381, 424 (*Boyette*); see also *People v. Peterson* (2020) 10 Cal.5th 409, 476–477.) Because defendant raised no such objection, but indeed sought to delve even further into the jury's deliberations, he cannot now assert Evidence Code section 1150 as a ground for reversal.

Finally, defendant urges he was denied a fair trial due to prejudicial juror misconduct. He maintains: "There is no question that . . . two jurors committed jury misconduct by meeting privately and discussing the case. . . . Juror No. 1 wrote the poems at home and Juror No. 7 typed the poems at home and distributed them to the jury during guilt phase deliberations and, obviously, Juror No. 1 and Juror No. 7 talked about the poems and the struggling juror." The record does not support defendant's characterization of the evidence or his claim of prejudicial misconduct.

The trial court has a duty to instruct the jury on "its basic functions, duties, and conduct," including that jurors "shall not converse among themselves, or with anyone else, . . . on any

subject connected with the trial" (§ 1122, subd. (a)) and may not "form or express any opinion about the case until the cause is finally submitted to them" (§ 1122, subd. (b)). Consistent with this obligation, the court instructed jurors at the beginning of defendant's trial not to discuss the case with anyone "or form or express any opinion" about the case before it was submitted to them for decision. Then, at the close of trial, it instructed them to decide the case based only on the evidence received and to discuss the case only with other jurors "when all twelve jurors are present in the jury room." (CALJIC No. 1.03.) "A juror who violates his or her oath and the trial court's instructions is guilty of misconduct." (*People v. Linton* (2013) 56 Cal.4th 1146, 1194 (*Linton*).) Thus, misconduct occurred below if: (1) Juror No. 1 formed or expressed an opinion about the case when she wrote the poems; (2) the poems brought outside information, not received into evidence, into the jury room; or (3) conversations about the case occurred apart from the other jurors when arrangements were made for a juror to type the poems. (See *Wilson, supra,* 44 Cal.4th at p. 829.)

" 'In determining whether juror misconduct occurred, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." ' " (*Linton, supra,* 56 Cal.4th at p. 1194.) Whether any such misconduct was prejudicial, however, " 'is a mixed question of law and fact subject to an appellate court's independent determination.' " (*People v. Danks* (2004) 32 Cal.4th 269, 303 (*Danks*).)

The record contains no suggestion that Juror No. 1 prejudged the case. She explained that she wrote the poems at home after all evidence in the guilt phase had been received. The poems do not discuss particular evidence or express any

conclusions on factual questions or defendant's guilt or innocence. Rather, they reflect on the physical, mental, and emotional challenges of serving as a juror in a death penalty trial. Nor is it of concern that the juror wrote the poems at home. "Jurors are allowed to reflect about the case during the trial and at home." (*Linton*, *supra*, 56 Cal.4th at p. 1195.) They are "not limited to thinking about the case in the deliberation room." (*People v. Collins* (2010) 49 Cal.4th 175, 253 (*Collins*).) In *Linton*, during trial, a juror told her husband she was confused about something in the prosecutor's opening statement and remarked that she would not have reacted in a certain way under the same circumstances. (*Linton*, at pp. 1192–1193.) We upheld a finding that this was not misconduct. (*Id*. at p. 1195.) We observed that it would be unrealistic to expect jurors not to think about the case before deliberations, and the juror's comment did not indicate she would be unwilling to deliberate fairly once the case was submitted. (*Id*. at pp. 1195–1196.)

We expect a great deal of jurors, most particularly in death penalty cases, as the poems reveal. It cannot, nor should it, be the rule that jurors commit misconduct when they simply note with solicitude the obligations and constraints that jury service imposes upon all of them. Indeed, we require that they bear those burdens and honor their obligations to follow the requirements of their role, no matter how onerous it may be. That said, jurors should generally be discouraged from sharing materials with other jurors outside of deliberations. Such behavior may create an appearance of misconduct, triggering an inquiry that must be conducted with care to avoid intruding upon the jury's deliberative processes.

We further conclude the poems did not introduce extrinsic evidence into the jury's deliberations. As noted, the poems do

not discuss particular evidence or advocate for any outcome. (Compare *Danks, supra,* 32 Cal.4th at p. 304 [bringing Bible verses to jury room was misconduct].) They simply represent one juror's ancillary thoughts about the difficulties of jury service. They indicate an awareness of the weighty import of the task, the need to consider all the evidence and reach any verdict unanimously, and the important question of state of mind. In this sense they are completely in concert with the court's instructions.

A variety of comments and approaches to stress-management "is probably unavoidable when 12 persons of widely varied backgrounds, experiences, and life views join in the give-and-take of deliberations. Not all comments by all jurors at all times will be logical, or even rational, or, strictly speaking, correct. . . . 'The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses: it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court. Such a weakness, however, must be tolerated. "[I]t is an impossible standard to require . . . [the jury] to be a laboratory, completely sterilized and freed from any external factors." [Citation.] Moreover, under that "standard" few verdicts would be proof against challenge.' (*People v. Marshall* [(1990)] 50 Cal.3d [907,] 950; see also *People v. Cox* (1991) 53 Cal.3d 618, 696.)" (*People v. Riel* (2000) 22 Cal.4th 1153, 1219.)

A similar misconduct claim was raised in *Collins* when a juror drew a scale diagram for himself based on expert ballistics testimony. (*Collins*, *supra*, 49 Cal.4th at pp. 237, 253.) Although he did not bring the diagram itself into the jury room, he used it in deliberations to conduct a demonstration of how he believed the shooting had occurred. (*Id*. at pp. 238–239.) We concluded the diagram did not introduce new evidence into the case and the juror's creation of it was not "improper because it occurred outside the presence of other jurors." (*Id*. at p. 253.) Similarly, in *Bormann v. Chevron USA, Inc.* (1997) 56 Cal.App.4th 260, it was not misconduct for a juror to prepare a typewritten statement at home summarizing her view of the evidence, nor to share that statement with other jurors when they resumed deliberations. (*Id*. at pp. 262–264.) Likewise here, Juror No. 1 did not commit misconduct by writing poems reflecting on the challenges of serving as a capital juror. Her poetry on that subject did not introduce new evidence, and sharing it with other jurors during deliberations "did not exceed the boundaries of proper conduct." (*Collins*, at p. 255.)

Nor does the record support defendant's claim that Juror No. 1 discussed the case with another juror outside of deliberations. He suggests such a conversation must have occurred when arrangements were made for a juror to type the poems. Yet Juror No. 1 simply said that another juror had typed the poems. She did not say where their conversation about the poems took place, and the record contains no indication it was elsewhere than in the jury room, in the presence of all deliberating jurors. She did not recount any conversation on that topic or whether the other juror simply took that task upon herself. Absent such a predicate showing, the claim of misconduct fails. (See *People v. Loker* (2008) 44 Cal.4th 691, 754

(*Loker*).) Nor is there evidence that any discussions about the poetry concerned the case itself. " '[W]hen jurors are observed to be talking among themselves it will not be presumed that the act involves impropriety, but in order to predicate misconduct of the fact it must be made to appear that the conversation had improper reference to the evidence, or the merits of the case.' " (*People v. Majors* (1998) 18 Cal.4th 385, 425.) Here the poems alluded to the difficulty of jury service. They properly described many of the principles and procedures jurors are instructed to employ. They made no reference to " 'the evidence, or the merits of the case.' " (*Ibid.*) There is also no evidence that the poems were aimed at changing the mind of a holdout juror. As the trial court noted before questioning jurors about the poems, Juror No. 1 simply stated that one juror "was having some trouble." She did not indicate what type of trouble was involved, and, as the court observed, "[i]t could have been emotional troubles."

Finally, even assuming a juror committed misconduct in creating or sharing the poems, there is no reasonable likelihood of prejudice. Although juror misconduct generally raises a presumption of prejudice, any such presumption is rebutted if a review of the entire record fails to show a "*substantial likelihood* that one or more jurors were actually biased against the defendant." (*In re Hamilton, supra,* 20 Cal.4th at p. 296; see *Carpenter, supra,* 9 Cal.4th. at pp. 651–653.) "We will find such bias if the misconduct is inherently and substantially likely to have influenced the jury. Alternatively, even if the misconduct is not inherently prejudicial, we will nonetheless find such bias if, after a review of the totality of the circumstances, a substantial likelihood of bias arose." (*Bennett, supra,* 45 Cal.4th at pp. 626–627; see *People v. Nesler* (1997) 16 Cal.4th 561, 578–579.) In determining whether there is a substantial likelihood

of bias, we may not consider evidence of jurors' mental processes, including how they reached a particular verdict. (*Boyette*, *supra*, 29 Cal.4th at p. 436; see Evid. Code, § 1150, subd. (a).) Accordingly, we do not rely on jurors' conclusory responses indicating the poems did not affect their verdicts. Apart from these statements, however, there is ample evidence rebutting the presumption of prejudice.

Under the first test for prejudice, the poems were not so inherently prejudicial that they were substantially likely to influence the jurors' proper deliberations. "This is not a case in which the jury received inadmissible evidence relating to guilt or innocence, or received improper legal information from outside sources." (*Pinholster*, *supra*, 1 Cal.4th at p. 927.) The poems did not discuss the evidence or assert conclusions about defendant's guilt; they merely reflected on the jury's role. Nor does a review of the totality of the circumstances indicate the poems created a substantial likelihood of bias. Deliberations lasted four court days, from the afternoon of February 17, 1999, until the afternoon of February 23, 1999. Juror No. 1 told the court she wrote the poems after the guilt phase evidence had concluded. Another juror took the poems home, typed them, brought them back, and gave copies to the other jurors. The majority of jurors reported the copies were distributed *after* the jury had decided on defendant's guilt. Juror No. 1 said, "I didn't show anybody those poems until after we decided." The court asked, "That he was guilty?" and Juror No. 1 responded, "Right." Similarly, Juror No. 11 reported that the poems had not been distributed until just before the penalty phase began, and the foreperson said, "I think it was at the very end of deliberations that that thing came out." Thus, it appears the seated jurors first received copies of the poems at some point after they had

reached a decision on guilt but before they announced their verdicts. This timeline accords with jurors' individual recollections about when they read the poems. Of the 11 jurors polled, only one specifically recalled reading the poems before the verdicts were returned. Based on this record it is not substantially likely the poems could have biased any juror's verdict.

## C. *Issues at the Second Penalty Phase*

### 1. *Lingering Doubt*

To establish a "lingering doubt" in mitigation of penalty, defendant sought to introduce evidence challenging his DNA identification as the perpetrator of Terena's sodomy and murder. Specifically, he sought to present the finding of an unknown party's DNA and alleged contamination in the DNA testing. The court ruled any such evidence inadmissible and declined to instruct the jury on lingering doubt. Defendant contends these rulings violate his state and federal constitutional rights to due process and compulsory process, equal protection, and a reliable penalty determination. We disagree. The court did not abuse its discretion in excluding the evidence, nor was there a reasonable possibility its exclusion could have affected the verdict.

### a. *Background*

In the guilt phase, defendant focused on challenging the DNA evidence linking him to the crimes. Through cross-examination and argument, defense counsel suggested evidence swabs had been contaminated. The defense also stressed that DNA from a third party had been found on one evidence swab. To recap, RFLP, PCR, and short tandem repeat (STR) testing all showed that DNA extracted from semen on Terena's rectal area

and jeans matched defendant's DNA. PCR testing further indicated that defendant was the major donor of sperm found in a vulvar swab. However, this testing also detected a minor amount of sperm on the vulvar swab from an additional donor.

The court declined to give a lingering doubt instruction at the close of the first penalty phase trial but noted counsel were free to address the point in argument. Defense counsel did so but mentioned the DNA evidence only briefly. In discussing the circumstances of the crime (§ 190.3, subd. (a)), he argued the sodomy and murder appeared to be spontaneous and may have been drug-induced. He then added: "The unanswered question that was never ferreted out here, was there a third donor. And the authorities had an opportunity to try to determine who that was, but they never did. *But there is no evidence that that third donor would have committed this crime, and so I just leave you with that thought.*" (Italics added.) Thus, although counsel's first penalty phase argument alluded to lingering doubt, counsel conceded there was "no evidence" that a third party had committed the charged offenses.

The first penalty trial ended in deadlock, with jurors split "7, 4, [and] 1." The court declared a mistrial. Shortly thereafter, defendant moved for "a new unitary trial on guilt/innocence and penalty or alternatively for a ruling allowing lingering doubt evidence to be permitted at the retrial of the penalty phase." The motion cited no authority for conducting a new *guilt* trial because the penalty phase did not result in a verdict, and defendant does not renew that argument here. The motion also did not specify what evidence defendant wanted to present. The court denied the motion. Because the defense sought to introduce DNA evidence for the sole purpose of creating a doubt as to defendant's guilt, the court ruled it was beyond the scope

95

of permissible evidence in the penalty phase.[28]  Defense counsel then asked the court "to bar the prosecution or any of their witnesses from mentioning anything about the DNA evidence whatsoever."  The prosecutor affirmed that the People did not intend to mention DNA in the penalty retrial.

Several months later, while the penalty retrial was pending, a new attorney representing defendant asked the court to revisit its ruling.  The defense wanted to introduce PCR testing that showed the presence of a third party's sperm and lab results that could indicate contamination.  Counsel argued the evidence was relevant to show the circumstances of the crime and that another person may have been involved.  When pressed by the court, defense counsel confirmed his intention either to call Myers, the prosecution's DNA expert, or to cross-examine Myers to elicit evidence of the third party donor.  The defense planned to argue lingering doubt from this evidence and would not be offering its own expert to contradict the DNA findings.  The prosecutor argued DNA evidence went solely to the issue of the killer's identity and was not a circumstance of the crime, having been generated close to a year after the murder.  He averred that the state would present no evidence on the issue of identity beyond the jury verdict from the first trial.

The court acknowledged that the defense had a right to present lingering doubt evidence and tended to agree that samples taken from the victim's body related to circumstances of the offense.  However, considering the overall strength of the DNA evidence against defendant, the court did not believe

---

[28]  Defendant's petition for writ of mandate challenging this order was denied.

revisiting the DNA evidence could raise an issue of lingering doubt. It recalled that both PCR and RFLP testing showed matches to defendant's DNA, and the probability of a random match under RFLP testing was one in 32 billion. In the face of this evidence, the finding of a third party donor on one PCR test would not suffice to raise a doubt about defendant's guilt. The court excluded the proffered evidence under Evidence Code section 352 because it would confuse the issues, would require an undue consumption of time, and would not be "useful evidence" to raise an issue of lingering doubt.

During the penalty retrial, the prosecution presented the circumstances of the crime without offering any DNA-related evidence. The court again denied defendant's request for an instruction on lingering doubt. Counsel was not precluded from arguing lingering doubt in his summation, however. First, regarding circumstances of the crime, he pointed out that the prosecutor "never introduced evidence to show [the jury] . . . who, in fact, did the killing." Later, counsel told the jury it could consider lingering doubt as an extenuating circumstance under section 190.3, subdivision (k). He explained that in an ordinary trial, the same jury decides both guilt and penalty, but here jurors did not "hear the first part of the case." "So there's got to be in your mind some question about not only how it happened but who exactly was involved with what happened." He acknowledged that a previous jury had found defendant guilty of special circumstance murder beyond a reasonable doubt, and the present jury was required to accept that verdict. Then he continued: "But the thing you don't know — because you can't, you haven't heard — is the certainness of this particular verdict and what arises under these particular circumstances. And it's not your fault. [¶] Is there any kind of a lingering or residual

doubt that you may have in terms of the certainty of this verdict, the kind that you may want to, you know, give a person the death penalty?" He argued the jury was "caught in this bind" because the prosecutor had chosen not to "present the entire case" to them. "But the question still remains, the certainty of someone else's verdict — not the certainty for his guilt, but the certainty to send the man to death, to death, that's what we are talking about."

The second jury returned a verdict fixing the penalty at death. The court denied defendant's motion for new trial, which challenged, among other rulings, the court's exclusion from the penalty retrial of "forensic evidence to raise the possibility of lingering doubt."

### b. Discussion

A capital defendant has no state or federal constitutional right to have a penalty phase jury consider lingering doubt evidence. (*People v. Gay* (2008) 42 Cal.4th 1195, 1220 (*Gay*); *Oregon v. Guzek* (2006) 546 U.S. 517, 523 (*Guzek*).) Admission of this evidence is instead governed by statute. (*People v. Mataele* (2022) 13 Cal.5th 372, 424 (*Mataele*).) Under section 190.3, "evidence of the circumstances of the offense, including evidence that may create a lingering doubt as to the defendant's guilt of the offense, is admissible at a penalty retrial as a factor in mitigation." (*People v. Hamilton*, *supra*, 45 Cal.4th at p. 912; see *Gay*, at p. 1221.) "But this does not mean that the defendant may introduce evidence, not otherwise admissible at the penalty phase, for the purpose of creating a doubt as to the defendant's guilt." (*People v. Zapien* (1993) 4 Cal.4th 929, 989.) " ' "The test for admissibility is not whether the evidence tends to prove the defendant did not commit the crime, but, whether

it relates to the circumstances of the crime or the aggravating or mitigating circumstances." [Citation.]' [Citation.] The evidence must not be unreliable [citation], incompetent, irrelevant, lack probative value, or solely attack the legality of the prior adjudication." (*People v. Hamilton*, at p. 912; see *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 814 (*Holmes, McClain and Newborn*); *Linton, supra*, 56 Cal.4th at p. 1198.)

The court below was aware of defendant's right to present lingering doubt evidence within these constraints, and it accepted defendant's assertion that DNA evidence was relevant to circumstances of the crime because it was derived from samples taken from the victim's body and clothing.[29] Nevertheless, the court concluded the evidence had little to no probative value on the issue of lingering doubt, risked confusing the jury, and would require an undue consumption of time. Its exclusion of the evidence on these grounds was not an abuse of discretion.

First, as the Attorney General points out, defendant made no offer of proof as to the specific evidence he intended to present. (See *Holmes, McClain and Newborn, supra*, 12 Cal.5th at p. 814.) In order to argue that DNA evidence linking him to the crime was tainted, defendant would have had to call both Myers and criminalist Sharon Smith to the stand, and possibly additional witnesses, to establish chain of custody. Yet defense counsel did not indicate he had spoken with these witnesses or taken any steps to secure their testimony. Nor had the defense retained its own expert to testify about potential contamination

---

[29] Like the trial court, we accept the defense's assertion but make no independent holding as to whether it is correct.

or the collection of a third party's DNA. Without an offer of proof describing the specific evidence the defense intended to present, the court was left to guess about what might be offered and how that evidence might be relevant in the penalty trial.

In any event, the court did not err in excluding the evidence under Evidence Code section 352. The evidence did concern the condition of the victim's body, and so was relevant as a circumstance of the offense. (§ 190.3, subd. (a).) It may also have been marginally relevant to show fallibility in the DNA testing that led to defendant's identification. But, overall, the probative value of this evidence to raise a lingering doubt about defendant's guilt was minimal. Contrary to defendant's suggestion on appeal, the proffered evidence would not have shown that a different person committed the crimes. "Evidence that a third person actually committed a crime for which the defendant has been charged is relevant but, like all evidence, subject to exclusion at the court's discretion under Evidence Code section 352 if its probative value is substantially outweighed by the risk of undue delay, prejudice or confusion." (*People v. Yeoman* (2003) 31 Cal.4th 93, 140.) Although such evidence need not show definitively that a third party committed the act, for it to be admissible the evidence must at least " 'be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability.' " (*People v. Hamilton*, *supra*, 45 Cal.4th at p. 914.) Rather, " 'there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' " (*Ibid*., quoting *People v. Hall* (1986) 41 Cal.3d 826, 833.)

Although defendant makes much of the fact that a third party's DNA was detected on one vulvar swab, this evidence does not tend to show that someone else committed the sodomy and murder. Semen stains on Terena's jeans and in rectal and vulvar slides matched defendant's DNA in all three forms of testing conducted. The probability of this match occurring at random ranged from one in 1.6 million using the PCR test to one in 32 billion using the RFLP method. The only anomalous finding, based on one slide and reflected in only one of three forms of testing, was a small amount of DNA from someone other than defendant or Terena's husband. The source of that third-party DNA was questionable, and evidence in the guilt phase suggested that, due to his lack of hygiene, it could have come from defendant himself. That finding on one slide notwithstanding, defendant was consistently identified as the major donor of all DNA found in the samples. Evidence of the foreign DNA did not exonerate defendant. Indeed, defense counsel conceded this point in the first penalty trial when he told the jury, "there is no evidence that that third donor would have committed this crime." At most, the evidence might have suggested that a third party had sexual contact, although not anal intercourse, with the decedent. Because the defense did not claim that an accomplice committed the crimes, the relevance of the evidence is far from apparent. " 'The court is not required to admit evidence that merely makes the victim of a crime look bad.' " (*People v. Stitely* (2005) 35 Cal.4th 514, 548 (*Stitely*).)[30]

---

[30] In the trial court, defense counsel suggested DNA contamination evidence could additionally be used to raise a lingering doubt about the truth of the sodomy special circumstance, because sperm was present in the criminalist's

The facts here distinguish this case from others in which we have found the exclusion of lingering doubt evidence erroneous. Defendant relies heavily on *Gay, supra,* 42 Cal.4th 1195, in which we reversed a penalty judgment due to the erroneous exclusion of lingering doubt evidence. The evidence at issue in *Gay* was markedly different, however. It included four statements from Gay's crime partner admitting that he, and not Gay, was the shooter. (*Id.* at pp. 1214–1215.) Unlike the anomalous forensic finding here, the evidence in *Gay* clearly and directly implicated a third party in commission of the charged crimes. Moreover, the error in excluding the evidence was compounded by the trial court's instruction that the jury disregard portions of the defense opening statement contending Gay was not the shooter and by an instruction stating Gay's "responsibility for the shooting had been conclusively proven and that there would be no evidence presented in this case to the contrary." (*Id.* at p. 1224.) The court here gave no comparable instruction that would have prevented the jury's consideration of lingering doubt. (See *Reed, supra,* 4 Cal.5th at p. 1014.)[31]

---

rectal slide even though no sperm had been found on the coroner's rectal slide. Defendant does not renew this argument in his briefing on appeal, however, and it is unclear whether he has abandoned it. In any event, a disparity over sperm in the various slides would have had little probative value in light of the significant other evidence that Terena had been sodomized and that defendant's sperm was present in other samples.

[31] The jury was instructed pursuant to CALJIC No. 8.84 that defendant had been found guilty of murder and that a special circumstance allegation had been found true. Defendant does not claim the giving of this instruction was error.

The proffered evidence was similarly compelling in other cases in which we have held the exclusion of lingering doubt evidence to be error. For example, in *People v. Banks* (2014) 59 Cal.4th 1113, 1194 (*Banks*), the court precluded the defense from asking eyewitnesses any questions regarding their identifications of the defendant. And in *Mataele, supra*, 13 Cal.5th at page 423, the court excluded testimony from a newly located eyewitness whose description of the shooter differed markedly from the defendant's appearance. Because the evidence in both cases was relevant and would have been admissible in the guilt phase, we concluded its exclusion was error, albeit harmless. (See *id.* at p. 426; *Banks*, at pp. 1195–1196; see also *Holmes, McClain and Newborn, supra*, 12 Cal.5th at pp. 814–815 [exclusion of eyewitness expert was harmless error].)

While evidence of DNA contamination and the minimal presence of third party DNA was admitted in the guilt phase of defendant's trial, the court reasonably found its probative value minimal at the penalty phase on the issue of lingering doubt. Moreover, even relevant evidence may be excluded " 'if it creates a substantial danger of prejudicing, confusing, or misleading the jury, or would consume an undue amount of time. (See Evid. Code, § 352.)' " (*Linton, supra*, 56 Cal.4th at p. 1202; see *People v. Fauber* (1992) 2 Cal.4th 792, 856.) Under that aspect of the Evidence Code section 352 balancing test, the court was well within its discretion to conclude that relitigation of DNA issues posed a substantial risk for confusion and undue time consumption. This jury had heard nothing of the DNA evidence linking defendant to the crimes. The presentation of defendant's proposed evidence would have required explanatory evidence about the science of DNA analysis and matching, how forensic

samples from the crime scene were collected and preserved, how DNA was extracted from these samples for comparison with defendant's DNA, how different methods of DNA testing are performed, and how the statistical significance of a match is determined for the different testing methods. Setting aside the evidence presented by necessary chain-of-custody witnesses, testimony on these issues from criminalist Sharon Smith, DNA expert Steven Myers, and supervisor of the DNA lab Gary Sims consumed the better part of five days in the guilt phase trial. This highly technical evidence also risked distracting the jury from its task of determining the appropriate penalty for the crimes of which the defendant stood convicted. On balance, the court did not abuse its discretion in excluding the evidence under Evidence Code section 352.

Even assuming error, there is no reasonable possibility it affected the verdict. (See *Gay*, *supra*, 42 Cal.4th at p. 1223.) Had the defense opened the door to DNA evidence, the prosecution would have been free to present proof that semen found on the victim's body and clothing matched defendant's DNA profile with odds of one in 32 billion that the DNA could have come from someone else. Although lingering doubt may often be an effective defense strategy in the penalty phase (see *Gay*, at p. 1227), "here, the evidence of defendant's innocence was so weak as to be nearly nonexistent." (*Banks*, *supra*, 59 Cal.4th at p. 1196.) It is notable that defense counsel spent very little time arguing lingering doubt in the first penalty trial. Even after an intense focus in the guilt phase trial on the possibility of contamination and the presence of third party DNA, defense counsel simply argued that the possibility of a third party donor was an "unanswered question" and expressly acknowledged there was "*no evidence* that that third donor

would have committed this crime." (Italics added.) Defendant argues prejudice must be inferred from the different outcomes of the two penalty trials, because the first jury was unable to reach a penalty verdict after it heard all the guilt phase DNA evidence whereas the second jury who did not hear this evidence returned a death verdict without difficulty. But this argument ignores the myriad considerations that affect the penalty decision and the new viewpoints brought to bear on the question by a different set of jurors. "All that can reasonably be inferred from the first jury's failure to agree on a penalty is that the jurors differed as to defendant's moral culpability for any number of reasons." (*People v. Hawkins* (1995) 10 Cal.4th 920, 968 (*Hawkins*).) In addition, as the Attorney General points out, the second jury heard aggravating evidence not presented in the first trial regarding defendant's 1990 possession of a billy club, his possession of a razor blade while in custody, the dramatic injuries that could be inflicted by such a weapon, his phone calls to sex hotlines in the weeks before the murder, and an incident in which he exposed his penis to two children. Standing alone, the fact the two penalty trials had different outcomes is not sufficient to establish prejudice. A contrary ruling would eliminate harmless error review of any penalty phase retrial.

Finally, defendant asserts constitutional error, despite settled law holding there is no federal constitutional right to present lingering doubt evidence. (See, e.g., *Mataele*, *supra*, 13 Cal.5th at p. 423; *Gay*, *supra*, 42 Cal.4th at p. 1220; *Stitely*, *supra*, 35 Cal.4th at p. 566; *Guzek*, *supra*, 546 U.S. at p. 523.) He seeks to distinguish these authorities because his claim involves a penalty retrial, and the evidence he sought to introduce was not "new" but had previously been admitted in the guilt trial. The argument is unpersuasive. Neither our

holdings, nor the high court's, are premised on whether the evidence in question was presented in a previous trial, and we have frequently applied these principles in the context of penalty retrials. (See, e.g., *Holmes, McClain and Newborn*, *supra*, 12 Cal.5th at pp. 813–814; *Banks*, *supra*, 59 Cal.4th at p. 1196; *Streeter*, *supra*, 54 Cal.4th at p. 265; *People v. Hamilton*, *supra*, 45 Cal.4th at pp. 911–912; *Gay*, at p. 1220; *Hawkins*, *supra*, 10 Cal.4th at p. 967.) Moreover, defendant fails to explain why the Eighth Amendment would demand admission of the evidence in one context but not the other. If evidence offered on lingering doubt is truly mitigating, the constitutional case for its admission might seem even more compelling if the evidence is newly discovered than if it was presented before and did not produce an acquittal. Defendant has cited no authority recognizing a constitutional right to present lingering doubt evidence under the circumstances here, and we adhere to our decisions holding there is none.

### 2. *Legality of Retrial*

Defendant next contends state and federal constitutional bans on cruel and unusual punishment prohibit retrial of the penalty phase after a jury deadlock. Citing laws of other states, he argues national consensus supports limiting the prosecution to a single opportunity to obtain a death sentence. He acknowledges, however, that we have previously rejected this claim. (See *People v. Taylor* (2010) 48 Cal.4th 574, 633–634.) "We have said the fact that California stands 'among the "handful" of states that allows a penalty retrial following jury deadlock on penalty does not, in and of itself, establish a violation of the Eighth Amendment or "evolving standards of decency that mark the progress of a maturing society." [Citation.]' (*Taylor*, at p. 634.) Further, we have held that a

penalty retrial following jury deadlock does not violate the constitutional proscription against double jeopardy or cruel and unusual punishment. (*Ibid.*)" (*Jackson, supra,* 1 Cal.5th at p. 356.) Recent decisions have reaffirmed these holdings (see *ibid.*; see also *People v. Rhoades* (2019) 8 Cal.5th 393, 441–443 (*Rhoades*); *People v. Young* (2019) 7 Cal.5th 905, 939; *People v. Peoples* (2016) 62 Cal.4th 718, 751 (*Peoples*).) We decline to depart from this precedent. "That a rule barring retrial of penalty on jury deadlock would benefit the defense does not demonstrate that the opposite rule, allowing retrial in order to provide the People a full opportunity to prove their case for the death penalty, deprives defendants of any right to which they are constitutionally entitled." (*Rhoades,* at p. 443.)

### 3. *Prosecutorial Misconduct*

Defendant claims the prosecutor committed prejudicial misconduct in closing argument by referring to him with derogatory epithets and by displaying publications that were not in evidence. He maintains the alleged misconduct violated his constitutional rights to due process, confrontation, and a reliable penalty verdict.

As discussed (see *ante,* at pp. 53–54), a prosecutor's "misbehavior 'violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*Rhoades, supra,* 8 Cal.5th at p. 418; see *Darden, supra,* 477 U.S. at p. 181.) "Conduct by a prosecutor that does not reach that level nevertheless constitutes misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury.' " (*Armstrong, supra,* 6 Cal.5th at p. 795.) When, as here,

misconduct is asserted "based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*Friend, supra*, 47 Cal.4th at p. 29.) To the extent any of the prosecutor's argument rose to the level of misconduct, no prejudice warrants reversal of the judgment.

### a. *Epithets*

Defendant complains of 10 instances in which the prosecutor referred to him using vigorous, derogatory language. Near the start of his argument, the prosecutor asked the jury to return a death verdict "for this depraved aberration of humanity, Giles Nadey." After describing details of the crimes, he similarly argued that death was the only appropriate penalty "for this depraved cancer." The prosecutor also repeatedly used epithets referring to defendant's tattoos. He called defendant a "tattooed pervert," a "tattooed predator," a "tattooed barbarian," and, sarcastically, "our tattooed hero." On three occasions, he referred to defendant as a "tattooed hyena." Finally, in anticipated rebuttal of a defense argument for sympathy, the prosecutor described defendant as a "vile, nasty predator."

Defendant objected to none of these characterizations. To preserve a prosecutorial misconduct claim for appeal, a defendant must ordinarily make "a timely and specific objection at trial" and request an admonition that the jury disregard the improper argument. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328; see *People v. Ghobrial* (2018) 5 Cal.5th 250, 289–290 (*Ghobrial*).) " ' "The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the

harmful effect upon the minds of the jury.' " ' " (*Peoples*, *supra*, 62 Cal.4th at p. 801.)  Failure to raise a timely objection and request an admonition will be excused only " 'if doing either would have been futile, or if an admonition would not have cured the harm.' " (*Ghobrial*, at p. 290.)  However, " '[a] defendant claiming that one of these exceptions applies must find support for his or her claim in the record.  [Citation.]  The ritual incantation that an exception applies is not enough.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853.)

Defendant contends the prosecutor's misconduct was so pervasive that an objection would have been futile, but the challenged remarks were allowed to continue because they were never met with an objection.  "The problem is that defendant made *no objections whatever* to the various instances of asserted misconduct," even though " 'a timely objection and admonition by the court at the outset might have tempered the prosecutor's aggressiveness *before* it became so extreme.' " (*People v. Dennis* (1998) 17 Cal.4th 468, 521.)  Moreover, nothing in the record of the trial court's rulings suggests that an objection to the derogatory references would have been futile.  "Although it is theoretically possible a trial court could be so biased against a defendant — as evidenced by prior rulings — that an appellate court might reasonably conclude further objections would have been futile, such is not the case here.  An objection and a request for admonition would have allowed the trial court to remedy any unfairness occasioned by the prosecutor's argument, avoiding any potential harm." (*Boyette*, *supra*, 29 Cal.4th at p. 432.)  Defendant's complaint that an objection "would have only reinforced the damaging force of the challenged remarks" is similarly unavailing.  As we have explained, reliance on such an exception "would swallow the rule requiring a timely objection

and request for admonition, for one always runs the risk of drawing the jury's attention to an improper line of argument by registering an objection." (*Ibid*.) Accordingly, defendant's claim of misconduct based on derogatory epithets has been forfeited. It also lacks merit.

"For a prosecutor's remarks to constitute misconduct, it must appear reasonably likely in the context of the whole argument and instructions that ' "the jury understood or applied the complained-of comments in an improper or erroneous manner." ' " (*Winbush*, *supra*, 2 Cal.5th at p. 480.) " ' "Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence." ' " (*People v. Fayed* (2020) 9 Cal.5th 147, 207 (*Fayed*); see *People v. Rivera* (2019) 7 Cal.5th 306, 337 (*Rivera*).)

The evidence showed that defendant committed a brutal crime in the victim's future home. He had used his employment to gain access to the residence, called a sex hotline from the scene, committed a particularly violent sexual assault and murder, and appeared unmoved by the impact of his offenses in their immediate aftermath. This evidence supported the use of harsh and pointed language in argument to describe defendant's conduct and character. That is particularly so when the central issue at a penalty phase trial turns on the appropriate punishment for a defendant whose guilt has previously been established. The prosecution is permitted to use language to support a penalty that reflects the highest degree of social opprobrium. The descriptions of defendant's behavior as depraved, inhumane, perverted, or vile are fair comment on the trial evidence. When the use of such language is supported by evidence of heinous crimes, the prosecution is not required to describe the defendant in terms more apt for a church choir

member or charitable aid worker. (See *Edwards*, *supra*, 57 Cal.4th at pp. 764–765.) Phrases that liken a defendant to an animal or dreaded disease are closer to the line, however, and we do not endorse them. Advocates may argue their cases with vigor, but they are also expected to remain mindful of their obligations to uphold professional decorum.

Although forceful epithets carry a risk of irrationally inflaming the jury or prejudicing it against the defendant, the epithets here do not rise to that level. The People were entitled to comment on the brutality of Terena's sodomy and murder, as well as section 190.3, factor (b) evidence of defendant's other misconduct suggestive of sexual deviancy. The use of "colorful or hyperbolic language will not generally establish prosecutorial misconduct." (*Peoples*, *supra*, 62 Cal.4th at p. 793.) Indeed, we have previously rejected misconduct claims based on very similar epithets to those here. In *People v. Thomas*, *supra*, 54 Cal.4th at page 943, the prosecutor called the defendant "a 'predator of the women of Alameda County,' a 'predator,' a 'depraved predator,' a 'vile, nasty predator of women,' a 'hyena,' a 'sociopath,' and a 'walking cancer' that should be culled from society by imposition of the death penalty." We rejected Thomas's misconduct claim because the descriptions "constituted permissible 'opprobrious epithets warranted by the evidence.'" (*Ibid*.; see *People v. Zambrano* (2007) 41 Cal.4th 1082, 1172 [collecting cases].) Similarly, the prosecutor's argument here amounted to more than name-calling; it permissibly attacked the defense's mitigating evidence and focused strongly on details of the aggravating evidence. Considered "in the context of the argument as a whole" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894), the epithets would not

have diverted the jury's attention from its proper role or invited an irrational response.

Defendant additionally complains that the prosecutor's repeated references to his tattoos constituted misconduct because "tattooed is a code word for gang membership." But a prosecutor has "wide latitude" to present an assertive closing argument, "as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom." (*People v. Harrison* (2005) 35 Cal.4th 208, 244.) Here, a photograph of defendant's hands showed multiple tattoos, including a double lightning bolt. These tattoos would have been plainly visible to the jury. "Tattooed" was thus an accurate description of defendant's appearance.

### b. *Display of Publications*

Defendant next contends the prosecutor improperly referred to facts not in evidence during closing argument when he displayed two publications on Nazi party symbols. This portion of the argument was offered to rebut testimony from defense expert James Park that defendant would adjust well to prison life and would be a "good prisoner."

During Park's cross-examination, the prosecutor raised the subject of defendant's tattoos and asked if Park was familiar with the Nazi party's use of "SS runes." Park seemed confused by the word "runes." After clarification, Park admitted he had seen such tattoos but asserted he paid little attention to them. The prosecutor showed Park a photograph of defendant's hands and asked if he had seen "those little SS marks" before. Park disputed the characterization, saying the tattoo looked "more like a double lightning bolt," but eventually said he had "probably" seen similar tattoos before. The prosecutor then

asked about Park's familiarity with the Aryan Brotherhood, and Park described it as "a white supremacist group who sometimes identify themselves as Nazis." He agreed that "very often" Aryan Brotherhood members announce their membership in that gang by tattooing their affiliation on their bodies. He then added, "Especially when they are young. It depends on how long he's had these." At this point, defense counsel objected that there had been no evidence of any gang involvement. The court overruled the objection, explaining the subject was proper impeachment of the expert's opinion. It observed that if defendant "has these runes tattooed on his fingers, the jury can draw their own inferences whether or not this man would be a gang member with a likelihood of violence."

The prosecutor reminded the jury of this exchange in closing argument. He criticized Park as an "avid opponent of the death penalty" whose "bias toward the side that hired him was blatantly shown when it came to the issue of the defendant's tattoos." The prosecutor then read back his cross-examination on the issue. He displayed a photograph of defendant's right hand showing the double lightning bolt tattoo and criticized Park for refusing to answer what the marks might signify. He then showed the jury a picture from "a little book about the Gestapo" and asked, "See these runes? Don't they look familiar?" Defendant objected that the picture was not in evidence and the argument was "far afield" of evidence the jury had received. The court ruled the argument was permissible in light of Park's testimony, so long as the prosecutor did not attempt to portray defendant "as a Nazi." He admonished the jury that the argument "goes to the issue of gang membership," in the context of defense evidence that defendant would adjust well to prison life.

The prosecutor continued by displaying images from another book, called SS Regalia. He argued: "Look, even the uniformed people of the SS, the pictures in here of their news magazine, their newspaper, what do you see? Runes, lightning bolts, whatever you want to call them. Okay? [¶] And to show that these were not just something I made up, here is a Panzer SS uniform with runes on the collar patch." He asked, "Gee, why didn't this 31-year expert in the prison system give me that? [¶] Because he doesn't want to anger the side who hired him. That's why." He then directed the jury's attention to another image of "an SS vehicle pennant, SS runes, okay, or thunder bolts, the identical thing we have on Nadey's hands." Referring again to Park's testimony, he commented, "Now, if he can't recall those as matching these, I question his expertise. I question his opinion. [¶] Is he biased? Draw your own conclusions."

It is misconduct for a prosecuting attorney to argue beyond the record by stating facts not in evidence. (*Fayed, supra*, 9 Cal.5th at p. 204; *Rivera, supra*, 7 Cal.5th at p. 335; *Hill, supra*, 17 Cal.4th at pp. 827–828.) An advocate who does so is essentially offering unsworn testimony not subject to cross-examination. (*People v. Bolton* (1979) 23 Cal.3d 208, 213.) "However, the prosecution 'enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom.'" (*Fayed*, at p. 204; see *Ghobrial, supra*, 5 Cal.5th at p. 289.) Thus, "comments drawn from common experience, history, or literature" are generally permissible (*Loker, supra*, 44 Cal.4th at p. 742), as are quotations from books or other sources presented for illustrative purposes (see *People v. Riggs* (2008) 44 Cal.4th 248, 325 (*Riggs*); *People v. Hines* (1997) 15 Cal.4th 997, 1063).

It is certainly permissible for a party to challenge the credibility of an opposing expert. The existence of bias, interest, or motive of any witness bears on the credibility question. (Evid. Code, § 780, subd. (f).) Here the prosecutor argued that Park had a bias against the death penalty and sought to please the party that hired him to testify. In support of that assertion, he pointed to Park's reluctance to concede the significance of defendant's tattoos and challenged whether an expert with Park's years of experience truly had such a limited exposure to, or inattention to, the symbols on defendant's hand when he was evaluating how defendant would conduct himself in prison.

The Attorney General contends the symbolism of SS runes is a subject of common knowledge. That may be true. He also contends it was permissible for the prosecutor to attack Park's credibility in closing argument. That is also true. But the prosecutor here did more. He did not simply argue that symbolism of the runes is common knowledge or use the printed material for illustration. Instead, he displayed pictures from two books that were not in evidence. These extra-record materials were not shown simply to illustrate a general principle related to the jury's sentencing decision. They were presented as substantive proof that, despite Park's refusal to acknowledge as much, the double lightning bolt was, in fact, a part of Nazi symbolism. Indeed, the prosecutor expressly told the jury he was displaying the images "to show that these were not just something I made up." Had the prosecution chosen to rely on this fact, it could have called an expert of its own. A party is allowed to appeal to common knowledge and let the jurors conclude for themselves whether an argued conclusion is supported by generally available knowledge. It cannot, however, argue beyond the evidence to factually augment the

115

record. This use of extra-record materials in closing argument was misconduct. (See, e.g., *Riggs, supra*, 44 Cal.4th at p. 326.)

This transgression notwithstanding, there was no prejudice under any standard. Although Park quibbled over whether defendant's tattoos depicted SS runes or thunderbolts, he did not dispute that the Nazis had used a similar symbol, and he conceded he had "probably" seen the symbol used by "members of the Aryan Brotherhood or white supremacist groups." The jury would therefore have been aware of these facts from the trial evidence. Moreover, the jury was instructed repeatedly that attorneys' arguments were not evidence and their decision could be based only on the evidence presented. (See *Peoples, supra*, 62 Cal.4th at p. 798.) The prosecutor emphasized these instructions at the beginning of his argument, reminding jurors "what we say is not evidence," and "[t]he only evidence that you can consider are the statements you heard on the witness stand as testimony and any tangible items . . . produced as various exhibits." We presume the jury followed the court's instructions. (*People v. Potts* (2019) 6 Cal.5th 1012, 1037.)

Furthermore, both sides' arguments discouraged jurors from relying on the extra-record materials as evidence of gang membership. The prosecutor did not explicitly argue that defendant belonged to a gang. His argument based on the extra-record materials was specifically directed at showing a defense expert's bias, which was permissible commentary on the trial evidence. And defense counsel's argument thoroughly rebutted any suggestion that defendant was a gang member. He argued: "Ladies and Gentlemen, . . . there's been absolutely no evidence that [defendant] is a gang member. Nothing in the records that we've seen, prison records or the jail records, indicate that he is

a gang member. [¶] Let me tell you something: If he were a gang member, the gentleman here, the deputy, . . . would have a file, and on his file . . . stamped would be 'gang member' so that he knows and the rest of the world knows that this man is a gang member and should be kept apart from other gang members . . . . [¶] No such evidence has been introduced because there isn't any. No deputy sheriffs came and told you he is a gang member because he is not."[32] Counsel then directly addressed the tattoos: "Does he have tattoos? [¶] Yes, he has tattoos. [¶] Do those tattoos stand for something? [¶] Maybe. Maybe not. [¶] Could they resemble some other tattoos? [¶] Certainly, they can. [¶] Are they wannabes? [¶] They are wannabes. [¶] But there is no evidence that he is a gang member." He closed by urging that this subject was not a proper consideration under section 190.3, factor (b).

Considering the court's instructions and these arguments, there is no reasonable likelihood the jury construed the prosecutor's argument " ' " 'in an objectionable fashion.' " ' " (*Linton, supra,* 56 Cal.4th at p. 1205.) The display of extra-record materials was relatively brief and " 'did not comprise a pattern of egregious misbehavior making the trial fundamentally unfair.' " (*Winbush, supra,* 2 Cal.5th at p. 484; see *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642–643.) Nor is it reasonably possible the jury would have rendered a different verdict absent the misconduct. (See *Ghobrial, supra,* 5 Cal.5th at p. 289; *People v. Brown* (1988) 46 Cal.3d 432, 448.) Park's testimony on cross-examination ultimately conceded that

---

[32] It appears this portion of the defense argument relating to the custodial deputy's file and the significance of its possible contents strayed beyond the trial evidence as well.

tattoos were a possible signifier of gang membership. The display in closing argument of images depicting the symbol's use in Nazi propaganda, while misconduct, was not so prejudicial that it could have realistically altered the trial's outcome, in light of all the other evidence.

Finally, as with his claim related to lingering doubt evidence, defendant infers prejudice from the fact that the retrial jury returned a death verdict after hearing the objectionable argument, whereas his first jury was unable to reach a penalty verdict. But, as discussed, jurors are not fungible. New jurors necessarily bring different experiences and viewpoints to questions bearing on the penalty decision. (See *Hawkins, supra,* 10 Cal.4th at p. 968.) New aggravating evidence was also presented in the second trial, including a significant new incident of sexual misconduct when defendant exposed his penis to an 11-year-old boy and his 12-year-old sister. The different outcomes do not establish prejudice.

### 4. *Challenges to Death Penalty Law*

Defendant acknowledges that we have previously rejected all of his challenges to the constitutionality of California's death penalty statute and instructions. He presents these claims again to urge reconsideration and preserve the issues for federal review. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 303–304.) We decline to depart from our settled precedents.

Because the jury's penalty choice is a normative decision, not a factual one (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 670), California's death penalty scheme does not violate the federal Constitution for failing to require written findings (*People v. Camacho* (2022) 14 Cal.5th 77, 150 (*Camacho*)) or unanimous findings as to the existence of aggravating factors,

prior convictions, or unadjudicated criminal activity (*People v. Tran* (2022) 13 Cal.5th 1169, 1235 (*Tran*); *People v. McDaniel* (2021) 12 Cal.5th 97, 142–145, 156 (*McDaniel*)). Nor is the scheme deficient because it does not require findings be made beyond a reasonable doubt as to the existence of aggravating factors (other than section 190.3 factor (b) or (c) evidence), that aggravating factors outweigh mitigating factors, or that death is the appropriate penalty (*People v. Thomas* (2023) 14 Cal.5th 327, 408; *Mataele*, *supra*, 13 Cal.5th at p. 435). The high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, and *Hurst v. Florida* (2016) 577 U.S. 92 do not alter these conclusions. (*Thomas*, at p. 408; *People v. Ng* (2022) 13 Cal.5th 448, 572.)

The class of death-eligible offenders is not impermissibly broad, and special circumstances are not so numerous or expansive as to defeat their constitutionally required narrowing function. (*People v. Parker* (2022) 13 Cal.5th 1, 89–90 (*Parker*); *People v. Pineda* (2022) 13 Cal.5th 186, 257 (*Pineda*).)

Section 190.3, factor (a), which permits aggravation based on the circumstances of the crime, does not result in arbitrary and capricious imposition of the death penalty. (*Mataele*, *supra*, 13 Cal.5th at pp. 434–435; *Pineda*, *supra*, 13 Cal.5th at p. 257.) A defendant's constitutional rights are not violated when the same jury that decided guilt also decides under section 190.3, factor (b) whether the defendant committed unadjudicated criminal conduct. (*Tran*, *supra*, 13 Cal.5th at p. 1235; *People v. Dement* (2011) 53 Cal.4th 1, 56.) Moreover, the predicate for this claim fails here because a different jury set defendant's penalty after a retrial. The use of prior convictions in aggravation under section 190.3, factor (c) does not place a capital defendant in double jeopardy. (*People v. Williams* (2016) 1 Cal.5th 1166,

1204; *People v. Williams* (2013) 56 Cal.4th 165, 201.) The trial court is not constitutionally required to instruct on whether a sentencing factor, including consideration of the defendant's age under section 190.3, factor (i), is aggravating or mitigating. (*Camacho, supra*, 14 Cal.5th at p. 149; *Tran*, at p. 1235.)

The sentencing factors listed in CALJIC No. 8.85 are not unconstitutionally vague, and the trial court is not required to delete inapplicable factors. (*Mataele, supra*, 13 Cal.5th at p. 435; *Pineda, supra*, 13 Cal.5th at p. 258.) The instruction's use of the words "extreme" and "substantial" does not unduly constrain the jury's consideration of mitigating circumstances. (*Parker, supra*, 13 Cal.5th at p. 91.) CALJIC No. 8.88's instruction that death may be imposed only if the jury finds aggravating factors "so substantial" compared to mitigating factors that death is warranted is not unconstitutionally vague. (*Mataele*, at p. 435; *Pineda*, at pp. 257–258.) The court was not required to instruct the jury to return a sentence of life imprisonment without parole if it found mitigation outweighed aggravation. (*People v. Thomas, supra*, 14 Cal.5th at p. 409; *Camacho, supra*, 14 Cal.5th at p. 149.)

The federal Constitution does not require intercase proportionality review. (*Mataele, supra*, 13 Cal.5th at p. 436; *McDaniel, supra*, 12 Cal.5th at p. 157.) Nor does the death penalty law violate equal protection for failing to provide the disparate sentence review afforded other felons. (*People v. Ramirez* (2022) 13 Cal.5th 997, 1161; *Parker, supra*, 13 Cal.5th at p. 91.) California's capital sentencing scheme does not violate international law or the Eighth Amendment. (*Camacho, supra*, 14 Cal.5th at p. 150; *McDaniel*, at p. 157.)

Finally, "considering the arguments in combination, and viewing the death penalty law as a whole, it is not constitutionally defective. Defendant's challenges to California's death penalty scheme 'are no more persuasive when considered together,' than when considered separately. [Citation.] 'California's capital sentencing scheme as a whole provides adequate safeguards against the imposition of arbitrary or unreliable death judgments.' " (*People v. Anderson* (2018) 5 Cal.5th 372, 426; see *Mataele, supra,* 13 Cal.5th at p. 436.)

## D. *Cumulative Error*

Defendant asserts that cumulative prejudice resulting from errors in the guilt and penalty phases requires reversal of the judgment. We have concluded the prosecutor committed misconduct in penalty phase closing argument by displaying extra-record materials and have assumed error regarding the court's response to a juror note concerning defense access to a DNA expert and testimony from a pathologist who did not conduct the victim's autopsy. Considering these errors together, we conclude their cumulative effect does not warrant reversal. (See *Tran, supra,* 13 Cal.5th at pp. 1236–1237; *Pineda, supra,* 13 Cal.5th at pp. 259–260.)

## III. DISPOSITION

The judgment is affirmed.

**CORRIGAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

PEOPLE v. NADEY

S087560


Dissenting Opinion by Justice Liu


Defendant Giles Nadey was convicted of murder by an Alameda County jury that included no Black jurors. During jury selection, six Black prospective jurors, all women, were called to the jury box; the prosecutor struck five of them. The trial court denied Nadey's motions under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) even though several of the prosecutor's reasons for striking the Black jurors were inconsistent with the record and the court made no effort to resolve those inconsistencies. Today's opinion defers to those rulings even though there is no reasoning or analysis to defer to. As a result, no court, either trial or appellate, has properly evaluated Nadey's *Batson* claims.

Today's application of *Batson* extends this court's record of lax enforcement and provides further confirmation of the Legislature's recent finding that existing law "has failed to eliminate [racial] discrimination" in jury selection. (Stats. 2020, ch. 318, § 1, subd. (b).) In 2020, the Legislature responded to deficiencies in our *Batson* jurisprudence by overhauling the legal framework for peremptory strikes in order "to put into place an effective procedure for eliminating the unfair exclusion of potential jurors based on race" or other categories. (Stats. 2020, ch. 318, § 1 subd. (a); see Assem. Com. on Judiciary, Analysis of Assem. Bill No. 3070 (2019–2020 Reg. Sess.), as

1

amended May 4, 2020, pp. 8–9; see Code Civ. Proc., § 231.7 [all undesignated statutory references are to this code].)  Especially in light of this legislative reform, I continue to believe that our decisions, including today's, do not demonstrate the vigilance necessary to eradicate the constitutional "evil" of "[e]xclusion of black citizens from service as jurors."  (*Batson*, *supra*, 476 U.S. at p. 85.)  This court should not lag behind the Legislature when it comes to ensuring the fairness of our justice system.

Today's decision is particularly jarring given what has come to light in federal court regarding capital jury selection in Alameda County around the time that Nadey was tried.  (See Office of the Alameda County District Attorney, *Alameda County Death Penalty Cases Are Reviewed After Prosecutors Discover Evidence of Prosecutorial Misconduct Excluding Jewish and Black Residents from Jury Service in Death Penalty Cases* (Apr. 22, 2024) Press Release, <https://perma.cc/A88N-LZSD> [as of June 17, 2024]; all Internet citations in this opinion are archived by year, docket number, and case name at <https://www.courts.ca.gov/38324.htm>.)  Depending on what the District Attorney finds in her review of the county's death penalty cases, this may not be the last we hear of Nadey's *Batson* claim.

Today's decision also condones the prosecutor's use of derogatory language — including likening Nadey to a "hyena," a "cancer," and a "barbarian" — to convince the capital jury to sentence him to death.  I do not agree that these opprobrious terms were "fair comment on the trial evidence."  (Maj. opn., *ante*, at p. 111.)  Those who appear in our courts, no matter what crimes they stand accused or convicted of, are not animals or savages or worse.  They are persons before the law.  Such blatant

efforts to dehumanize and denigrate a criminal defendant in order to achieve a death sentence should be reproved.

## I.

The trial court heard Nadey's first *Batson/Wheeler* motion after the prosecutor had struck four Black women from the venire: Alice S., Victoria E., Harriett D., and Lorraine D. Observing that the full venire included eight Black prospective jurors, the trial court found that "50 percent ha[d] been excused by the prosecution" and concluded this constituted a prima facie case of discrimination. The prosecutor provided his reasons for challenging each of the Black women, and Nadey's counsel submitted the matter. The court denied the motion, explaining in full: "[A]fter hearing the district attorney's reasons, I think that these are — these excuses are facially and racially neutral. I don't believe that any of these jurors are excused because of their race, and there is justification and cause for the excuse [*sic*] of each juror. [¶] In the Court's opinion, there is no showing of any exclusion of these jurors because they were black females. [¶] So the *Wheeler* motion is denied."

Shortly thereafter, the prosecutor struck a fifth Black woman from the panel, Doris C. Then Nadey made a second *Batson/Wheeler* motion, arguing that the "record speaks for itself that there is an institutional bias here and a systematic exclusion of African-Americans." Defense counsel pointed out that the prosecutor had the opportunity to strike a total of six Black jurors, all of whom were women, and had struck five of them. Defense counsel struck the sixth Black woman on the panel. The court acknowledged that Nadey had already established a prima facie case of discrimination and then asked the prosecutor to explain why he challenged Doris C.

The prosecutor said that "the only reason why any challenges were exercised by [him]" was the "relative strengths or weaknesses regarding the penalty of death." According to the prosecutor, prospective jurors were stricken "based upon what they would do in the penalty phase. It's got nothing to do with race." The prosecutor then gave reasons for striking Doris C. The court denied Nadey's second *Batson/Wheeler* motion, explaining in full that "with respect to the last juror, [Doris C.], the Court finds that the excuses as put forth by the defense — the prosecution — I beg your pardon — are genuine and facially neutral. [¶] I will consider that as a *Wheeler* motion, and that will also be denied for the reasons stated, and the record will so reflect." The trial court provided no further commentary on the *Batson/Wheeler* motions. In total, six of eight Black prospective jurors were called to the jury box, the prosecutor struck five, and no Black juror served on Nadey's guilt phase jury.

## A.

Today's opinion acknowledges that "the trial court did not elaborate on its rulings" (maj. opn., *ante*, at p. 18) but defers to those rulings on the ground that the prosecutor's reasons for challenging all five prospective Black women jurors were "inherently plausible" and supported by the record (*id.* at p. 20). In reaching this conclusion, the court overlooks parts of the record that contradict several of the prosecutor's stated reasons. Given these inconsistencies, the trial court's ruling would be entitled to deference only if there were some indication in the record that it "made a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.'" (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1159 (*Gutierrez*).) Without such evidence, today's opinion improperly defers to the trial

court's rulings and denies Nadey an adequate evaluation of his *Batson* claims.

At *Batson*'s third step, "all of the circumstances that bear upon the issue of racial animosity must be consulted" (*Snyder v. Louisiana* (2008) 552 U.S. 472, 478) to determine whether "it was more likely than not that the challenge was improperly motivated" (*Johnson v. California* (2005) 545 U.S. 162, 170 (*Johnson*)).  This requires the prosecutor "to come forward with explanation to the court that demonstrates other bases for the challenges, *and* that the court satisfy itself that the explanation is genuine." (*People v. Hall* (1983) 35 Cal.3d 161, 167.)  "Some neutral reasons for a challenge are sufficiently self-evident, if honestly held, such that they require little additional explication" — for instance, "excusing a panelist because she has previously been victim to the same crime at issue in the case to be tried." (*Gutierrez, supra*, 2 Cal.5th at p. 1171.)  But "when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (*People v. Silva* (2001) 25 Cal.4th 345, 386 (*Silva*); accord, *Gutierrez*, at p. 1171.)  In such circumstances, the trial court's ruling is entitled to deference "only when" it makes "a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror."  (*Silva*, at p. 386; see *Gutierrez*, at p. 1159.)

The prosecutor gave the following explanation for striking Harriett D., referring to a ten-point scale with ten being most supportive of the death penalty: "And granted she said she was a ten philosophically, but on her questionnaire what she told us was the death penalty was a last resort.  When somebody tells me that, that tells me I'm going to have to sit there and, you

know, prove something beyond any possible shadow of a doubt. When they say it's a last resort, that means that they will do anything or think anything of getting away from it." Today's opinion observes that although Harriett D. initially said she was a "ten" in favor of the death penalty, she may have misunderstood the prosecutor's scale, and she ultimately placed herself in the middle. (Maj. opn., *ante*, at pp. 21–23.) The court says Harriett D. "accepted" the death penalty "in theory and thought she could impose it, but she also thought deciding to take a life was very serious and she would want to be 'absolutely' certain defendant deserved death." (*Id.* at p. 23.) On this basis, the court concludes that "Harriett D.'s responses could have raised a legitimate concern that the prosecutor would have to present a more compelling case to her than would be required to persuade other jurors." (*Id.* at p. 24.)

Absent from the court's analysis is any discussion of Harriett D.'s other voir dire responses, which contradict the prosecutor's claims that Harriett D. would "do anything or think anything" to avoid imposing the death penalty or that he would have to "prove something beyond any possible shadow of a doubt." For example, the court asked, "[I]f you convicted the defendant of those crimes that we just mentioned to you, the death penalty would be an option for you because this crime is so terrible, so serious?" Harriett D. responded, "I have no problem with having to make that decision." Moments later, she reaffirmed this view when the court asked, "[I]f [Nadey] gets found guilty . . . is this case serious enough that it lives up to your expectations as to the kind of case where the death penalty might be appropriate?" Harriett D. responded unequivocally, "Yes." The prosecutor then explained that if a unanimous jury agreed to impose the death penalty, "[E]ach of the 12 jurors at

that point in time is going to have to announce in open court that they have returned a death verdict right in front of the very man that you're going to be condemning to die." He asked Harriett D., "Could you do it?" She responded, "Yes, I can." And when the prosecutor went on to describe the act of announcing a death penalty verdict as "downright ugly" and "one of the most unpleasant things that you probably ever will have to do," and asked if she could do it "amid the tension and, you know, just the unpleasant dealing you're going to have to do," Harriet D. responded, "Yes." Harriett D. further explained that she could impose the death penalty because "we're part of the society, and that's the way it's set up." She also confirmed there was nothing about her "work experiences" that "might influence [her] ability to pick either the death penalty or life without parole in this case." And when asked, "[S]hould California have the death penalty, keep it, or should we dump it," Harriet D. said, "I believe in it."

Nothing about these responses shows that Harriett D. would "do anything or think anything of getting away from" imposing the death penalty or that the prosecutor would have to "prove something beyond any possible shadow of a doubt." Instead, they demonstrate that Harriett D. would impartially evaluate whether to impose the death penalty in this case, as required by Penal Code section 190.3. Though she also said that the death penalty was "a last resort" — meaning she would "try to be absolute as far as [her] decision without any remorse" — that comment simply reflects an understandable desire for certainty in making such a grave decision and, in any event, is hardly enough in light of all that Harriett D. said in voir dire to make the prosecutor's reason for striking her self-evident.

*Silva* is instructive. In that case, defense counsel made a *Batson*/*Wheeler* motion after the prosecutor had exercised peremptory challenges against three Latino prospective jurors. (*Silva*, *supra*, 25 Cal.4th at p. 376.) The prosecutor explained that he challenged one prospective juror, Jose M., in part because when he " 'asked [M.] could he exercise his discretion to impose the death penalty,' " "M. 'indicated that he thought it was the toughest penalty, and he would look for other options.' " (*Ibid.*) The trial court denied the *Batson*/*Wheeler* motion and "said only that the prosecutor 'did provide an explanation with regard to' the three peremptory challenges and that 'I think that there was a good excuse with regard to all of these people.' " (*Silva*, at p. 382.)

Upon reviewing the jury selection transcript, we concluded the trial court's ruling was not entitled to deference. We explained: "When defense counsel asked M. for his opinion on the death penalty, M. answered: 'Well, I guess I have an opinion on it. I mean, it's the most — the hardest — oh, what's the word I'm looking for — punishment you can give.' When defense counsel asked M. to clarify whether he was for or against the death penalty, he replied: 'I would say I'm mixed. I would, you know, consider it and I would consider opposition to it.' Defense counsel then explained how a jury is supposed to decide the penalty in a capital case, and M. said he could do that. Defense counsel asked: 'So you're saying you don't think you would have a problem returning either verdict?' M. replied: 'No.' " (*Silva*, *supra*, 25 Cal.4th at p. 377.)

"The prosecutor then asked: 'Do you lean one way or the other on the death penalty, do you think?' [¶] M. answered: 'Possibly slightly for it.' [¶] Finally, the prosecutor asked M. whether he could return a death verdict against defendant 'if

8

he's earned the death penalty.'  M. answered 'Yes.' " (*Silva,
supra*, 25 Cal.4th at p. 377.)

We concluded:   "Nothing in the transcript of voir dire
supports the prosecutor's assertions that M. would be reluctant to
return a death verdict . . . . " (*Silva, supra*, 25 Cal.4th at p. 385.)
"[W]hen the prosecutor gave reasons that misrepresented the
record of voir dire, the trial court erred in failing to point out
inconsistencies and to ask probing questions.  'The trial court has
a duty to determine the credibility of the prosecutor's proffered
explanations' (*McClain v. Prunty* (9th Cir. 2000) 217 F.3d 1209,
1220), and it should be suspicious when presented with reasons
that are unsupported or otherwise implausible (see *Purkett v. Elem*
[(1995)] 514 U.S. 765, 768 [stating that at step three 'implausible
or fantastic justifications may (and probably will) be found to be
pretexts for purposeful discrimination']; *McClain v. Prunty, supra*,
at p. 1221 ['Where the facts in the record are objectively contrary
to the prosecutor's statements, serious questions about the
legitimacy of a prosecutor's reasons for exercising peremptory
challenges are raised.'])." (*Silva*, at p. 385.)  Because we found
"nothing in the trial court's remarks indicating it was aware of, or
attached any significance to, the obvious gap between the
prosecutor's claimed reasons for exercising a peremptory challenge
against M. and the facts as disclosed by the transcripts," we were
"unable to conclude that the trial court met its obligations to make
'a sincere and reasoned attempt to evaluate the prosecutor's
explanation' [citation] and to clearly express its findings." (*Silva*,
at p. 385.)

Just as Jose M.'s view that the death penalty was the
"hardest . . . punishment," in context with his other responses,
did not support the prosecutor's claim that " 'he would look for
other options' " (*Silva, supra*, 25 Cal.4th at p. 376), Harriett D.'s

comment that the death penalty was "a last resort," in context with her other responses, does not demonstrate that she would "do anything or think anything of getting away from it" or that the prosecutor would have to "prove something beyond any possible shadow of a doubt." Before crediting the prosecutor's reasons for striking Harriett D., the trial court should have resolved this inconsistency. But, as in *Silva*, "nothing in the trial court's remarks indicat[es] it was aware of, or attached any significance to, th[is] obvious gap." (*Id.* at p. 385.)

Some of the prosecutor's reasons for striking other Black women were also inconsistent with the record. For example, the prosecutor claimed Lorraine D. was "very weak on the death penalty." But Lorraine D. rated herself an eight out of ten in favor of the death penalty and confirmed during voir dire that she could "vote to execute another human being." While she said her decision would " 'depend[] on the circumstances' " (maj. opn., *ante*, at p. 27), she confirmed that she had no "feelings about either the death penalty or life without parole that . . . might prevent [her] from making a choice between those two penalties in this case." Like Harriett D., Lorraine D. also confirmed that she would be able to deliver a death sentence in open court in front of the defendant and his loved ones, despite the prosecutor having described such a task as "one of the most disagreeable, unpleasant, gut-wrenching, just miserable, ugly things that anybody is going to have to do. No question about it."

In addition, the prosecutor said one of the reasons he struck Doris C. was because "there were tons of better-qualified jurors more willing to impose the death penalty that were coming up later on." But prospective jurors were pulled at random from a group of qualified jurors, so the prosecutor could not have known which juror would replace Doris C. or if that

juror would be more inclined to impose the death penalty. In addition, Doris C. said on the juror questionnaire that her "general feelings" regarding the death penalty were, "If you do the crime — you should pay the price!" Though she was open to mitigating evidence (maj. opn., *ante*, at p. 42), she repeatedly expressed support for the death penalty: "I believe if you commit a crime — I believe in capital punishment — that you should die, also." "And I believe that if you go out and kill someone and you're found guilty, then death is a possibility for you, also." "I think if you take another's life, that you should expect that yours is taken, too."

None of these inconsistencies elicited any response from the trial court. As noted, the court provided no explanation for its conclusion that all of the prosecutor's reasons were "facially and racially neutral" or "genuine and facially neutral." "[W]hen a trial court fails to make explicit findings or to provide any on-the-record analysis of the prosecution's stated reasons for a strike, a reviewing court has no assurance that the trial court has properly examined 'all of the circumstances that bear upon the issue' of purposeful discrimination." (*People v. Williams* (2013) 56 Cal.4th 630, 717 (dis. opn. of Liu, J.) (*Williams*).) By affirming the trial court's rulings without such assurance, today's opinion "erodes the incentive for trial courts to articulate their findings and analysis." (*People v. Mai* (2013) 57 Cal.4th 986, 1075 (conc. opn. of Liu, J.) (*Mai*).)

Since Nadey's trial, the Legislature has concluded that existing law "has failed to eliminate [racial] discrimination." (Stats. 2020, ch. 318, § 1, subd. (b).) In response, it enacted a new procedure for evaluating peremptory challenges. (§ 231.7.) Among other things, the new law requires the trial court to "evaluate the reasons given to justify the peremptory challenge

in light of the totality of the circumstances" and "explain the reasons for its ruling on the record." (*Id.*, subd. (d)(1).) This means that a reviewing court may no longer " 'assume' " the basis of a trial court's ruling (maj. opn., *ante*, at p. 18); it will instead evaluate the reasons actually given. According to the Legislature, an explained ruling contributes to "an effective procedure for eliminating the unfair exclusion of potential jurors." (Stats. 2020, ch. 318, § 1, subd. (a).) Although the statute does not apply retroactively to Nadey's claims, it supports the view that appellate deference to unexplained *Batson* rulings adopted by today's opinion is ineffective at rooting out racial discrimination. (Cf. *Pena-Rodriguez v. Colorado* (2017) 580 U.S. 206, 222 ["The duty to confront racial animus in the justice system is not the legislature's alone."].)

Even without the new statute, there is ample basis in our case law and the record to conclude that deference is unwarranted here. "In deciding whether deference is warranted, our opinions have . . . consistently examined whether the reasons given for a strike are *both* plausible and supported by the record." (Maj. opn., *ante*, at p. 18, italics added.) Several of the prosecutor's reasons are contradicted by the record, yet they elicited no response from the trial court. On this record, I am "unable to conclude that the trial court met its obligations to make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation.' " (*Silva, supra*, 25 Cal.4th at p. 385.)

### B.

An independent evaluation of the record is necessary to determine whether it was more likely than not that one or more of the prosecutor's strikes were motivated by race. (*Johnson, supra*, 545 U.S. at 170.) Based on that review, I find it more likely than

not that the exclusion of at least one Black woman, Harriett D., was racially motivated.

The prosecutor struck all Black women except one when presented with the opportunity. The jury venire included eight Black jurors; six were called to the jury box, and all six were women. The prosecutor struck five of them, and defense counsel struck one. The trial court concluded the prosecutor's pattern of strikes supported an inference of purposeful discrimination, and I agree. " 'Happenstance is unlikely to produce this disparity.' " (*Miller-El v. Dretke* (2005) 545 U.S. 231, 241 (*Miller-El*).)

Black women are "well known to be a frequent target of prosecutors' peremptory strikes in capital jury selection." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 835 (dis. opn. of Liu, J.) (*Holmes*); see *id.* at pp. 840–841 [collecting empirical studies demonstrating that Black women are struck disproportionately compared to other groups]; *People v. Harris* (2013) 57 Cal.4th 804, 887–889 (conc. opn. of Liu, J.) [discussing additional research on the disparate strikes of Black jurors].) This court has repeatedly upheld the exclusion of Black women from capital juries based on the same reason the prosecutor gave here: "weakness[] regarding the penalty of death." (See, e.g., *Williams*, *supra*, 56 Cal.4th at p. 652 [prosecutor struck five Black women based on their alleged reluctance to impose the death penalty; trial judge said " 'black women are very reluctant to impose the death penalty' "]; *Mai*, *supra*, 57 Cal.4th at pp. 1050–1053 [prosecutor struck three Black women based on their attitudes toward the death penalty]; *People v. Elliott* (2012) 53 Cal.4th 535, 560 [prosecutor struck Black woman because she was " 'weak on death' "]; *People v. Taylor* (2010) 48 Cal.4th 574, 612 [prosecutor's " 'main reason' " for excusing Black woman was that she was

" 'undecided on death' "]; *People v. Boyette* (2002) 29 Cal.4th 381, 420–423 [prosecutor struck four Black women for being " 'lifers,' that is, they could not vote for the death penalty"]; see also *Holmes*, at pp. 841–842 (dis. opn. of Liu, J.) [collecting capital cases in which Black women were struck from the jury].) Although "[r]eluctance to impose the death penalty" is a race-neutral reason for a peremptory challenge (maj. opn., *ante*, at p. 21), there is an obvious risk that it operates more as a stereotype than an individualized, record-based observation when applied to Black women.

That appears to be the case with Harriett D. As noted, the prosecutor's sole basis for striking Harriett D. was her questionnaire response that the death penalty was "a last resort." Despite her repeated statements that she could impose the death penalty and that she "believe[d] in it," the prosecutor claimed she would "do anything or think anything of getting away from it." In addition, several non-Black prospective jurors expressed reluctance to impose the death penalty but were not struck by the prosecutor. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Miller-El, supra,* 545 U.S. at p. 241.)

Paralleling Harriett D.'s "last resort" comment, Juror No. 12, a non-Black man, wrote on his questionnaire that the death penalty should be an option when "all options to redeem and rehabilitate an individual ha[ve] not worked." He reiterated this view during voir dire, explaining that the death penalty "should be retained as an option" when "it's proven that there is no rehabilitation for the person of any kind." He also

characterized the death penalty as the "highest . . . punishment you can administer to somebody." Yet none of these statements elicited any follow-up from the prosecutor, as they "probably would have" had these views "actually mattered" to him. (*Miller-El, supra*, 545 U.S., at p. 246.)

Today's opinion claims that "Juror No. 12 was a considerably stronger supporter of the death penalty than Harriett D." based on several statements he made on his questionnaire and during voir dire. (Maj. opn., *ante*, at p. 25.) But all those statements are consistent with views expressed by Harriett D. First, the court says Juror No. 12 "said on his questionnaire that [the death penalty] is 'warranted' and explained in voir dire his belief that the death penalty is a deterrent and serves a societal purpose." (*Ibid*.) But the court omits the part of this explanation in which Juror No. 12 clarified that what he meant by "warranted" "is if I had a choice to say this law should exist or not, the death penalty law, my choice would be that it should exist." The trial court then confirmed, "You think it serves a purpose in our society?" And Juror No. 12 responded, "Right." Recall that when Harriett D. was asked "should California have the death penalty, keep it, or should we dump it," she said, "I believe in it." She also said she could impose the death penalty "in the right case" because "we're part of the society, and that's the way it's set up." How are these views meaningfully different from Juror No. 12's?

Today's opinion also says Juror No. 12 was "a considerably stronger supporter of the death penalty" because he said during voir dire that the death penalty " 'should be done' " " 'if it's a first-degree murder where you have planned and carried out a heinous act and there is some special circumstance.' " (Maj. opn., *ante*, at p. 25.) Harriett D. likewise confirmed that the

death penalty "might be appropriate" if the case is "serious enough" and that the allegations against Nadey were "so terrible, so serious" that, if proven, the death penalty would be an option.

Today's opinion further claims that Juror No. 12 was stronger on the death penalty because "[h]e also wrote on the questionnaire that we cannot 'blame all of our "wrong doings" on our past,' which suggests he would not be overly swayed by mitigation evidence in the penalty phase." (Maj. opn., *ante*, at p. 25.) But the court neglects to mention that Juror No. 12 prefaced that comment by saying, "We are all products of the way we were raised." The totality of his comment indicates that Juror No. 12 had a neutral (neither favorable nor unfavorable) predisposition toward mitigation evidence. Harriett D. expressed similar neutrality by confirming that nothing would "influence [her] ability to pick either the death penalty or life without parole in this case."

The prosecutor also did not challenge Juror No. 2, who was not Black and repeatedly stated she would have difficulty imposing the death penalty. For example, when asked if she "could impose the death penalty," she explained, "I just don't think it would be an easy situation or an easy task for me to handle. I think it would be difficult for — I don't know. I just think it would be difficult for me to do. I could do it if it was proven to me, but, yes, it would still be draining and difficult for me." She reiterated this view five additional times throughout voir dire. By contrast, Harriett D. said she had "no problem" with having to choose whether to impose the death penalty or life without parole. Though at one point Juror No. 2 said " 'the death penalty would still be an overriding factor for me' " (maj. opn., *ante*, at p. 25), she also said, "I think either/or is just. I

wouldn't like to live my life in prison." She further confirmed that "both penalties [were] open to [her]," she did not "favor one punishment over the other," and she "could pick either one." Consistent with these statements, Juror No. 2 rated herself a five out of ten in favor of the death penalty, just as Harriett D. placed herself "in the middle."

Today's opinion says Juror No. 2's "voir dire revealed that she tended to favor the death penalty for a first degree murder involving sodomy." (Maj. opn., *ante*, at p. 25.) Presumably the court is referring to her response when asked if she viewed the death penalty as a "just punishment for certain types of crimes." To that she answered, "I think it's a just punishment but, I'm — I asked my significant other why this would be a death penalty or life without parole, and he expressed to me because of sodomy. That's why." Then the court asked, "Because of the special circumstances?" Juror No. 2 confirmed, "That's correct. I didn't know the law, so to speak." Rather than showing that "she tended to favor the death penalty," this passage simply demonstrates that Juror No. 2 (in her own words) learned from her significant other that the law authorizes the "death penalty *or life without parole*" (italics added) as punishment for first degree murder with a special circumstance. As noted, she confirmed multiple times that she did not "favor one punishment over the other."

In sum, neither Juror No. 12 nor Juror No. 2 appeared to be a "stronger supporter of the death penalty than Harriett D." (Maj. opn., *ante*, at p. 25.) Today's opinion identifies other characteristics of these jurors that may have been attractive to a prosecutor. But the prosecutor said "the only reason" he struck any of the Black women was their "relative strengths or weaknesses regarding the penalty of death." There is no

apparent race-neutral explanation for why the prosecutor with an avowed focus on death penalty views would strike Harriett D. but not Juror No. 12 or Juror No. 2.

Based on these circumstances — including the facts that the prosecutor challenged five of six Black women jurors, that several of the prosecutor's reasons for exercising those strikes were inconsistent with the record, and that he accepted several non-Black jurors who expressed reservations about imposing the death penalty — I find it more likely than not that at least the strike of Harriett D. was racially motivated. Exclusion of a "single juror on the basis of race or ethnicity is an error of constitutional magnitude requiring reversal." (*Silva*, *supra*, 25 Cal.4th at p. 386.)

If the circumstances above were not enough, a recent investigation into the Alameda County District Attorney's Office, which prosecuted Nadey, revealed "strong evidence that, in prior decades, prosecutors from the office were engaged in a pattern of serious misconduct, automatically excluding Jewish and African American jurors in death penalty cases." (*Dykes v. Martel* (N.D.Cal. Apr. 22, 2024, No. 11-cv-04454) Order Lifting Confidentiality of Jury Selection Files, Dock. No. 164.) During that investigation, the District Attorney's Office disclosed prosecutors' jury selection notes from the capital trial of Ernest Dykes in 1995, four years before Nadey's trial. (See *People v. Dykes* (2009) 46 Cal.4th 731.) "Some of those notes . . . included the initials 'FB' in reference to Black women ('female, Black')"; another note said a Black woman " 'seemed put out' by the prosecutor's questions about the death penalty"; a third note, referencing Jewish heritage, said "Pro D/P [death penalty] but no way." (Raguso, *Alameda County Death Penalty Cases Under Review Over Alleged Misconduct*, The Berkeley Scanner (Apr.

23, 2024) <https://perma.cc/YZW7-WNTH> [as of June 17, 2024].) According to the District Attorney, this " 'serious misconduct' " is " 'not limited to one or two prosecutors, but a variety of prosecutors.' " (*Federal Judge Orders Alameda County District Attorney to Review 35 Capital Cases Following Disclosure of Prosecutorial Misconduct in Jury Selection*, Death Penalty Information Center (Apr. 26, 2024) <https://perma.cc/8LQ4-EA9E> [as of June 17, 2024].)

These findings are inconvenient for today's holding, and the court refuses to consider them, saying this evidence "cannot properly inform our decision" because it is "not before us in this appeal." (Maj. opn., *ante*, at p. 19, fn. 8.) But records of a matter pending in federal court are judicially noticeable. (Evid. Code, § 452, subd. (d) ["Judicial notice may be taken of" records of "any court of record of the United States"]; *id.*, § 459.) And the contemporaneous practices of the Alameda County District Attorney's office are directly relevant to the *Batson* analysis in this case. (See *Miller-El*, *supra*, 545 U.S. at pp. 263–264.)

Although I have no doubt that most prosecutors do their utmost to follow the law, it is undeniable that racial discrimination in jury selection occurs, and there is no reason to think Alameda County is exceptional. Yet despite scores of *Batson* claims in our capital docket, " 'it has been more than [36] years since this court has found any type of *Batson* error involving the removal of a Black juror. (See *People v. Snow* (1987) 44 Cal.3d 216.)' " (*Holmes*, *supra*, 12 Cal.5th at p. 844 (dis. opn. of Liu, J.).) *More than 36 years.* (But cf. *Batson*, *supra*, 476 U.S. at p. 85 ["Exclusion of black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure"].)

Dissatisfied with this court's *Batson* jurisprudence, the Legislature enacted section 231.7 to address the fact that "unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in the State of California." (§ 231.7, subd. (d)(2)(A).) In addition to requiring the trial court to state the basis of its ruling on the record, the statute designates several justifications for peremptory strikes presumptively invalid. As the Legislature explained, "[M]any of the reasons routinely advanced to justify the exclusion of jurors from protected groups are in fact associated with stereotypes about those groups or otherwise based on unlawful discrimination." (Stats. 2020, ch. 318, § 1, subd. (b).)

Several of those presumptively invalid reasons were advanced by the prosecutor here. The prosecutor believed that being politically "liberal" signaled reluctance to impose the death penalty and said that people who work in social services tend to be "liberal." (Maj. opn., *ante*, at p. 33.) He struck Alice S. because she "works as a social worker for special education children," Victoria E. because she "is also a welfare worker," and Doris C. because she "works for the welfare department." Under section 231.7, "employment in a field" "that serves a population disproportionately comprised of members" of a certain "race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation" (§ 231.7, subds. (a), (e)(10)) is a presumptively invalid justification for a peremptory strike. Welfare and social services are examples of fields that predominantly serve racial and ethnic minority groups.

The prosecutor also explained that he struck Doris C. in part because "she has animosity towards the police department." He made no attempt to connect this justification

to his stated focus on death penalty views. Section 231.7 identifies "distrust of or having a negative experience with law enforcement or the criminal legal system" as a presumptively invalid justification. (§ 231.7, subd. (e)(1); see *People v. Bryant* (2019) 40 Cal.App.5th 525, 546 (conc. opn. of Humes, P. J.) [discussing "the undeniable evidence that some minority groups — particularly black men — have been overpoliced and subjected to harsher sentences than others"].)

Further, when the trial court asked the prosecutor to explain why he struck Victoria E. "from Nigeria," he said, among other things, "I suspect there's a language barrier there because we had a hard time getting to understand each other." This justification has no relationship to the prosecutor's claimed focus on prospective jurors' death penalty views and has only a tenuous basis in the record. Although Victoria E. said she did not understand one of the prosecutor's questions, the record does not reveal any further "miscommunication." (Maj. opn., *ante*, at p. 37.) Moreover, Victoria E. had resided in Alameda County for 17 years, had worked for Alameda County for 10 years, and had an associate degree from the College of Alameda in business. In light of circumstances such as these, it is little wonder that the Legislature has deemed "[n]ot being a native English speaker" (§ 231.7, subd. (e)(7)) a presumptively invalid reason for exercising a peremptory strike. (Stats. 2020, ch. 318, § 1, subd. (b).)

Although section 231.7 does not apply to Nadey's claims, the core premise of the new law is that the analytical approach exemplified by today's opinion has failed to effectively combat racial bias in jury selection and has "disproportionately harmed African Americans, Latinos, and other people of color." (Stats. 2020, ch. 318, § 1, subd. (b).) The considered judgment

21

of the Legislature on this matter of constitutional importance provides sound reason for reexamining how we apply *Batson* going forward. (See *Frontiero v. Richardson* (1973) 411 U.S. 677, 687–688 (plur. opn.) [the "conclusion of a coequal branch of Government is not without significance to the question presently under consideration"]; *In re Marriage Cases* (2008) 43 Cal.4th 757, 822 ["[O]ur reference to numerous statutes demonstrating California's current recognition that gay individuals are entitled to equal and nondiscriminatory legal treatment [citation] does not suggest that an individual's entitlement to equal treatment under the law" depends on any "legislative measure . . . . [T]hese measures simply provide explicit official recognition of, and affirmative support for, that equal legal status."].)

It is notable that our elected officials, no longer willing to tolerate judicial inaction, are the ones taking the lead in protecting prospective jurors and criminal defendants from unlawful discrimination. This court is ultimately responsible for the fairness of our justice system, and we can do better. In the alternative, or in addition, the Legislature may wish to consider whether to make the reforms of section 231.7 retroactive to cases pending on appeal.

## II.

Today's opinion rejects Nadey's claim of prosecutorial misconduct based on the prosecutor's use of derogatory language during his penalty phase closing argument. In calling on the jury to sentence Nadey to death, the prosecutor referred to him as a "depraved aberration of humanity," "[d]epraved aberration of mankind," "this depraved aberration of mankind," "this sexual psychopath," "that tattooed hyena," "depraved cancer,"

"that tattooed pervert," "some beast," "you tattooed hyena," "our tattooed hero," "the tattooed hyena," "that tattooed predator," "a vile, nasty predator," and "this tattooed barbarian." The court says this language was "supported," "fair," and "accurate" in light of the evidence in this case. (Maj. opn., *ante*, at pp. 111, 112.)

No one disputes that Nadey's offenses were heinous and reprehensible. But no court should permit a prosecutor to portray a defendant in these terms. During the penalty phase of a capital trial, it is the jury's role to "express the conscience of the community." (*Witherspoon v. Illinois* (1968) 391 U.S. 510, 519.) The jury "render[s] an individualized, normative determination about the penalty appropriate for the particular defendant — i.e., whether he should live or die." (*People v. Brown* (1988) 46 Cal.3d 432, 448, italics omitted.) This entails "treating each defendant in a capital case with that degree of respect due the uniqueness of the individual." (*Lockett v. Ohio* (1978) 438 U.S. 586, 605.) It should go without saying that to assign punishment based on individual culpability, the jury must assess the defendant as a human being — i.e., one capable of being held accountable — rather than an animal or subhuman. In other words, to " 'maintain a link between contemporary community values and the penal system' " (*Woodson v. North Carolina* (1976) 428 U.S. 280, 295), jurors who sit in judgment of the defendant must treat him as a fellow member of their community; otherwise, the defendant would not be judged by a jury of his peers. By calling Nadey a "hyena," "beast," "cancer," "barbarian," and an "aberration of mankind," the prosecutor invited jurors to disregard this essential feature of their role.

Today's opinion also endorses the prosecutor's use of the term "tattooed" on the ground that it was "an accurate description of defendant's appearance." (Maj. opn., *ante*, at p. 112.) But Nadey's appearance had no bearing on whether he deserved the death penalty, and the court does not say otherwise. According to Nadey, the prosecutor described him as "tattooed" to suggest he was a gang member even though that suggestion had essentially no basis in the record. Today's opinion agrees that Nadey's alleged gang membership was not at issue. (Maj. opn., *ante*, at pp. 116–117 ["The prosecutor did not explicitly argue that defendant belonged to a gang."]; *ibid.* ["And defense counsel's argument thoroughly rebutted any suggestion that defendant was a gang member."].) The only reason for calling Nadey "tattooed" would have been to insinuate a fact not in evidence or to otherwise prejudice Nadey. Although a prosecutor may " 'make vigorous arguments,' " they must be " 'warranted by the evidence' " and may not be " 'principally aimed at arousing the passion or prejudice of the jury.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 337.)

We have repeatedly said "we do not condone the use of opprobrious terms" to appeal to the jury's sense of morality. (*People v. Yeoman* (2003) 31 Cal.4th 93, 149; *People v. McDermott* (2002) 28 Cal.4th 946, 1002; see *People v. Hawkins* (1995) 10 Cal.4th 920, 961.) By approving the prosecutor's language and adding that "the prosecution is not required to describe the defendant in terms more apt for a church choir member or charitable aid worker" (maj. opn., *ante*, at p. 111), today's opinion does not just condone this behavior but will, I fear, encourage it. A prosecutor need not portray a capital defendant favorably. But the prosecutor's argument must respect the principle that those who appear in our courts,

whatever crimes they stand accused or convicted of, are persons before the law.

I respectfully dissent.

**LIU, J.**

**I Concur:**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Nadey

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S087560
**Date Filed:** June 17, 2023

_____

**Court:** Superior
**County:** Alameda
**Judge:** Alfred A. Delucchi

_____

**Counsel:**

Christopher Johns, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Alice B. Lustre, Jeffrey M. Bryant and Christen Somerville, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Christopher Johns
Attorney at Law
4380 Redwood Highway, Suite C-17
San Rafael, CA 94901
(415) 785-7439

Christen Somerville
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3856

**S087560**

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

_____

THE PEOPLE, Plaintiff and Respondent,

v.

GILES ALBERT NADEY, JR., Defendant and Appellant.

_____

Defendant Giles Albert Nadey, Jr., has petitioned for rehearing of this matter and filed a request for judicial notice in support.  In large part, the petition merely repeats arguments based on *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) that have already been rejected by a majority of this court.  To that extent, defendant provides no basis for rehearing, and his petition warrants no further comment.

However, as our dissenting colleagues note, defendant goes further.  He refers to a pending federal court investigation into potential *Batson/Wheeler* violations and discriminatory jury selection practices by prosecutors in the Alameda County District Attorney's Office, and he requests judicial notice of a document produced in related federal court litigation that purports to reflect a prosecutor's notes regarding jury selection in a different case.

We emphasize that defendant's allegations of racial bias, if true, are profoundly troubling.  Racial discrimination in jury selection affects not only the defendant, but the integrity of the justice system itself.  "When the government's choice of jurors is tainted with racial bias, that 'overt wrong . . . casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial . . . .'  [Citation.]  That is, the very integrity of the courts is jeopardized when a prosecutor's discrimination 'invites cynicism respecting the jury's neutrality,' [citation], and undermines public confidence in adjudication."  (*Miller-El v. Dretke* (2005) 545 U.S. 231, 238 (*Miller-El*); accord, *People v. Armstrong* (2019) 6 Cal.5th 735, 782.)

But the only potential evidence defendant offers to support these serious allegations is contained in his request for judicial notice.  It consists of a single document that, according to a supporting declaration, was produced in federal court litigation and reflects jury selection notes in a different capital case by the same prosecutor who handled defendant's trial.  Although this document will presumably

receive thorough examination and consideration in the federal court, we deny defendant's request for judicial notice here because the document does not fall within any category of judicially noticeable materials in Evidence Code section 452. Defendant observes that we may judicially notice court records (*id*., subd. (d)), as do our dissenting colleagues, but the document at issue was produced in discovery. Defendant has not shown it was filed in any court. And, even if it had been, we may judicially notice only its *existence* in the court file, not the truth of its hearsay contents. (*In re Vicks* (2013) 56 Cal.4th 274, 314.)

Moreover, to the extent defendant would like to pursue his allegations based on extra-record evidence of discrimination in jury selection, this appeal is not the proper vehicle to do so. "Appellate jurisdiction is limited to the four corners of the record on appeal . . . ." (*In re Carpenter* (1995) 9 Cal.4th 634, 646.) "[W]e cannot consider on appeal evidence that is not in the record." (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1249.) Thus, even if defendant had established a basis for judicial notice, it would properly be denied "because it is 'in contravention of the general rule that an appellate court generally is not the forum in which to develop an additional factual record . . . .' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 952–953.) Instead, the proper forum is a petition for writ of habeas corpus, which allows for the presentation and development of extra-record evidence. (*Id*. at p. 953; cf. *People v. Ramirez* (2022) 13 Cal.5th 997, 1145 ["Nothing we say here precludes defendant from developing extra-record evidence bearing on these factors in support of a petition for writ of habeas corpus"].) The limited and specific examples of judicial notice cited by our dissenting colleagues do not suggest otherwise. (See *People v. Hayes* (1990) 52 Cal.3d 577, 611, fn. 3 [taking judicial notice of amended criminal complaint]; *People v. Belcher* (1974) 11 Cal.3d 91, 94, fn. 2 [taking judicial notice of federal indictment and judgment presented to the trial court; rejecting judicial notice of affidavit of federal public defender].)

Our dissenting colleagues' proposal — to essentially stay the present action in order to allow separate proceedings to develop and then invite updates on the status of those proceedings — seems destined to run afoul of these fundamental principles. It would encourage defendant to present extra-record evidence in support of his claim so that we might weigh its evidentiary value. And the Attorney General then would likely be compelled to respond with extra-record evidence of his own, which we would be asked to weigh as well. That is not how direct appellate review works. It is, instead, precisely what habeas corpus proceedings are designed to accommodate. In fact, in *Miller-El, supra*, 545 U.S. 231, also cited by our dissenting colleagues, the United States Supreme Court was not reviewing a judgment on direct appeal, but instead was reviewing the denial of a writ of habeas corpus. While our dissenting colleagues see no harm in "hit[ting] 'pause' " on defendant's direct appeal (dis. statement of Liu, J., at p. 6), the passage of time will not change what is possible in this proceeding. Our dissenting colleagues' proposal to essentially stay proceedings in this court, while well-intentioned, will only delay finality of defendant's direct appeal and thereby slow the litigation of the

very habeas corpus proceedings that are essential to resolving the issues raised here. Moreover, we are not persuaded by our dissenting colleagues' suggestion that we wait and see if more information can be presented in the future. As described above, defendant's petition for rehearing relies on jury selection notes, which he admits are not part of the record — thus, *extra-record* evidence. The dissenting statement relies heavily on these notes and contends (incorrectly in our view) that we can take judicial notice of them. But then the dissenting statement pivots (perhaps recognizing that extra-record evidence is not the proper subject of judicial notice) and states that we can rely on these notes to grant rehearing in the hope that defendant may be able to procure evidence at some unspecified future date that *is* the proper subject of judicial notice. Needless to say, a petition for rehearing must be evaluated based upon the evidence that can be appropriately considered at the time the petition is made, not upon an ill-defined hope that admissible evidence may be produced at some later date.

In sum, we agree with our dissenting colleagues that the exploration of these serious allegations is critically important, but direct appeal does not provide the proper forum by which we can give these rapidly evolving claims the consideration they deserve. Defendant's petition for rehearing is denied without prejudice to his ability to "present[] such information on a fuller record in connection with a petition for habeas corpus if he so chooses." (*People v. McDaniel* (2021) 12 Cal.5th 97, 128.)


Liu and Evans, JJ., are of the opinion the request for judicial notice should be granted and the petition for rehearing should be conditionally granted.

Kruger, J., is of the opinion the petition for rehearing should be conditionally granted.

(See Dissenting Statement by Liu, J., joined by Evans, J.)



_____/s/_____
*Chief Justice*

PEOPLE v. NADEY

S087560

Dissenting Statement by Justice Liu

Defendant Giles Albert Nadey, Jr. petitions for rehearing of this court's decision affirming the death judgment against him and requests that we take judicial notice of jury selection notes produced in *Lynch v. Davis* (N.D.Cal. No. 3:18-cv-00444) (*Lynch*), a capital habeas matter pending in federal court. The notes show that Alameda County Deputy District Attorney James Anderson, who also prosecuted Nadey's case, marked two prospective jurors with the letter "B" and wrote by hand in the top left margin, "NOTE FOR WHEELER." These notes, Nadey argues, further bolster his claim of racial discrimination in jury selection under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258.

This petition presents unusual circumstances, to say the least. Over the past five months, an investigation by the Alameda County District Attorney's Office in connection with a capital habeas proceeding in the United States District Court for the Northern District of California has revealed "strong evidence that, in prior decades, prosecutors from the office were engaged in a pattern of serious misconduct, automatically excluding Jewish and African American jurors in death penalty cases." (*Dykes v. Martel* (N.D.Cal. Apr. 22, 2024, No. 11-cv-04454) Order Lifting Confidentiality of Jury Selection Files, Dock. No. 164 (*Dykes* Order).) In the case of Ernest Dykes, who was tried in 1995, jury selection documents show that the same prosecutor, Anderson, made notes about prospective jurors that included the letters "FB" next to a Black female juror, the words

1

"Must go" next to a Black male juror described as "MB," and the underscoring of the word "Jewish" on another juror's questionnaire along with a handwritten note that said, "I liked him better than any other Jew.  But no way."  As a result of this prosecutorial misconduct, Dykes was resentenced in July and may be released next year.

Then, in August, the federal district court vacated the capital conviction of Curtis Lee Ervin, who was sentenced to death in 1991, after the Alameda County District Attorney conducted a thorough review of his trial and found "serious prosecutorial misconduct."  (Office of the Alameda County District Attorney, *DA Pamela Price Announces Death Penalty Conviction of Curtis Ervin Overturned Due to Prosecutorial Misconduct* (Aug. 7, 2024).)  According to the District Attorney, the same prosecutor, Anderson, had removed nine out of 11 Black prospective jurors, and "[t]he use of strikes could not be explained without reference to the race of the jurors or the defendant.  There was also evidence that Anderson used disparate questioning and investigation of Black and White prospective jurors and misrepresented information to the Court about one of the jurors."  (*Ibid.*)

Now we are presented with jury selection notes in the case of Franklin Lynch, who was also prosecuted by Anderson and sentenced to death in 1992.  Again, the notes appear to show a list of prospective jurors with the letter "B" next to two jurors and the handwritten words "NOTE FOR WHEELER" in the top left corner.  I would grant Nadey's request for judicial notice of this document.  The accompanying declaration of Lynch's federal habeas counsel states that he received the notes through discovery in the investigation occurring in federal court.  Court records are judicially noticeable pursuant to Evidence Code

section 452, subdivision (d).  And the District Attorney's official act of reviewing capital cases for discrimination in jury selection — including producing related jury selection documents such as the notes in *Lynch* — is also subject to judicial notice under Evidence Code section 452, subdivision (c).

Ervin was prosecuted by Anderson in 1991, Lynch in 1992, and Dykes in 1995.  The defendant here, Nadey, was prosecuted by Anderson in 1999, in a trial where Anderson struck five of six Black prospective jurors, all women, and no Black juror served on the guilt-phase jury.  (*People v. Nadey* (2024) 16 Cal.5th 102, 125 (*Nadey*).)  Under controlling precedent, the practices of the same prosecutorial office in other cases — indeed, the practices of the *same prosecutor* — are relevant in evaluating a claim of racial discrimination in jury selection.  (*Miller-El v. Dretke* (2005) 545 U.S. 231, 240–241 (*Miller-El*).)

In *Miller-El*, the high court found that the prosecution's peremptory strikes of ten Black venire members were racially motivated.  "[T]he appearance of discrimination [was] confirmed by widely known evidence of the general policy of the Dallas County District Attorney's Office to exclude black venire members from juries at the time Miller-El's jury was selected." (*Miller-El*, *supra*, 545 U.S. at p. 253.)  Relying on evidence developed in a prior proceeding, the high court observed that prosecutors in Miller-El's case employed tactics commonly associated with race-based jury selection, such as jury shuffling and disparate questioning.  (*Id.* at pp. 253–262.)  The high court said, "We know that for decades leading up to the time this case was tried prosecutors in the Dallas County office had followed a specific policy of systematically excluding blacks from juries . . . ."  (*Id.* at p. 263.)  Testimony from former Dallas assistant district attorneys and a jury selection manual presented as

evidence in an earlier proceeding showed that the office " 'had a systematic policy of excluding African-Americans from juries.' " (*Id.* at p. 264.) *Miller-El* concluded, "It is true, of course, that at some points the significance of Miller-El's evidence is open to judgment calls, but when this evidence on the issues raised is viewed cumulatively its direction is too powerful to conclude anything but discrimination." (*Id.* at p. 265.)

The Alameda County District Attorney's investigation into the county's death penalty cases is ongoing, and we do not know what more it will reveal. What we do know, from *Miller-El*, is that the practices of the District Attorney's office in other cases are relevant to evaluating Nadey's *Batson* claim. And we know that the federal court in the *Dykes* proceeding has already found "strong evidence that, in prior decades, prosecutors from the office were engaged in *a pattern* of serious misconduct, *automatically* excluding Jewish and African American jurors in death penalty cases." (*Dykes* Order, *supra*, italics added.)

Given these circumstances, I would conditionally grant Nadey's petition for rehearing in order to preserve our jurisdiction (Cal. Rules of Court, rule 8.532(b)(1)(B)) and then defer action on the matter and await any further results from the federal proceedings. The court says there is no point in waiting because any extra-record evidence submitted by the parties would not be properly cognizable on direct appeal. (*People v. Nadey*, S087560, Supreme Ct. Mins., Sept. 13, 2024, at pp. 2–3.) But, given what has already come to light that is properly subject to judicial notice, including the notes in *Lynch* and federal court findings in *Dykes* (*Nadey*, *supra*, 16 Cal.5th at pp. 204–205 (dis. opn. of Liu, J.)), I suggest we wait to see if the ongoing investigation yields more information that is relevant to Nadey's *Batson* claim. To the extent such information is

forthcoming, it would inform our consideration of " 'all relevant circumstances' " bearing on his claim (*Miller-El*, *supra*, 545 U.S. at p. 240) and is properly cognizable on direct appeal. Such information is properly cognizable on direct appeal. (*People v. Collie* (1981) 30 Cal.3d 43, 57, fn. 10 [scope of appellate review is limited "to matters either preserved in the record or properly subject to judicial notice"]; see, e.g., *People v. Hayes* (1990) 52 Cal.3d 577, 611, fn. 3 [giving consideration to exhibit appended to defendant's appellate brief that was "a proper subject of judicial notice and pertinent to an issue raised on appeal"]; *People v. Belcher* (1974) 11 Cal.3d 91, 94, fn. 2 [same].)

Today's order says "the proper forum" for presenting and developing evidence of racial discrimination from the ongoing investigation "is a petition for writ of habeas corpus." (*People v. Nadey*, S087560, Supreme Ct. Mins., Sept. 13, 2024, at p. 2.) But "[t]here are 363 death-sentenced people awaiting initial appointment of counsel for state habeas litigation, more than half of all people sentenced to death in California. Eighty-five people on death row have been waiting for appointment of habeas counsel for more than 20 years." (Com. on Revision of the Pen. Code, Death Penalty Report (Nov. 2021) p. 32, fns. omitted.) If the District Attorney's investigation results in additional judicial findings that bolster Nadey's *Batson* claim, why should Nadey be relegated to the years-long wait for appointment of habeas counsel instead of having his claim adjudicated properly on direct appeal? The latter approach would not "slow the litigation" of habeas corpus proceedings (*People v. Nadey*, S087560, Supreme Ct. Mins., Sept. 13, 2024, at p. 2) since Nadey is and has long been entitled to the appointment of habeas counsel. Moreover, even if counsel were appointed, that would merely initiate the lengthy process of

preparing and filing a petition, the Attorney General's return, and the traverse. By contrast, there is no reason to think that a rehearing of this direct appeal, if warranted by circumstances arising from the investigation, would require such a protracted period of time.

I do not know whether the inquiry in the federal proceeding will surface evidence of racial discrimination in Nadey's case or " 'a systematic policy of excluding African-Americans from [capital] juries' " in Alameda County during the relevant time period. (*Miller-El, supra,* 545 U.S. at p. 264.) But there is every sign that the District Attorney is proceeding expeditiously in her investigation, and any judicial findings will be subject to judicial notice in this court. I do not see why we need to close out Nadey's direct appeal right now and effectively kick the can down the long road to habeas. We should hit "pause" on this matter and allow a serious and relevant investigation to run its course. If the investigation does not yield any information that changes the court's mind about Nadey's *Batson* claim, the court can then say so and reinstate its previous decision affirming the judgment. But if the investigation yields additional findings that are judicially noticeable and supportive of the *Batson* claim, then a rehearing of this direct appeal *is* the proper forum for reconsideration of Nadey's claim.

**LIU, J.**

**I Concur:**

**EVANS, J.**